**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 14-20341-CIV-LENARD/WHITE**

GEORGE HORN,

       Plaintiff,

vs.

MICHAEL CREWS, Secretary of the Florida Department of Corrections, in his official capacity; WEXFORD HEALTH SOURCES, INC., a Florida corporation; MARLENE HERNANDEZ, M.D.; SEYED HOSSEINI, M.D.; DAVID REDDICK, M.D.;

       Defendant.
_____/

## SECOND AMENDED COMPLAINT

The Plaintiff files this second amended complaint pursuant to this Court's order [DE 73]. This is an action for deliberate indifference to serious medical needs pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

## PARTIES

1. George Horn is an inmate in the custody of the Florida Department of Corrections.

2. Michael Crews[1] is the Secretary of the Florida Department of Corrections. He is sued in his official capacity for injunctive relief only.

3. Wexford Health Sources, Inc. (Wexford) is a Florida corporation engaged in the business of providing employee-leasing services under contract for healthcare workers working

---

[1] Michael Crews has announced his resignation as Secretary of the Department of Corrections effective November 30, 2014. Plaintiff intends to have the name of the Secretary amended by interlineation at later date(s) as appropriate, as Michael Crews is named as a defendant in his official capacity only.

at the Florida Department of Corrections.

4. Marlene Hernandez, M.D. is an employee of Wexford and in her role as medical site director as South Florida Reception Center denied medical care to the Plaintiff in deliberate indifference to his serious medical needs.

5. Seyed Hosseini, M.D. was the chief health officer at South Florida Reception Center during portions of 2012 and 2013, and in his role as chief health officer knew about the Plaintiff's serious medical need for hip surgery and refused to address his need for treatment.

6. David Reddick, M.D. is an employee of Wexford and/or the Florida Department of Corrections appointed as the Regional Medical Director for all facilities serviced by Wexford in south Florida.

## JURISDICTION

7. This is an action for deprivation of civil rights under the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983. This court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

## GENERAL ALLEGATIONS

8. Several years prior to 2011, the Plaintiff received a right total hip replacement, which is done by implanting an artificial hip joint in place of the ball and socket joint between the pelvic bone and the femur.

9. In or about July 2011, the Plaintiff developed an infection and severe abscess related to a defect or failure of the artificial hip joint in his right hip.

10. While in custody in the Florida Department of Corrections, the Plaintiff was admitted to Kendall Regional Medical Center (Kendall) near Miami for treatment of the severe abscess and infection of his right upper thigh, for approximately six weeks in July and August of

2011.

11. The doctors that treated the Plaintiff at Kendall in summer 2011 recommended that the Plaintiff receive immediate surgery to remove the failed artificial hip joint from the Plaintiff's leg.

12. The Plaintiff was instead discharged to South Florida Reception Center near Doral, Florida.

13. The Florida Department of Corrections did not obtain surgery to remove the hip prosthetic from the Plaintiff's leg until February 2013, over nineteen months later, during which time the abscess persisted and the infection worsened.

14. Staff at South Florida Reception Center gave the Plaintiff oral antibiotics and drained the abscess numerous times for the next seven months but the infection persisted.

15. After seven months, the Plaintiff's condition deteriorated to the point that he was placed in the palliative care unit at South Florida Reception Center for about 12 months, where he received antibiotics intravenously but did not improve.

16. During the nineteen months after he was discharged from Kendall, the Plaintiff suffered extreme pain and muscle and nerve tissue damage from the worsening infection and believed that he was going to die.

17. The Plaintiff exhausted all grievance procedures available to him at that time and asked the chief health officer at South Florida Reception Center often about whether he would receive the surgery that had been recommended by physicians at Kendall.

18. The Chief Health Officer, Dr. Hosseini, indicated that the surgery had been delayed because the Florida Department of Corrections failed to reach an agreement with several hospitals for orthopedic surgery services for inmates due to disagreement over payment

procedures.

19. The Plaintiff was sent to Kendall in February 2013 in order to have a new PICC line installed. During his visit to Kendall, the physicians who recommended immediate removal of the hip joint spotted the Plaintiff and learned that nothing had been done to remove the Plaintiff's failed hip implant for nineteen months.

20. The treating physicians made arrangements with the Department of Corrections for the Plaintiff to undergo emergency surgery while at Kendall.

### The Incomplete Hip Surgery

21. The Plaintiff underwent the first of several planned hip surgeries on February 27, 2013, nineteen months after it was first recommended. The surgery was performed by Dr. Arturo Corces, a Miami area orthopedic surgeon. Dr. Corces removed the entire artificial hip joint, cleaned the infected areas in the Plaintiff's leg, and placed antibiotic beads to kill the remaining infection.

22. On March 13, 2013, the Plaintiff underwent a second surgery to remove the antibiotic beads and place a spacer in place of the joint and was returned to South Florida Reception Center for a two-month recovery.

23. Some time after March 13, 2013, the spacer dislocated and caused severe pain to the Plaintiff. The Plaintiff complained and requested medical care for the dislocated hip but received no attention from doctors at South Florida Reception Center.

24. On May 13, 2013, the Plaintiff underwent a third surgery to remove the spacer and again clean and debride the area of the hip joint.

25. In an operative report prepared by Arturo Corces on May 14, 2013, Dr. Corces noted:

> The patient [George Horn] is status post a previous total hip replacement that has failed secondary to infection. Unfortunately a large part of the reason as to the reason for the failure has to do with the fact that this patient prior to his having seamy[2] had over a year of drainage. The patient had undergone surgery now three months ago and was told to return to the office approximately one week after surgery. This patient however for reasons that I do not understand was never return [sic] to the office and in addition even when the patient was seen last week with. Material [sic] coming from the hip and the patient was told to immediately go to the hospital the managing company that is taken [sic] care of patient did not send the patient to the hospital. Was necessary for me to speak with the medical director who gave no reason as to why this patient was being treated in this fashion.

26. The Plaintiff was scheduled, on the recommendation of the orthopedic surgeon, for a fourth surgery in the series to place a new working hip implant in the Plaintiff to be conducted in October 2013. To date this surgery has not been performed and the Department of Corrections and its contractors Wexford and Corizon have refused to pay for this or any other surgery.

**No Further Treatment Provided**

27. In late 2013, all correctional healthcare services in the State of Florida were privatized, and Wexford Health Sources, Inc. took over healthcare management and utilization management duties for healthcare services in numerous prisons in south Florida, including South Florida Reception Center.

28. After the third hip surgery in May 2013, the Plaintiff has no hip joint and no spacer in his hip joint, causing his femur to float independently of his hip and rendering his leg immobile. Any movement of his thigh causes him intense pain.

29. To immobilize the Plaintiff's hip to prevent damage and pain while he had no hip joint, the orthopedic surgeon ordered that an abductor brace be obtained for the Plaintiff following the May 2013 surgery.

---

[2] probably intended to be "seen me"

30. Wexford refused to provide the ordered brace for the Plaintiff's hip.

31. As a result of having no abductor brace, the Plaintiff's leg moved involuntarily in relation to his body, causing him pain.

32. The Plaintiff was never sent for the fourth surgery in the series.

33. The Plaintiff filed grievances regarding the denial of the surgery recommended by a treating specialist, and these grievances were approved, meaning that the Department of Corrections reviewed the Plaintiff's complaint and promised to take action to remedy the situation.

34. Although the approval of the Plaintiff's grievance on September 3, 2013 stated that an orthopedic consult was approved by the utilization management structure and "was approved for surgery, pending the authorization code and eventually scheduling time," Wexford employees including Dr. Hosseini and Dr. Reddick thereafter sent the Plaintiff to another orthopedic surgeon for a second opinion for the sole purpose of cost containment, after having engaged in a utilization management proceed called Collegial Review, which is intended to control costs.

35. The new orthopedic surgeon, Dr. Jose Ponce De Leon, stated that he could not continue a course of surgery where another surgeon had already done work without an assisting surgeon.

36. Wexford treated this opinion as a statement that completing the Plaintiff's hip revision surgery was unnecessary or impossible, and denied hip surgery to the Plaintiff.

37. The Plaintiff has tried repeatedly to obtain the final stage of surgery to repair his leg, but the surgery has been repeatedly refused.

**Refusal to treat pain**

38. The Plaintiff had been administered liquid morphine by nurses to treat the severe pain caused by his hip infections and incomplete hip surgery for approximately two years prior to December 2013.

39. The new chief health officer (or medical site director) Marlene Hernandez removed the Plaintiff from morphine abruptly on or about January 7, 2014 and refused to provide any alternative pain treatment for the Plaintiff, claiming that morphine pills had been found as contraband at South Florida Reception Center in another inmate's possession and that she is "not a drug dealer."

## COUNT ONE – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
## (SEYED HOSSEINI)

40. Paragraphs 1 through 39 are incorporated by reference as if fully stated herein.

41. Seyed Hosseini, M.D. was the chief health officer at South Florida Reception Center during 2011, 2012 and 2013, and acted under color of state law in that capacity.

42. Hosseini knew through his review of George Horn's medical history, his personal interviews with George Horn, the UM Collegial Review process, and his familiarity with Horn's grievances that treating physicians at Kendall Regional Medical Center had identified a serious medical need for the Plaintiff to have a faulty right hip replacement removed.

43. Additionally, Hosseini knew through his review of George Horn's medical history, his personal interviews with George Horn, the UM Collegial Review process, and his familiarity with Horn's grievances that the Plaintiff had a serious medical need to have medical treatment for the dislocated spacer in the Plaintiff's right hip.

44. Additionally, Hosseini knew through his review of George Horn's medical history, his personal interviews with George Horn, the UM Collegial Review process, and his

familiarity with Horn's grievances that Dr. Arturo Corces, an orthopedic specialist, had identified a need for the final stage of the Plaintiff's hip revision surgery and had ordered that a hip abductor brace be provided to keep the Plaintiff's leg from moving and causing pain to the Plaintiff while his hip spacer had been removed.

45. Hosseini had the authority to ensure that the Plaintiff received medical treatment for these serious medical needs. Instead, Reddick, using the UM Collegial Review process put in place by Wexford Health Sources, Inc., his employer, for the purpose of cost containment, ordered that the surgery and the requested hip abductor brace be re-evaluated for the sole purpose of controlling costs.

46. Despite knowledge of the Plaintiff's serious medical needs and the authority to address them, Hosseini failed to take any action to address those needs, and after surgery was approved, caused the request for surgery to be re-presented to a different specialist, Dr. Ponce De Leon, who refused to perform the surgery himself, resulting in severe pain, nerve and muscle damage, long term inability to walk, and other physical injury.

47. All conditions precedent to this count have been satisfied.

WHEREFORE the Plaintiff respectfully requests that the Court grant the following relief:

a. Compensatory damages; and

b. Punitive damages.

## COUNT TWO – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS (MARLENE HERNANDEZ)

48. Paragraphs 1 through 39 are incorporated by reference as if fully stated herein.

49. Marlene Hernandez, M.D. was listed as Medical Site Director at South Florida Reception Center in 2013 and 2014 and acted under color of state law in that capacity.

50. Marlene Hernandez knew about George Horn's medical history regarding his

failed hip replacement, the surgeries to correct his hip, and the long course of pain management and antibiotic treatments because she had access to George Horn's medical chart and personally spoke with Horn in January 2014 to convince him not to have surgery.

51.     Hernandez knew that Dr. Arturo Corces, an orthopedic specialist, had identified a serious medical need for the final stage of the Plaintiff's hip revision surgery.

52.     On January 6, 2014, Dr. Hernandez visited Horn along with Dr. Reddick and questioned him about his "willingness to insist" on requesting a right hip surgery. She and Reddick discussed the pros and cons of additional surgery as well as the recommendations of the orthopedic surgeon. Hernandez noted that Mr. Horn "continues to insist on having surgery done on right hip despite our recommendations of not being suitable for surgery at this time."

53.     On or about January 7, 2014, soon after Mr. Horn had continued to insist on the surgery which Dr. Hernandez felt that Mr. Horn should not have, Dr. Hernandez discontinued Mr. Horn's morphine prescription and all other pain management treatments under the pre-text that another inmate had been caught trafficking in prescription pain medication.

54.     Additionally, Hernandez knew that the Plaintiff had a serious medical need for pain management for pain associated with incomplete hip surgery and infections.

55.     Hernandez had the authority to ensure that the Plaintiff received medical treatment for these serious medical needs.

56.     Despite knowledge of the Plaintiff's serious medical needs and the authority to address them, Hernandez willfully and maliciously failed to take any action to address those needs and intentionally denied medical treatment for severe pain to the Plaintiff, resulting in severe pain, nerve and muscle damage, severe withdrawal symptoms due to abrupt discontinuation of long-term morphine treatment, long term inability to walk, and other physical

injury.

57. All conditions precedent to this count have been satisfied.

WHEREFORE the Plaintiff respectfully requests that the Court grant the following relief:

a. Compensatory damages; and

b. Punitive damages.

### COUNT THREE – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS (DAVID REDDICK)

58. Paragraphs 1 through 39 are incorporated by reference as if fully stated herein.

59. David Reddick, M.D. was Regional Medical Director for Florida Department of Correction facilities serviced by Wexford during 2013 and 2014 and acted under color of state law in that capacity.

60. Reddick knew, through his review of George Horn's medical history, his personal interviews with George Horn, the UM Collegial Review process, and his familiarity with Horn's grievances that Dr. Arturo Corces, an orthopedic specialist, had identified a serious medical need for the final stage of the Plaintiff's hip revision surgery during Corces's previous treatment of the Plaintiff in May 2013.

61. Reddick knew, through his review of George Horn's medical history, his personal interviews with George Horn, the UM Collegial Review process, and his familiarity with Horn's grievances that Dr. Corces had ordered that a hip abductor brace be ordered after the May 2013 to reduce the mobility of George Horn's right leg and avoid severe pain associated with the movement of that leg.

62. Reddick knew that the Plaintiff had a serious medical need for pain management for his incomplete hip surgery and infections, and that Marlene Hernandez had unjustifiably denied any treatment for that need and cancelled the Plaintiff's long-standing morphine

prescription on or about January 7, 2014 despite knowledge of the need and/or in intentional retaliation for the Plaintiff's insistence on having the course of surgery recommended by Dr. Corces completed.

63.     Reddick had the authority to ensure that the Plaintiff received medical treatment for these serious medical needs by demanding that the previously ordered treatments be provided through the UM Collegial Review process which was used to deny hip surgery and an abductor brace to the Plaintiff; and in the overruling Marlene Hernandez in her decision to arbitrarily discontinue the Plaintiff's pain medication, as he was her direct supervisor and had independent knowledge of the Plaintiff's medical needs.

64.     Instead, Reddick, using the UM Collegial Review process put in place by Wexford Health Sources, Inc., his employer, for the purpose of cost containment, ordered that the surgery be re-evaluated for the sole purpose of controlling costs.

65.     Despite knowledge of the Plaintiff's serious medical needs and the authority to address them, Reddick willfully and maliciously failed to take any action to address those needs, resulting in severe pain, nerve and muscle damage, severe morphine withdrawal symptoms due to the abrupt discontinuation of long-term morphine treatment, long term inability to walk, and other physical injury.

66.     All conditions precedent to this count have been satisfied.

WHEREFORE the Plaintiff respectfully requests that the Court grant the following relief:

a.      Compensatory damages; and

b.      Punitive damages.

### COUNT FOUR - DELIBERATE INDIFFERENCE TO A CUSTOM OF DENYING MEDICAL CARE TO INMATES (WEXFORD)

67.     Paragraphs 1 through 39 are incorporated by reference as if fully stated herein.

68. Wexford Health Sources, Inc. is a for-profit corporation engaged in providing healthcare personnel and management services for Florida Department of Corrections facilities.

69. Wexford Health Sources, Inc. is responsible for all costs associated with the provision of healthcare services to inmates.

70. Wexford is compensated monthly for its services at a rate of $8.4242 per inmate, per day, times the average monthly number of inmates, times the number of days in the month, regardless of actual expenditures for necessarily medical care for inmates.

71. Wexford has a clear incentive to eliminate as many medical expenditures as it can, and to direct and/or incentivize its healthcare employees, including Hernandez and Reddick, to deny medical care whenever feasible, regardless of medical necessity, in order to maximize profits under its contract with the Florida Department of Corrections.

72. To cut costs and remain profitable on $8.4242/patient/day, Wexford engages in a comprehensive utilization management program.

73. According to Wexford's own website[3]: "Wexford Health's comprehensive utilization management (UM) program balances clinical needs with cost containment."

74. Wexford's UM program "[i]ncludes Collegial Review$^{SM}$, a proactive, physician-led process designed to reduce offsite care costs. Using video and/or telephone conference calls, site clinicians and Wexford Health Medical Directors and UM Nurses confer to review the patient's medical history and determine the most clinically appropriate and financially responsible approaches to inmate health care issues. Collegial Review$^{SM}$ results in fewer requested offsite referrals, a reduction in the percentage of referrals denied as inappropriate, and an overall decrease in specialty consults."

75. According to an August 2004 report by the Florida Legislature's Office of

---

[3] Located at http://www.wexfordhealth.com/Services/Utilization-Management

Program Policy Analysis and Government Accountability, during a previous contract term between Wexford and the State of Florida:

> A primary way Wexford contains costs is through tight utilization management. However, the quality of Wexford's health care has been problematic. The department's health care contract monitoring team and the Correctional Medical Authority review the appropriateness of the services provided to inmates. According to their reports, several of the facilities Wexford serves show repeated noncompliance. Inspections at Everglades, Dade, Broward, and Homestead correctional facilities and the South Florida Reception Center often have shown repeated deficiencies and a deteriorated level of service to the extent that the clinical quality of care required immediate corrective action by the contractor. Issues of concern include inadequate medical record keeping, insufficient staffing, and postponement of specialty clinic visits."

76. Wexford has a policy of directing and/or incentivizing its healthcare employees to deny non-emergency surgical care whenever feasible for cost containment, regardless of medical necessity, through the UM Collegial Review process.

77. Alternatively, Wexford employees have a custom of denying non-emergency surgical care whenever feasible, regardless of medical necessity, in order to maximize the profitability of their service site, and Wexford knows of and condones or encourages this custom in deliberate indifference to the serious medical needs of inmates.

78. The aforementioned policy or custom was the driving force behind Hernandez and Reddick's deliberate indifference to the serious medical needs of the Plaintiff as set forth in Counts Two and Three.

79. The aforementioned deliberate indifference resulted in severe pain, nerve and muscle damage, severe morphine withdrawal, long term inability to walk, and other physical injury.

80. All conditions precedent to this count have been satisfied.

WHEREFORE the Plaintiff respectfully requests that the Court grant the following relief:

a.  Compensatory damages; and

b.  Punitive damages.

### COUNT FIVE – DELIBERATE INDIFFERENCE TO A CUSTOM OF DENYING MEDICAL CARE TO INMATES (SECRETARY OF THE DEPARTMENT OF CORRECTIONS)

81.  Paragraphs 1 through 39 are incorporated by reference as if fully stated herein.

82.  The Secretary of the Florida Department of Corrections has a nondelegable duty to ensure the health and safety of inmates under the Department's custody, and to provide necessary medical services for inmates' serious medical needs.

83.  It is the policy of the Florida Department of Corrections to outsource its healthcare responsibilities to private contractors including Wexford in order to save money on inmate healthcare costs.

84.  The Florida Department of Corrections entered into a contract with Wexford knowing that in prior contract operations by Wexford at the DOC's south Florida prisons, Wexford's cost cutting measures and utilization management procedure resulted in unacceptable decline in the quality of medical care provided to prisoners and noncompliance with the DOC's obligations under the law to provide health care, as described more fully in paragraphs 70 – 75, supra, in deliberate indifference to the serious medical needs of the inmates under its custody.

85.  The Secretary of the Florida Department of Corrections knows of and condones or encourages the custom of Florida Department of Corrections healthcare employees and the employees of its contractors to deny necessary medical care for inmates' serious medical needs in order to reduce costs and/or increase profits, in deliberate indifference to the serious medical needs of inmates.

86. These customs and policies were the driving force behind Hernandez's and Reddick's deliberate indifference to the serious medical needs of the Plaintiff as set forth in Counts Two and Three, in that Drs. Hernandez and Reddick used the UM Collegial Review system put in place by Wexford for cost containment in order to deny the Plaintiff medical care for his serious medical needs as identified by Dr. Corces, and this utilization management system was the same system which the Department of Corrections knew led to insufficient medical care having been provided as referenced in the 2004 report of the Florida Legislature..

87. The aforementioned deliberate indifference resulted in severe pain, nerve and muscle damage, long term inability to walk, and other physical injury.

88. All conditions precedent to this count have been satisfied.

WHEREFORE the Plaintiff respectfully requests that the Court grant the following relief:

a. an injunction directing the Secretary of the Florida Department of Corrections to take all necessary action to ensure that the Plaintiff receives all surgery recommended for the Plaintiff's right hip revision, identified as a serious medical need by Dr. Arturo Corces, and all recommended necessary medical care to complete hip revision and recover from that surgery;

b. an injunction directing the Secretary of the Florida Department of Corrections to take all necessary action to ensure that the Plaintiff receives all necessary pain management services for pain associated with his hip revision and infections and other associated injuries;

c. an injunction directing the Secretary of the Florida Department of Corrections to reassume direct supervision and control of healthcare operations at its facilities from Wexford Health Sources, Inc.; and

d. all such other relief in equity as the court may deem just and proper.

Respectfully submitted,

/s/ Michael O. Colgan
Michael O. Colgan, Esquire
Florida Bar No.: 27625
**Katzman Garfinkel, PA**
300 North Maitland Avenue
Maitland, FL 32751
Phone: (407) 539-3900
Fax:  (407) 539-0211
mcolgan@likeyourlawyer.com
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY certify that on the 25th day of November, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing:

/s/ Michael O. Colgan
Michael O. Colgan, Esquire
Florida Bar No.: 27625
**Katzman Garfinkel, PA**
300 North Maitland Avenue
Maitland, FL 32751
Phone: (407) 539-3900
Fax:  (407) 539-0211
mcolgan@likeyourlawyer.com
Attorney for Plaintiff