**In the Matter of:**

GEORGE HORN

vs.

MICHAEL CREWS

---

**DAVID REDDICK, M.D.**

*July 15, 2015*

---



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                     1

```
 1

 2          IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
 3                    MIAMI DIVISION

 4         CASE NO. 14-20341-CIV-LENARD/WHITE

 5
    GEORGE HORN,
 6
                        Plaintiff,
 7   vs.

 8   MICHAEL CREWS, Secretary of
    the Florida Department of
 9   Corrections, in his official
    capacity; WEXFORD HEALTH
10   SOURCES, INC.,  a Florida
    corporation; MARLENE
11   HERNANDEZ, M.D.; SEYED
    HOSSEINI, M.D.; DAVID REDDICK,
12   M.D.;,

13                      Defendants.

14   _____/

15   DEPOSITION OF:   DAVID REDDICK, M.D.

16
    DATE:            JULY 15, 2015
17
    TIME:            10:07 A.M. - 1:35 P.M.
18
    TAKEN BY:        DEFENDANTS
19
    PLACE:           CHIMPOULIS, HUNTER & LYNN
20                    150 S. PINE ISLAND RD., #510
                      PLANTATION, FLORIDA 33324
21
    REPORTED BY:     EDWARD F. KIDD, RPR, LCR
22                    Notary Public, State of Florida

23   _____

24

25
```



```
 1   A P P E A R A N C E S :

 2

 3   Appearing on behalf of the Plaintiff:

 4

 5   MICHAEL COLGAN, ESQUIRE
     OF:      KATZMAN GARFINKEL
 6            300 North Maitland Avenue
              Maitland, Florida 32751
 7            (407)539-3900
              MCOLGAN@LIKEYOURLAWYER.COM
 8            (Appearing via telephone)

 9

10   Appearing on behalf of the Defendants:

11

12   M. KATHERINE HUNTER, ESQUIRE and
     ERIC D. FREEDMAN, ESQUIRE
13   OF:      CHIMPOULIS, HUNTER & LYNN, P.A.
              150 South Pine Island Road
14            Suite 510
              Plantation, Florida 33324
15            (954)463-0033
              EFREEDMAN@CHL-LAW.COM
16

17
     Appearing on behalf of the Defendant Department
18   of Corrections:

19

20   SHANE WEAVER, ESQUIRE
     OF:      OFFICES OF THE ATTORNEY GENERAL
21            1515 North Flagler Drive
              Suite 900
22            West Palm Beach, Florida 33401
              (561)837-5000
23            SHANE.WEAVER@MYFLORIDALEGAL.COM

24

25
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    3

```
 1                  I N D E X           Page

 2

 3   WITNESS: DAVID REDDICK, M.D.

 4   Direct Examination By Mr. Colgan ...........5
     Cross-Examination By Mr. Weaver ...........85
 5   Cross-Examination By Ms. Hunter ...........96
     Redirect Examination By Mr. Colgan .......109
 6   Recross-Examination By Ms. Hunter .......115
     Recross-Examination By Mr. Weaver .......116

 7

     CERTIFICATE OF OATH .....................118
 8
     CERTIFICATE OF REPORTER .................119
 9
     ERRATA PAGE .............................120
10
     READ AND SIGN LETTER ....................121
11

12                  E X H I B I T S

13

14   EXHIBIT         DESCRIPTION              PAGE

15

16   Exhibit A       Part A - Inmate Grievance    36

17   Plf Exh B       DOC Consultation             36
                     Request/Report
18
     Plf Exh C       7/7/13 Meltzer Memo to       36
19                   File/Attachment

20   Plf Exh D       Medical Records              36

21

22

23

24

25
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                          4

```
 1
 2                        *  *  *  *  *  *
 3               S T I P U L A T I O N S
 4           It is hereby stipulated and agreed by
 5    and between counsel present for the respective
 6    parties, and the deponent, that the reading and
 7    signing of the deposition are hereby reserved.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          5

```
 1            THE REPORTER:  Would you raise your
 2       right hand, please?
 3            THE WITNESS:  (Witness complies.)
 4            THE REPORTER:  Do you solemnly swear
 5       the testimony you're about to give will be
 6       the truth, the whole truth and nothing but
 7       the truth so help you God?
 8            THE WITNESS:  I do.
 9  THEREUPON,
10            DAVID REDDICK, M.D.,
11  called as a witness, and after having been first
12  duly sworn, testified as follows:
13            DIRECT EXAMINATION
14  BY MR. COLGAN:
15       Q.   Good morning.  My name is Mike Colgan.
16  I'm an attorney for the plaintiff, George Horn,
17  in a case that was filed where you have been
18  named as a defendant.  Have you ever had your
19  deposition taken before?
20       A.   Yes, I have.
21       Q.   Okay.  Just a couple ground rules that
22  may be specific to this deposition just to
23  refresh your memory.  Wait until I finish asking
24  the question before you answer so there is a
25  clear record once the answer is given.  The court
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    6

```
 1   reporter is trying to type down one thing at a

 2   time.  When both people are speaking it increases

 3   the problem understanding.  If you answer yes or

 4   no, please answer yes or no out loud.  Don't

 5   shake your head or say uh-huh or huh-uh.  If you

 6   need to take a break at any time, just ask me.

 7   The only thing I ask is that you answer any

 8   question that I ask that is pending before we

 9   take a break.

10            Please state your full name for the

11   record.

12       A.   David Jerome Reddick.

13       Q.   Dr. Reddick, where are you currently

14   employed?

15       A.   With Wexford Health Sources.

16       Q.   What's your position there?

17       A.   Now, I'm the chief health officer at

18   Homestead Correctional Institution.

19       Q.   Do you have a medical degree?

20       A.   Yes, I do.

21       Q.   Where did you go to medical school?

22       A.   Boston University School of Medicine.

23       Q.   When did you graduate from Boston

24   University?

25       A.   1985.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    7

1      Q.   Are you licensed to practice medicine

2  in the state of Florida?

3      A.   Yes, I am.

4      Q.   When were you licensed?

5      A.   1989.

6      Q.   Since 1989, we'll go through the

7  chronological list.  Where was the first place

8  that you worked as a physician after you were

9  licensed to practice medicine in the state of

10 Florida?

11     A.   I was with the Department of Health,

12 State of Florida.

13     Q.   Where was that?

14     A.   Pahokee and Belle Glade, Florida.

15     Q.   Okay.  What were your duties there?

16     A.   I was senior physician.

17     Q.   For how long?

18     A.   For two and a half years, and then I

19 went into private practice as part of National

20 Health Service Corp.

21     Q.   Where were you in private practice?

22     A.   In Pahokee, in Belle Glade, the same

23 town.

24     Q.   How long were you in private practice

25 there?



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                   8

```
 1        A.   Through 1993 or '4.

 2        Q.   All right.  After 1993 or '4, after you

 3   finished that practice, where did you work?

 4        A.   I was guest lecturer for a number of

 5   years with Eastern Virginia Medical School in

 6   Norfolk, Virginia.

 7        Q.   How long were you there?

 8        A.   Through 2003.

 9        Q.   All right.  After 2003 where did you

10   work?

11        A.   With the Florida Department of

12   Corrections.

13        Q.   All right.  Where were you first --

14        A.   First I was at.

15             MS. HUNTER:  Wait.

16             THE WITNESS:  Sorry repeat that, sir.

17   BY MR. COLGAN:

18        Q.   Where were you first stationed the with

19   Department of Corrections?

20        A.   Lowell Correctional Institution in

21   Ocala, Florida.

22        Q.   What years were you there?

23        A.   From 2003 until 2007.

24        Q.   What was your title or your position at

25   Lowell Corrections Institution?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                 9

```
 1      A.   I had two.  I was senior physician and
 2  chief health officer.
 3      Q.   All right.  After that where did you
 4  work?
 5      A.   Broward Correctional Institution in
 6  Region IV with the Florida Department of
 7  Corrections.
 8      Q.   All right.  What was your position
 9  there?
10      A.   I was a regional medical director for
11  Region IV.
12      Q.   All right.  What is the regional
13  medical director?
14      A.   Repeat, please.
15      Q.   What are the regional medical
16  director's duties?
17      A.   To oversee the medical department for
18  the specific region.
19      Q.   Okay.  When you say oversee the medical
20  department, what specific day-to-day tasks would
21  you perform?
22          MS. HUNTER:  Form.
23  BY MR. COLGAN:
24      Q.   You can answer as best you can, please.
25      A.   Administrative duties, approving drug
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    10

```
 1  exception requests, making sure that the general

 2  operations are in effect, not direct oversight of

 3  any particular institution.

 4      Q.   Okay.  When you say drug exception

 5  requests, what does that refer to?

 6      A.   These are medications that are

 7  nonformulary that need approval before they can

 8  be given.

 9      Q.   Other than doing drug exception

10  requests, what other specific administrative

11  duties did you have to do as medical directors?

12      A.   There were reviews of specific medical

13  institutions on a periodic basis.

14      Q.   Did you respond to any grievances

15  during that time?

16          MS. HUNTER:  Form.

17          THE WITNESS:  Not really, on a

18      consistent basis.  There may have been a

19      couple, but not on a regular basis.

20  BY MR. COLGAN:

21      Q.   As a regional medical director, were

22  you involved in any utilization management

23  decision making?

24          MS. HUNTER:  Are you talking about when

25      he worked for Broward Correctional?
```



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 12 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    11

```
 1          MR. COLGAN:  Right now I'm talking

 2      about when he was a facility employee.

 3          MS. HUNTER:  Let me object to the form

 4      as being vague.

 5  BY MR. COLGAN:

 6      Q.   Okay.  Let me restate the question.

 7  While you were a regional medical director for

 8  Region IV, did you participate in any utilization

 9  management decision making?

10      A.   No.

11      Q.   Do you know what utilization management

12  is?

13      A.   Yes.

14      Q.   How would you define it?

15          MS. HUNTER:  Form.

16          THE WITNESS:  I --

17          MS. HUNTER:  You can answer, if you

18      know.

19          THE WITNESS:  Utilization management is

20      similar to an HMO where they make medical

21      decisions based on patient need.

22  BY MR. COLGAN:

23      Q.   Are decisions made in part based on the

24  cost of the care that is being rendered?

25      A.   The cost of the care is involved in it,
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      12

 1  but the patients receive the care they need.

 2  Cost not being a factor.

 3       Q.   Okay.  How long were you a regional

 4  medical director of Region IV?

 5       A.   From 2007 until 2013.

 6       Q.   Okay.  After 2013 where did you work?

 7       A.   For Wexford Health Sources.

 8       Q.   Okay.  What was your position with

 9  Wexford Health Sources?

10       A.   I was their regional medical director

11  for the same region.

12       Q.   Is that the same position you're in

13  now?

14       A.   Yes.  No, not now.

15       Q.   I'm sorry.  What position are you in

16  now?

17       A.   I'm now the chief health officer at

18  Homestead Correctional Institution.

19       Q.   Which correctional institution?

20       A.   Homestead.

21       Q.   Homestead.  When did you begin that

22  position?

23       A.   January of this year.

24       Q.   Are you familiar with a process called

25  UM collegial (inaudible)?



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    13

1            MR. WEAVER:  What's the next word?

2            MS. HUNTER:  Collegial, UM collegial

3      call, is that correct?

4            MR. COLGAN:  Yes.

5            MS. HUNTER:  It's a little muffled

6      sometimes, so we may have to interrupt you

7      and clarify.

8   BY MR. COLGAN:

9      **Q.    Okay.  I appreciate that.  I got on the**

10   **handset to try to be clear.**

11      A.    I'm familiar with the process.

12      **Q.    Describe the process for me.**

13      A.    Collegial process is a system where

14   institutions, institutional physicians will

15   present to utilization management cases they have

16   for consultants.  These cases are discussed in

17   conjunction with the consultant and decisions

18   made on whether to approve the consult or

19   determine an alternative treatment plan.

20      **Q.    What criteria are institutional**

21   **physicians provided with as to whether they need**

22   **to refer someone to UM collegial call?**

23      A.    In terms of -- I'm not understanding

24   your question.

25      **Q.    In other words, let's say that I'm, I'm**



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    14

```
 1   the chief health officer at a given institution

 2   and I have a patient that requires treatment.

 3   How do I decide whether I need to contact you on

 4   a collegial call or not?

 5        A.    If you felt the patient needed to see

 6   an outside provider or consultant, you would

 7   complete a form for that, and then it would be

 8   submitted to the UM committee.

 9        Q.    All right.  And what form would the

10   physician use for that?

11        A.    It's a blue consultant form.  I'm not

12   sure of the number.  Oh, yes, I am.  It would be

13   DC4702.

14        Q.    And who is on the UM collegial call

15   committee?

16             MS. HUNTER:  Form.

17             THE WITNESS:  It varies.

18   BY MS. HUNTER:

19        Q.    Is the regional -- is the medical

20   executive director or regional medical director

21   on that committee?

22        A.    Occasionally.

23        Q.    But not always?

24        A.    No, not always.

25        Q.    Is there any policy or criteria for
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    15

```
 1  determining who is going to be on the committee

 2  at any given time?

 3      A.   Not that I'm privy to.

 4      Q.   Is there a typical person who

 5  determines who is going to be on a committee at

 6  any given time?

 7      A.   Not that I'm privy to.

 8      Q.   Let me, if the institution physician

 9  has put in a request for approval of a consult,

10  who determines who's going to be on the committee

11  for approving that consult?

12      A.   That's a Wexford decision above my pay

13  grade, sir.

14      Q.   You don't know what person at Wexford

15  makes that decision?

16      A.   Who makes the decision in terms of

17  whose on the committee?

18      Q.   Right.

19      A.   No.

20      Q.   Have you been on the committee before?

21      A.   As a substitute, yes.

22      Q.   Okay.  When you were on the committee

23  who informed you that you were going to be on the

24  committee?

25      A.   The UM director.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    16

```
 1       Q.   And who is the UM director?

 2       A.   We've had two.  Dr. Fisher and

 3   Dr. Smith.

 4       Q.   When was Dr. Fisher in that position?

 5       A.   Say that again, please?

 6       Q.   When was Dr. Fisher in that position?

 7       A.   From, I guess from the inception of the

 8   contract in March to, you know, I'm guessing,

 9   maybe --

10            MS. HUNTER:  Okay.  I don't want you to

11       guess.

12            THE WITNESS:  Okay.

13            MS. HUNTER:  Tell him what you know.

14   BY MR. COLGAN:

15       Q.   Give me your best estimate.

16            MS. HUNTER:  I object to the form at

17       this point.  You can answer.

18            THE WITNESS:  I would say June or July.

19   BY MR. COLGAN:

20       Q.   June or July of which year?

21       A.   Of 2015, and then Dr. Smith took over

22   from that point on.  No, '13.

23            MS. HUNTER:  Stop.  Stop.

24   BY MR. COLGAN:

25       Q.   Was that 2015 you were referred to?
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    17

```
 1        A.   It was '15, I'm sorry.  Not '13.

 2             MS. HUNTER:  Let's correct it.  He

 3        misspoke.

 4   BY MR. COLGAN:

 5        Q.   That's fine, you know, I don't want to

 6   have any misunderstandings.  Dr. Fisher,

 7   approximately how many months was Dr. Fisher in

 8   the position of UM director?

 9             MS. HUNTER:  Object to the form.

10             THE WITNESS:  Approximately four or

11        five.

12   BY MR. COLGAN:

13        Q.   Four or five months?

14        A.   Yes, sir.

15        Q.   Okay.  And then after that what was the

16   name his successor?

17        A.   Dr. Smith.

18        Q.   I'm sorry.  What did you say?

19        A.   Dr. Smith.

20        Q.   Dr. Smith.  Do you know Dr. Fisher's

21   first name?

22        A.   Neil.

23        Q.   Neil?

24        A.   N-E-I-L, yes.

25        Q.   How about Dr. Smith?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      18

1      A.    Robert.

2      Q.    **During the time you were a medical**

3   **director before you were chief health officer at**

4   **Homestead were you involved in the day-to-day**

5   **care of the inmates?**

6      A.    Only as a gynecologist with the female

7   institution in Homestead.

8      Q.    **Are you familiar with an inmate named**

9   **George Horn?**

10     A.    Yes.

11     Q.    **Okay.  Have you ever met him?**

12     A.    Yes.

13     Q.    **When did you first meet him?**

14     A.    I can't really recall the exact time.

15     Q.    **Was it essentially (inaudible)?**

16     A.    Say again, please.

17     Q.    **Was it since the time this lawsuit was**

18  **filed?**

19     A.    It was prior to the lawsuit.

20     Q.    **Do you recall the context of your first**

21  **meeting with him?**

22     A.    No.  The first specific meeting was in

23  an infirmary situation.

24     Q.    **Okay.  When was he in the infirmary?**

25           MS. HUNTER:  What was the question?



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                              19

 1      I'm sorry.  We didn't hear you.

 2  BY MR. COLGAN:

 3      **Q.   Where was the infirmary where he was?**

 4      A.   It was located in South Florida

 5  Reception Center.

 6      **Q.   Okay.  Were you visiting that infirmary**

 7  **just as part of making your rounds or were you**

 8  **visiting him for a specific reason?**

 9      A.   No, just part of making my rounds when

10  I first met him.  And correct that, it was F

11  dorm.  Not the infirmary.

12      **Q.   When you first met him did you have any**

13  **conversations with him?**

14      A.   He stopped me in the hall.  There is a

15  common room and he stopped me in the common room.

16      **Q.   Do you remember what year this was?**

17      A.   Most likely 2013.

18      **Q.   What did he talk to you about?**

19      A.   His medication and his hip.

20      **Q.   What did he tell you about his hip?**

21      A.   That he wanted it replaced.

22      **Q.   Was that the first that you had heard**

23  **of his request for hip surgery?**

24      A.   No.

25      **Q.   When was the first time that you heard**



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                         20

```
 1   about his request for hip surgery?

 2       A.   I can't give you a specific date.  I'd

 3   have to refer to the medical record.

 4       Q.   Do you have the medical records with

 5   you?

 6            MS. HUNTER:  Yes.

 7   BY MR. COLGAN:

 8       Q.   Can you look through those and find out

 9   what the first date was?

10            MS. HUNTER:  All right.  We'll look.

11            MR. COLGAN:  Okay.  Thank you.

12            MS. HUNTER:  It's going to take a few

13       minutes.  It's pretty voluminous.

14            MR. COLGAN:  That's fine.

15            MS. HUNTER:  I think they're in order.

16       I'm hoping they're in date order.  What are

17       you looking for?

18            MR. WEAVER:  Can we go off the record

19       while he looks?

20            MS. HUNTER:  Yes, we're off the record.

21            (Discussion off the record.)

22            MS. HUNTER:  Okay, now we're back on

23       the record.

24   BY MR. COLGAN:

25       Q.   Okay, were you able to find an answer
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    21

```
 1  to the question?

 2          MS. HUNTER:  Let me just object to the

 3      form of the question.  But we were able to

 4      find some records.  So I'll let him speak to

 5      that.

 6          THE WITNESS:  I have the chart of

 7      his -- it's dated 4/22/13.  The consult was

 8      done on 1/9/14.

 9  BY MR. COLGAN:

10      Q.   What was the nature of the consult?

11      A.   Surgery for a PICC line.

12      Q.   I'm sorry.  What?

13      A.   Surgery for a PICC line.

14      Q.   What is a PICC line?

15      A.   It's a long-term catheter for IV

16  antibiotics.

17      Q.   Okay.  What was the reason for the PICC

18  line to be installed?

19      A.   According to the record it was for a

20  hip infection.

21      Q.   Okay.  How were you involved in this

22  contact?

23          MS. HUNTER:  Form.  Go ahead.

24          THE WITNESS:  Just acknowledging the

25      consult was done.
```



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 23 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    22

 1  BY MR. COLGAN:

 **2**     **Q.   Okay.  What was the**

 **3**  **consult (inaudible)?**

 4     A.   Say again?

 **5**     **Q.   What was the report that the consult**

 **6**  **was done?**

 7     A.   That the PICC line was inserted?

 **8**     **Q.   Okay.  I'm going to go through the**

 **9**  **allegations of the second amended complaint.  Do**

**10**  **you have that handy?**

11          MS. HUNTER:  No.

12  BY MR. COLGAN:

**13**     **Q.   I'll just read it out --**

14          MS. HUNTER:  Wait a minute.

15          MR. COLGAN:  And you can object.

16          MS. HUNTER:  Wait a minute.  I can pull

17     it out if you will give me a second.  You

18     know, he wants the second amended complaint.

19          (Discussion off the record.)

20          MS. HUNTER:  Go ahead.  You can go

21     ahead.

22  BY MR. COLGAN:

**23**     **Q.   Okay.  I'm going to go through these**

**24**  **allegations that are specific to you.  First,**

**25**  **paragraph number six?**



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    23

```
 1              MS. HUNTER:  Number six?

 2              MR. COLGAN:  Yes.

 3              MS. HUNTER:  Okay.

 4   BY MR. COLGAN:

 5       Q.    Do you have any reason to dispute that?

 6   I understand that you changed job positions

 7   recently.  Do you have any reason to dispute

 8   that?

 9       A.    No.

10       Q.    All right.  Turning to paragraph number

11   eight.  Do you (inaudible) the content of the

12   paragraph?

13              MS. HUNTER:  Object to the form, and

14        the way that you're handling the questioning

15        is absolutely inappropriate to be going

16        through a complaint, and having a witness

17        comment on your allegations and your legal

18        conclusions is all objectionable.  I'm going

19        to move to strike any of the questions at

20        this point in time.  You can ask him factual

21        questions but you can't have him go through

22        a complaint that you have drafted for your

23        client which is a legal document and make a

24        comment about it.  You can certainly ask him

25        factual questions pertaining to your
```

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          24

```
 1    position.

 2        MR. COLGAN:  Do you have any legal

 3    authority for that position.

 4        MS. HUNTER:  It's just pure common

 5    sense.  A complaint is not evidence at

 6    trial.  You can't show it to a jury,

 7    therefore, you can't ask a witness to talk

 8    about it.

 9        MR. COLGAN:  Let's go off the record

10    for a minute.

11        MS. HUNTER:  No, I'm not going off.

12        MR. COLGAN:  There is certainly nothing

13    wrong with asking about interrogatories.

14    All I'm asking is asking your client whether

15    he has knowledge about the allegations?

16        MS. HUNTER:  No, you're not.

17        MR. COLGAN:  If he has any statements

18    that he denies these allegations that are

19    made, I want to know what circumstances he

20    will use to deny these allegations.  I think

21    I'm entitled to that.

22        MS. HUNTER:  You are, but here's how

23    you do it.  You ask him specific questions

24    about the factual basis.  So, for example,

25    you ask him Dr. Reddick, were you an
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    25

```
 1    employee of Wexford, and, by the way, and/or

 2    the Florida Department of Corrections, you

 3    can't -- that statement is actually

 4    overbroad and vague.  You ask him specific

 5    questions.  You ask him about, I mean,

 6    number eight.  Several years prior to 2011.

 7    You asked him the dates he worked there, the

 8    dates he was involved.  You don't go through

 9    the complaint.

10        MR. COLGAN:  I don't know.  I mean, I

11    appreciate your lesson on how to practice

12    law.  This is my deposition.

13        MS. HUNTER:  And I'm going to object --

14        MR. COLGAN:  As far as I know, there is

15    no privilege regarding these questions.  And

16    if you insist on stopping this deposition

17    and moving to strike and telling your client

18    not to answer questions, then, you know, I

19    don't know if I'm going to have to go to a

20    judge, but I would like to ask these

21    questions.  If your only objection is that

22    I'm asking with reference to specific

23    paragraph numbers, is that your only

24    objection?

25        MS. HUNTER:  My objection is to the
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                26

```
1    form.  It's inappropriate to refer to a

2    legal pleading that is not going to be

3    evidence and, by the way, I have never

4    instructed Dr. Reddick that he can't answer

5    the question.  So I don't know what you're

6    listening to.  I'm objecting to the form of

7    the question and I'm entitled to move to

8    strike it.  So when and if we try this case

9    and you try to read his answers of this to

10   the jury, I can bring it before the judge.

11   I haven't stopped you from doing anything.

12   I'm just stating the basis of my legal

13   objection.  You can keep asking all the

14   questions you want.  Whether or not they are

15   admissible at trial is a different story.

16   So go right ahead.

17        MR. COLGAN:  Okay.  We'll go back on

18   the record.

19        MS. HUNTER:  We were on the record, by

20   the way.  I'm not going to go off the record

21   anymore.

22        MR. COLGAN:  That's fine.

23        MS. HUNTER:  Go ahead.  Your next

24   question is what?

25        MR. COLGAN:  My next question is with
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                    27

```
 1      regard to paragraph eight.  You can have a

 2      general objection if you would like rather

 3      than go through each paragraph, or you can

 4      do whatever you want.  I'm just, you know,

 5      in the essence of time --

 6           MS. HUNTER:  Objection to form.  It's

 7      broad, vague, calls for speculation.  Go

 8      ahead.  What's your question about number

 9      eight?

10           MR. COLGAN:  I believe that's a

11      speaking objection.

12           MS. HUNTER:  It's not a speaking

13      objection.

14           MR. COLGAN:  You're not allowed

15      speaking objections.

16           MS. HUNTER:  I'm allowed to state the

17      basis of my legal objection.  Go ahead.

18      What's your question, sir?

19 BY MR. COLGAN:

20      Q.  My question is several years prior to

21 2011 the plaintiff received a total hip

22 replacement, which was done by implanting an

23 artificial hip joint in place of the ball and

24 socket joint between the pelvis bone and the

25 femur, correct?  Do you contest that allegation?
```



Orange Legal
800-275-7991

Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 29 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    28

1          MS. HUNTER:  Lack of predicate.

2    BY MR. COLGAN:

3          **Q.    Do you contest that allegation?**

4          A.    Can you define several years prior to

5    2011?

6          **Q.    How do you understand several years**

7    **prior to 2011?**

8          MS. HUNTER:  Objection; argumentative.

9          MR. WEAVER:  He's just reading the

10         allegations.

11         MS. HUNTER:  If you can, you can.  If

12         you can't, do the best you can.

13         THE WITNESS:  I'm aware he had a hip

14         replacement.

15   BY MR. COLGAN:

16         **Q.    Is that an accurate description of a**

17   **total hip replacement?**

18         MS. HUNTER:  Form, predicate.  He is

19         not a hip surgeon.  He didn't perform the

20         surgery.  Predicate.

21         MR. COLGAN:  Is he testifying or are

22         you?

23         THE REPORTER:  Is he...

24         MS. HUNTER:  He's being a snark.  I'm

25         going to tell you I'm going to continue to



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    29

1    state the basis of my objections, which is a

2    legal basis which is lack of predicate.  If

3    you want to fix that, that's great.  And I'm

4    sure he'll be able to answer it.

5         MR. COLGAN:  You know the rules of

6    depositions as well as I do.  If you have an

7    objection to the form, you can state object

8    to the form.  If I ask for the basis to

9    clarify, you can go ahead and tell me.

10   You're not going to sit here and say lack of

11   predicate, he doesn't know this, he doesn't

12   know that.  Those are speaking objections

13   and that is basically instructing him how to

14   answer the questions.

15        MS. HUNTER:  No, he's not.  He's not

16   following my direction because he's answered

17   every question you asked.  Object to the

18   form.  Predicate.  Go ahead, Dr. Reddick.

19        THE WITNESS:  What's your question,

20   sir.

21        MR. COLGAN:  Can you read the question

22   back, please?

23        (The requested proceedings were read

24   back by the court reporter.)

25        THE WITNESS:  I'm not an orthopedic



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    30

```
 1      surgeon.
 2  BY MR. COLGAN:
 3      Q.    Okay.
 4      A.    I can't really answer that question to
 5  your satisfaction.
 6      Q.    All right.  Paragraph nine, in or about
 7  July 2011 the plaintiff developed an infection
 8  and severe abscess related to a defect or failure
 9  of the artificial hip joint in his right hip.  Do
10  you have any knowledge about this?
11      A.    Of an infection being present at some
12  time.  I'm not sure of the date.
13      Q.    How did you learn of the infection?
14      A.    From reviewing the medical record.
15      Q.    The medical record says (inaudible) the
16  infection -- (inaudible).
17      A.    Say again, please.
18      Q.    Did the medical record reveal that he
19  had an infection and severe abscess?
20      A.    It actually said he had a seroma at
21  first and then --
22      Q.    What is a seroma?
23      A.    It's a fluid filled cyst of serous
24  material, or serosanguinous material, which is
25  serous material mixed with blood.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                  31

```
 1        Q.   Is that different from an infection?

 2        A.   Yes, it is.

 3        Q.   How is it different from an infection?

 4        A.   An infection is an infection.

 5        Q.   Do any of the medical records indicate

 6   that he had an infection in his right hip?

 7        A.   Yes.

 8        Q.   So in addition to some records which

 9   say that he had a seroma there are also records

10   which indicate he had an infection in his right

11   hip, is that correct?

12        A.   That is correct.

13        Q.   Okay.  Do the medical records indicate

14   whether the infection was due to any failure in

15   the artificial hip joint in his right hip?

16             MS. HUNTER:  Form.

17             THE WITNESS:  That's difficult to say

18        definitively whether the prosthesis caused

19        the infection or not.  There was an

20        infection there.

21   BY MR. COLGAN:

22        Q.   Was there any examination done to

23   determine whether that was the source of the

24   infection?

25             MS. HUNTER:  Form.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    32

```
 1            THE WITNESS:  There were cultures done

 2      on the wound, but, again, that won't tell

 3      you whether that was the prosthesis or not.

 4   BY MR. COLGAN:

 5        Q.    Do you know whether there was a

 6   defective failure in the artificial hip joint?

 7        A.    Please explain a little further

 8   defective failure.

 9        Q.    Do you know what a defective failure

10   is?

11            MS. HUNTER:  Form; argumentative.

12            THE WITNESS:  Obviously, I do.

13   BY MR. COLGAN:

14        Q.    Obviously you do, you said?

15        A.    I said I do know what a defect is, yes.

16        Q.    Okay.  Do you know whether there was a

17   determination there was a defect in the

18   artificial hip joint?

19            MS. HUNTER:  Form.

20            THE WITNESS:  The defect may not have

21      been in the joint but in his actual hip so

22      that's a hard question to answer.

23   BY MR. COLGAN:

24        Q.    Do you know whether the plaintiff was

25   admitted to Kendall Regional Medical Center in
```



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 34 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      33

1  2011?

2           MS. HUNTER:  When?

3  BY MR. COLGAN:

4       Q.  2011?

5       A.  I believe so.

6       Q.  Do you know the purpose for that

7  admission?

8           MS. HUNTER:  Form.

9           MR. COLGAN:  I'm sorry.  What's wrong

10      with the form, Katherine?

11          MS. HUNTER:  It's vague and ambiguous.

12      He was admitted -- it's vague and ambiguous

13      as to time.

14  BY MR. COLGAN:

15      Q.  Okay.  Dr. Reddick, you stated that you

16  know that he was admitted to Kendall Regional

17  Medical Center in 2011, correct?

18      A.  That's correct.

19      Q.  Do you know whether he was admitted

20  more than once?

21      A.  Yes, he was.

22      Q.  Okay.  How many times was he admitted?

23      A.  I'd have to refer to the medical

24  record.

25      Q.  So the first time that he was admitted,



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    34

```
 1   do you know the purpose of his admission?

 2       A.   No, not on a firsthand basis, no.

 3       Q.   Do you know whether the plaintiff was

 4   ever admitted for an abscess in his right upper

 5   thigh in 2011?

 6           MS. HUNTER:  All right, you know what,

 7       if you're going to ask him about medical

 8       care, do you mind if I have him look at the

 9       medical records so that he gives you

10       accurate information?

11           MR. COLGAN:  Sure, absolutely.  If you

12       need to take a look at the medical records,

13       please, by all means.

14           MR. FREEDMAN:  2011?

15           MS. HUNTER:  Yes, we need to pull all

16       that.  You are asking him to work off memory

17       and I don't know if that's what you really

18       want.

19           MR. COLGAN:  Okay.

20           (Recess taken.)

21           MR. FREEDMAN:  Here is 2011 and here's

22       2012.

23           MS. HUNTER:  Do we have records from

24       Kendall?

25           MR. FREEDMAN:  They're combined.  There
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                              35

1    may be some separate with Kendall, but...

2        MS. HUNTER:  I thought we had separate

3    records.

4        THE REPORTER:  Do you want this on the

5    record?

6        MS. HUNTER:  No.

7        (Discussion off the record.)

8        MR. COLGAN:  Could the reporter please

9    read back my last question.

10       (The requested proceedings were read

11   back by the court reporter.)

12       MS. HUNTER:  Did he answer that

13   question?

14       THE REPORTER:  No.

15       THE WITNESS:  I would have to consult

16   the medical record.

17       MR. COLGAN:  That's fine.  We can take

18   a minute.

19       (Recess taken.)

20       MS. HUNTER:  We have the Kendall

21   Regional medical records.  I'm going to have

22   Dr. Reddick look through what we have here.

23       MR. COLGAN:  Okay.

24       MS. HUNTER:  Do you want to attach

25   these as an exhibit since you're having him



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                36

```
 1      refer to it?
 2          MR. COLGAN:  Yes, we can attach this as
 3      Exhibit B.  We already have A through C
 4      marked?
 5          THE REPORTER:  No.
 6          (Discussion off the record.)
 7          (Exhibit A was marked for identification
 8      purposes only.)
 9          (Exhibit B was marked for identification
10      purposes only.)
11          (Exhibit C was marked for identification
12      purposes only.)
13          (Exhibit D was marked for identification
14      purposes only.)
15          MR. COLGAN:  Okay.  Can you read back
16      my last question?
17          THE REPORTER:  The same question that
18      was previously read?
19          MR. COLGAN:  Yes.
20          (The requested proceedings were read
21      back by the court reporter.)
22          MS. HUNTER:  Go ahead.
23          THE WITNESS:  Yes.
24  BY MR. COLGAN:
25      Q.   What was the date of that?
```

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                37

```
 1      A.   It appears to be

 2  9/20/11, September 20th, 2011.

 3      Q.   What doctors did he see?

 4          MS. HUNTER:  I'm going to object to the

 5      form.  Go through the records and list all

 6      the doctors he saw that you can tell from

 7      the records, sir.  That's what he's asked

 8      you to do.  So you go through these records

 9      and find the admission from 2011 and list

10      all the doctors that he saw that you can

11      identify in these records.  Okay.

12          You only want to know about

13      September 2011, correct?

14          MR. COLGAN:  Yes.

15          THE WITNESS:  There is a Dr. Jose

16      Barros, and he was admitted 9/15/11.

17          MS. HUNTER:  Wait a minute.  We're

18      going through the rest of the records.

19      We'll give you other names.  Just one

20      second, please.  That's a different month.

21          MR. WEAVER:  These are all doctors he

22      saw in 9/2011?

23          MS. HUNTER:  The question as stands is

24      what doctors did he see during this

25      September 2011 admission.  And that's what
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                           38

```
 1        we're trying to review the records to

 2        determine.

 3             THE WITNESS:  There is another

 4        physician named Walter Ramirez.  And there

 5        is a physician, Juan Telleria,

 6        T-E-L-L-E-R-I-A.  There is a Robert

 7        Calderon, C-A-L-D-E-R-O-N.  There is a

 8        George Borrero, B-O-R-R-E-R-O.  From the

 9        record on hand, that seems to be it.

10             (Discussion off the record.)

11   BY MR. COLGAN:

12        Q.   Is that the last visit that he, that

13   Mr. Horn made to Kendall Regional Medical Center

14   in 2011?

15             MS. HUNTER:  Form.  The last visit in

16        2011.

17             THE WITNESS:  I don't know offhand.

18   BY MR. COLGAN:

19        Q.   Do you see any in the records?

20             MS. HUNTER:  Okay.  Let us look through

21        again.  Let me just state on the record, I

22        do not believe the records that we have from

23        Kendall Regional Medical Center, they seem

24        to be incomplete to me.  They are the 120

25        pages we received.  We'll do the best we can
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        39

```
 1        with what is in front of us here.

 2             MR. COLGAN:  Okay.

 3             MS. HUNTER:  In looking at them, they

 4        don't seem to be complete.

 5             I'm sorry.  Could you read back the

 6        last question?

 7             THE REPORTER:  Sure.

 8             (The requested proceedings were read

 9        back by the court reporter.)

10             THE WITNESS:  There is an examination

11        from 11/15/11.

12   BY MR. COLGAN:

13        Q.   What was the examination of?

14        A.   It says CT femur with contrast, right

15   side.

16             MS. HUNTER:  We're continuing to look.

17             THE WITNESS:  So 11/15/11, and

18        diagnosis is sebaceous cyst.

19   BY MR. COLGAN:

20        Q.   During the visit in 2011 was it

21   recommended that he have surgery to remove the

22   hip implant from his right hip?

23             MS. HUNTER:  I'm sorry.  I didn't

24        understand the first part of the question.

25             (The previous question was read back by
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    40

```
 1        the court reporter.)

 2             MS. HUNTER:  Which visit?

 3             MR. COLGAN:  During any visit.

 4             MS. HUNTER:  So we only have two

 5        visits.  So it would be November.

 6             THE WITNESS:  The note states there is

 7        no further intervention requested at this

 8        moment.  That's a 9/15/11 note.

 9   BY MR. COLGAN:

10        Q.   Okay.  Do you know whether there was

11   any surgery done at any point to remove the

12   implant from his right hip?

13        A.   No, I don't.

14        Q.   You don't know whether there was?

15             MS. HUNTER:  You mean in September?

16        Object to the form.

17             MR. COLGAN:  I'm talking globally here.

18             MS. HUNTER:  Objection to the form.

19             THE WITNESS:  Are you -- I'm not going

20        to ask him.

21             MS. HUNTER:  Object to the form.  If

22        you don't understand it, you have to tell

23        him that.  Don't look at me.

24             THE WITNESS:  Yeah, I don't really

25        understand that question.  Do you mean the
```

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    41

```
 1       whole year, 2011?

 2  BY MR. COLGAN:

 3       Q.    At any point in time in 2011 or

 4  afterwards, did he have a hip implant removed

 5  from his right hip?

 6       A.    Afterwards, yes.

 7       Q.    Do you know the name of the surgeon

 8  that performed that?

 9            MS. HUNTER:  Do you need to look at the

10       records?

11            THE WITNESS:  Yes, I need to look at

12       the records.  I could say, but I don't want

13       to guess.

14            MS. HUNTER:  You want to know the date

15       of it?

16            MR. COLGAN:  I just want to know the

17       name of the physician.  If he wants to tell

18       me the date, that's fine.

19            MS. HUNTER:  Would you, I'm sorry to

20       keep asking you this, but I need to hear the

21       specific question again.

22            (The requested proceedings were read

23       back by the court reporter.)

24            MS. HUNTER:  He's talking specifically

25       the removal.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    42

```
 1              THE WITNESS:  There is a note by

 2        Dr. Arturo Corces.

 3   BY MR. COLGAN:

 4        Q.    Have you ever spoken with Dr. Corces

 5   before?

 6        A.    No.

 7        Q.    Do you know who Dr. Corces is?

 8        A.    He's an orthopedic surgeon.

 9        Q.    Did you know before you reviewed these

10   records that he was an orthopedic surgeon?

11        A.    No.

12        Q.    Have you ever heard his name before?

13        A.    Just in association with this case.

14        Q.    During the time that the plaintiff was

15   undergoing treatment had you ever heard of

16   Dr. Corces?

17              MS. HUNTER:  Form.

18              THE WITNESS:  Yes.

19   BY MR. COLGAN:

20        Q.    In what context did you hear about him?

21        A.    As a consultant.

22        Q.    A consultant, in terms of a consultant

23   for the plaintiffs?

24        A.    Yes.

25        Q.    Okay.  And did you review any of the
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                43

```
 1   consultation requests that were put in for

 2   treatment by Dr. Corces?

 3            MS. HUNTER:  Object to the form.

 4   BY MR. COLGAN:

 5       Q.   Do you understand the question?

 6       A.   Yes, I understand the question.

 7   Specifically, not that I can recall.

 8       Q.   Did you review any consultation

 9   requests that were made by any physician in the

10   South Florida Reception Center regarding George

11   Horn's care?

12            MS. HUNTER:  Object to the form.

13   BY MR. COLGAN:

14       Q.   Do you understand the question?

15       A.   Not exactly what you're looking for.

16   It's rather broad.

17       Q.   Okay.  This question is only in regard

18   to George Horn.  During your time as regional

19   medical director, did you review any consultation

20   requests by any physician at South Florida

21   Reception Center regarding George Horn's medical

22   care?

23       A.   Yes.

24       Q.   Okay.  What consultation request did

25   you review?
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    44

```
 1        A.   It was a report from a Dr. Ponce de

 2   Leon.

 3        Q.   Okay.  Who is Dr. Ponce de Leon?

 4        A.   He's an orthopedic surgeon.

 5        Q.   Was he consulted after Mr. Horn was

 6   being treated by Dr. Corces?

 7             MR. WEAVER:  Object to the form.

 8             MS. HUNTER:  Join.

 9             THE WITNESS:  Yes.

10   BY MR. COLGAN:

11        Q.   Why was Dr. Ponce de Leon consulted?

12             MS. HUNTER:  Why was he consulted is

13        the question?

14             MR. COLGAN:  Yes.

15             MS. HUNTER:  Form.

16             THE WITNESS:  For evaluation of his

17        hip.

18   BY MR. COLGAN:

19        Q.   Okay.  But he hadn't been treating

20   Mr. Horn for his hip before he was consulted,

21   correct?

22             MS. HUNTER:  I'm going to object to the

23        form.

24   BY MR. COLGAN:

25        Q.   Do you understand the question?
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                    45

```
 1       A.    Yes.   Did Dr. Ponce de Leon treat him
 2   for his hip prior to Dr. Corces.   That's your
 3   question?
 4       Q.    You're stating that Dr. Ponce de Leon
 5   treated George Horn for his hip prior to George
 6   Horn seeing Dr. Corces?
 7       A.    No, not prior.   I'm not sure of those
 8   dates.   I know he did see him.
 9       Q.    Okay.   Let me maybe rephrase.
10             At some point George Horn was seen by
11   Dr. Corces for surgery and evaluation, correct?
12       A.    That's correct.
13       Q.    Was there just one visit or was there
14   multiple visits?
15             MS. HUNTER:   Form.
16             THE WITNESS:   There were multiple
17       visits.
18   BY MR. COLGAN:
19       Q.    Okay.   Over what stretch of time was
20   Mr. Horn seeing Dr. Corces?
21       A.    Again, I'd have to consult the record
22   for those exact dates.
23       Q.    Okay.   And I notice that the Kendall
24   records don't seem to have a complete set of the
25   records regarding Dr. Corces?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                46

```
 1          MR. COLGAN:  Ms. Hunter, do you have
 2      those available?
 3          MS. HUNTER:  What are you talking
 4      about?  I'm sorry.
 5          MR. COLGAN:  I want to know the term
 6      of -- the course of treatment Dr. Corces
 7      provided treatment, from when to when.
 8          MS. HUNTER:  You want Dr. Reddick to
 9      look at Dr. Corces' notes and tell you what
10      dates he saw the patient?
11          MR. COLGAN:  Yes.
12          MS. HUNTER:  I think we have them.
13      We'll look through them.  I object to the
14      form.  There is a lack of predicate.
15          Do you want to attach Corces' records
16      as well?
17          MR. COLGAN:  I think he can look at
18      records and just tell me what dates
19      Dr. Corces saw Mr. Horn, that would be fine.
20          MS. HUNTER:  Okay.
21          THE WITNESS:  All right.  I've got two
22      operative reports from Dr. Corces.  Date of
23      operation, March 13th of 2013 and May 13th
24      of 2013.
25  BY MR. COLGAN:
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          47

 1      Q.   Other than those operations were there
 2   any other consultations that George Horn did with
 3   Dr. Corces?
 4           MS. HUNTER:  So you want -- okay.  So
 5        keep looking through the notes that we have
 6        for Dr. Corces.  He wants to know about
 7        consultations.  Let me object to the form
 8        because, you know, I don't know if all the
 9        consults are part of Dr. Corces' records,
10        but we'll tell you what we have in front of
11        us.
12           MR. COLGAN:  Okay.
13           THE WITNESS:  There is a progress note
14        from May 28th of 2013.
15           MS. HUNTER:  Tell him all the dates you
16        have in front of you.
17           THE WITNESS:  Okay.  5/7/13,
18        February 27, 2013.
19           MS. HUNTER:  Is that all that you have?
20           THE WITNESS:  Yes.
21           MS. HUNTER:  He's now read through all
22        the records and told you all the days he
23        sees in Dr. Corces' chart.  But let me look
24        through.  Did you tell him at the very
25        beginning?  Did you read off the dates at



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 49 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    48

1        the very beginning?

2              THE WITNESS:  I read those off, yes.

3              MS. HUNTER:  Are these part of the

4        record, in this part of the record?  Did

5        you --

6              THE WITNESS:  Yes, I did.

7              MS. HUNTER:  Did you tell those dates

8        or not?  Go through them again and just make

9        sure.

10              THE WITNESS:  7/23/13, 6/25/13, I

11        believe I already told you 2/22/13.

12              MS. HUNTER:  Yes.

13              THE WITNESS:  That's all I've got.

14  BY MR. COLGAN:

15        Q.   Okay.  Including operations and other

16  consultations is it fair to say that George Horn

17  saw Dr. Corces about a half dozen times in 2013?

18              MS. HUNTER:  Object to the form.

19              THE WITNESS:  I really didn't count

20        them.

21  BY MR. COLGAN:

22        Q.   Okay.  He saw Dr. Corces a number of

23  times, correct?

24        A.   Yes.

25        Q.   What dates did he see Dr. Ponce de



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                49

```
 1  Leon?

 2      A.   January 31st of 2012.

 3      Q.   Is that it for Dr. Ponce de Leon?

 4      A.   That is correct.

 5      Q.   Do you have a record which indicates

 6  that, where would I see that?

 7      A.   It's on the consult.  I'm looking right

 8  at it.

 9      Q.   Which consult are you looking at?

10      A.   It's the consult from 1/31/12 signed by

11  Dr. Ponce de Leon.

12      Q.   Did Dr. Ponce de Leon see the plaintiff

13  at any time after Dr. Corces rendered care to

14  him?

15      A.   Yes.

16      Q.   Okay.  What were those dates?

17           MS. HUNTER:  Okay, hold on.  We have to

18      go to a different chart.

19           THE WITNESS:  12/13/13.

20  BY MR. COLGAN:

21      Q.   Was there a reason that you know of

22  that Mr. Horn was sent to see Dr. Ponce de Leon

23  on 12/13/13 and not to Dr. Corces?

24      A.   Repeat that, please?

25      Q.   Is there a reason that you are aware of
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                  50

 1  why Mr. Horn was sent to Dr. Ponce de Leon on

 2  12/13/13 and not to Dr. Corces?

 3       A.   It's my recollection that Dr. Corces --

 4  well, providers -- the vendors had changed during

 5  that time period and Dr. Corces practiced at

 6  Baptist Hospital and Baptist Hospital is not

 7  interested in dealing with inmates.  So vendors

 8  were changed.

 9       Q.   Wasn't Dr. Corces providing care

10  through Kendall Regional Medical Center?

11       A.   That's correct.

12       Q.   Is that different than Baptist

13  Hospital?

14       A.   Yes, it is different from Baptist

15  Hospital, and Wexford contracted with Larkin

16  Hospital as Kendall Hospital was not interested

17  in taking care of inmates anymore.

18       Q.   So both Kendall Regional Medical Center

19  and Baptist Hospital were not interested in

20  providing care to inmates anymore, is that what

21  you stated?

22       A.   That's correct.

23       Q.   When was that decision made or when was

24  the vendor changed?

25       A.   I'm not sure of the exact date.



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                51

```
 1        Q.    I'm going to turn your attention to

 2   what has been marked as Plaintiff's Exhibit A?

 3             THE REPORTER:  Let me hand those to

 4        you.

 5             MS. HUNTER:  Thank you.  Let me move

 6        these documents out of the way.  All the

 7        exhibits are getting mixed up.

 8             THE WITNESS:  All right.  I have A in

 9        front of me.

10   BY MR. COLGAN:

11        Q.    Okay.  Without reading the whole thing

12   out loud, can you take a look at it and tell me

13   what this document is?

14        A.    It's an inmate grievance.

15        Q.    Okay.  What is your summary of what --

16   this is a grievance from George Horn, correct?

17        A.    Yes, it's from George Horn.

18        Q.    And can you give me a summary of what

19   George Horns is complaining about?

20             MS. HUNTER:  Form.

21             THE WITNESS:  It notes his intent to

22        sue and a 1983 civil rights violation.  He's

23        claiming deliberate indifference to a

24        serious medical need and health problems,

25        engaged against the medical cost to
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                              52

1       determine cheapest cost of treatment

2       provided.  And basically saying that a less

3       expensive surgeon was chosen -- experienced,

4       sorry.

5  BY MR. COLGAN:

6       Q.    In his complaint that he was scheduled

7  for surgery?

8            MS. HUNTER:  I'm just going to object

9       to the form as far as summarizing, but go

10      ahead.

11           THE WITNESS:  Not scheduled but he says

12      keep his professor of ortho surgery so he

13      can finish surgery to put a hip replacement

14      back in.

15 BY MR. COLGAN:

16      Q.    Is there an answer to that grievance?

17      A.    It says the case of orthopedic consult

18 was presented to the UM collegial call, it was

19 approved for surgery pending the authorization

20 code and eventual scheduling time and the

21 grievance was approved.

22      Q.    Okay.  Date of the grievance was?

23      A.    Yes, it was written August 15th, 2013

24 and responded to on September 3rd, 2013.

25      Q.    Was there any surgery on the



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    53

```
 1   plaintiff's hip performed after August 15th,

 2   2013?

 3          MS. HUNTER:  Have to look.  After...

 4   BY MR. COLGAN:

 5      Q.   August 15, 2013.

 6      A.   After August 15th.

 7          MS. HUNTER:  Well, object to the form.

 8      Okay.

 9          THE WITNESS:  So far not that I can see

10      that he had surgery after August 2013.

11      Still looking, though.

12          There is a note from 12/13/13 that

13      indicates no surgery is advised at the

14      present time.

15   BY MR. COLGAN:

16      Q.   Do you know whether at the time that

17   Dr. Hosseini responded to the grievance there was

18   actually a surgery that was approved?

19          MR. WEAVER:  Object to the form.

20          MS. HUNTER:  Join.

21          THE WITNESS:  No, I don't.

22   BY MR. COLGAN:

23      Q.   Okay.  I'm going to show you what's

24   marked as Plaintiff's Exhibit B.

25      A.   I've got B in front of me.
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        54

```
 1       Q.   Are you familiar with this document?

 2       A.   Yes.

 3       Q.   What is this document?

 4       A.   It's a consult request.

 5       Q.   Okay.  Is this a consult request that

 6  you were involved in preparing?

 7       A.   Not in the preparation, no.

 8       Q.   But you were -- did you review this

 9  document at the time that it was generated?

10       A.   No, I reviewed the document on 1/9/14.

11       Q.   Okay.  How did this document come to

12  your attention?

13       A.   It's part of the patient's medical

14  record.

15       Q.   Okay.  But why did you review the

16  patient's medical record on January 9, 2014?

17            MS. HUNTER:  Object to the form.

18            THE WITNESS:  It was in a chart review.

19  BY MR. COLGAN:

20       Q.   When you say chart review, what do you

21  mean?

22       A.   Looking over his medical record and --

23       Q.   Were you asked to look over his medical

24  record at that time?

25       A.   No, I look over lots of medical
```



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 56 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        55

1   records, and his was one of them.

2        Q.   Okay.  Did you pick those at random or

3   was there a particular reason you reviewed his

4   medical record?

5        A.   It was random.

6        Q.   What's the date of the original

7   request?

8        A.   8/21/13.

9        Q.   It states there was a surgery presented

10  to collegial review for, or there was a request

11  to collegial review for left hip surgery that had

12  not been approved yet?

13       A.   No, it says to be presented collegial

14  8/28/13.

15       Q.   Okay.  The notes at the top says

16  patient Horn is a 51 year-old with right hip

17  osteomyelitis.  Presented to collegial review for

18  right hip surgery.  Do you see that?

19       A.   Yes, I do.

20       Q.   Okay.  What does it mean, to be

21  presented alternate plan collegial 8/28/13?

22       A.   I would be assuming if I made a comment

23  on that at this point.

24       Q.   Have you ever seen any mark like that?

25       A.   Say again.



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                          56

1      Q.   Have you ever seen any markup like that

2  on a document before?

3      A.   As an alternative plan, yes.

4      Q.   What does that alternative plan mean?

5      A.   There is another plan of treatment.

6      Q.   Would that have been determined by UM

7  collegial, though?

8           MS. HUNTER:  Form.  What did you -- I'm

9       sorry.  I didn't understand the words that

10      you were saying.

11  BY MR. COLGAN:

12      Q.   When it says there was an alternate

13  plan, is that because the utilization management

14  collegial call requested an alternate plan?

15      A.   Possibly, in conjunction with other

16  information that's not here.

17      Q.   Did somebody else ever request an

18  alternate plan of treatment?

19      A.   No, that would come from UM.

20      Q.   You sat on a UM collegial committee

21  before, correct?

22      A.   Yes.

23      Q.   How is that discussed?

24      A.   There is a recording nurse who

25  documents what happens during the collegial call.



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    57

```
 1        Q.    Okay.   Where are those documents kept?

 2        A.    Pittsburgh.

 3        Q.    Pittsburgh, you said?

 4        A.    Pittsburgh, Pennsylvania.

 5        Q.    Is that Wexford's corporate offices?

 6        A.    Yes, it is.

 7        Q.    Do you know the person who is in charge

 8   of those records?

 9        A.    No, they have got quite a number of

10   people.  I don't know who would be the director.

11        Q.    Do you know if those are kept in any

12   particular form?

13        A.    I believe it's on computer.

14        Q.    Okay.   When a physician makes a request

15   to the UM collegial call committee, how is the

16   response of the committee given to the physician

17   that's making the request?

18        A.    It's verbal and written.

19        Q.    So in other words, a call is made to

20   him and also a physician receives a document from

21   the collegial call committee?

22        A.    Yes.

23        Q.    Is there a document in the form of a

24   letter?

25        A.    It's a form letter.  I guess you could
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    58

 1   say it's a letter.

 2       Q.   Okay.  Is there an official form or is

 3   that just a free form letter format?

 4       A.   It was a form in that it was preprinted

 5   and fill in the areas you need to fill in.

 6       Q.   Would the letter be kept in the medical

 7   records of an inmate?

 8       A.   They're kept with the consult

 9   coordinator.

10       Q.   I'm sorry.  What did you say?

11       A.   They are kept with the consult

12   coordinator.

13       Q.   Okay.  Who would be consult coordinator

14   for the South Florida Reception Center?

15            MS. HUNTER:  Form.  Overbroad as to

16       date.

17   BY MR. COLGAN:

18       Q.   In August 2013 who would the consult

19   coordinator be for the South Florida Reception

20   Center?

21       A.   I'm not sure.  They have had a couple

22   of them and I'm not sure of the dates.

23       Q.   You said there is a particular

24   physician or person who would be designated the

25   consult coordinator?



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    59

```
 1        A.   Yes.

 2        Q.   Is there another job title for the

 3   consult coordinator or is that person, is that

 4   that person's official job title?

 5        A.   That's the official job title.

 6        Q.   The consult coordinator would keep

 7   records of the utilization management response,

 8   correct?

 9        A.   That's correct.

10        Q.   That would not be kept in the inmate's

11   personal medical file?

12        A.   No.

13        Q.   Have you seen the utilization

14   management response with regard to this

15   consultation?

16        A.   No.

17        Q.   Were you involved in the UM committee

18   for this decision?

19        A.   No, not for this decision.

20        Q.   Were you involved in the UM committee

21   for any decision regarding care to George Horn?

22        A.   I may have filled in at one time but

23   it's speculation on my part.

24             MS. HUNTER:  Don't speculate.  Don't

25        guess.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    60

```
 1          THE WITNESS:  Okay, then I can't answer
 2     that question.
 3 BY MR. COLGAN:
 4     Q.   Did you write the note that says refer
 5 to a note from Dr. Ponce de Leon that says do not
 6 advise hip replacement?
 7     A.   Repeat that, please.
 8     Q.   On the second page of Exhibit B?
 9     A.   Right.
10     Q.   Where it says refer to notes from
11 Dr. Ponce de Leon?
12     A.   Right.
13     Q.   Is that your handwriting?
14     A.   Yes, it is.
15     Q.   What note were you referring to in that
16 document?
17     A.   It was a note where Dr. Ponce de Leon
18 did not advise surgery from 12/13/13.
19     Q.   Was the decision not to use Kendall
20 Regional Medical Center a decision made because
21 Kendall Regional Medical Center refused to accept
22 inmates as patients?
23          MR. WEAVER:  Form.
24          MS. HUNTER:  Join.
25          THE WITNESS:  That's was a corporate
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                61

1        decision.

2    BY MR. COLGAN:

3        Q.    A corporate decision by who?

4              MS. HUNTER:  Form.

5              THE WITNESS:  At Wexford?  I'm sorry.

6    BY MR. COLGAN:

7        Q.    Do you understand the question?

8        A.    Yes, I understand the question.

9        Q.    Okay.  Who made the corporate decision

10   not to use Kendall Regional Medical Center?

11             MS. HUNTER:  Form.

12             THE WITNESS:  I'm not aware of the

13       particular person.

14   BY MR. COLGAN:

15       Q.    Do you know the reason why that

16   decision was made?

17             MR. WEAVER:  Object to the form.

18             MS. HUNTER:  Join.

19             THE WITNESS:  No.

20   BY MR. COLGAN:

21       Q.    As regional medical director for

22   Wexford did you have any sort of employee manual

23   that dictated any cost control measures?

24       A.    No, I don't get involved in any of the

25   cost.



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          62

```
 1      Q.   Did you receive invoices from any

 2   inmate medical care or did you as regional

 3   medical director?

 4      A.   No.

 5      Q.   Does the CHO of an institution receive

 6   invoices for inmate medical care?

 7      A.   Not directed to his decision making

 8   process, no.

 9      Q.   Does the regional medical director

10   receive any reports that explain medical costs

11   for that region for the inmates under Wexford's

12   care?

13      A.   No, the regional medical director is

14   not involved in the finances.

15      Q.   When you served on the UM collegial

16   call committee, what documents would you review

17   in order to make your decision?

18           MS. HUNTER:  Form.

19           THE WITNESS:  We reviewed the medical

20      record.

21   BY MR. COLGAN:

22      Q.   Would you review any decisions or any

23   information about the cost of the procedure that

24   is being recommended?

25           MS. HUNTER:  Form.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          63

```
 1              THE WITNESS:  No.

 2   BY MR. COLGAN:

 3       Q.   Would you review any documents which

 4   indicated how much money had been spent on the

 5   care of an inmate?

 6       A.   Once again, I did not --

 7              MS. HUNTER:  Form.

 8              THE WITNESS:  -- was not involved with

 9       any of the finances of Wexford Health

10       Sources.

11   BY MR. COLGAN:

12       Q.   You stated earlier, I think, that the

13   cost of medical care was considered, but an

14   inmate receives the care that he needs regardless

15   of cost, correct?

16       A.   Yes, I did say that.

17       Q.   So how is the cost considered?

18       A.   For instance, if there is a request

19   made for a CAT scan versus an MRI, and the CAT

20   scan can give you the same information, which is

21   less expensive, the CAT scan is what's done.

22       Q.   What sorts of criteria would

23   utilization management use to consider whether an

24   alternate plan for treatment should be

25   recommended?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                64

```
 1       A.   Please repeat that.

 2       Q.   What sorts of criteria would the

 3  utilization management committee consider in

 4  determining whether an alternate plan of

 5  treatment should be pursued for an inmate?

 6       A.   It's really patient specific as to, you

 7  know, whether there is going to be harm to the

 8  inmate or whether there will be a positive

 9  outcome or what have you.  It's very

10  individualized.

11       Q.   Is there any person for Wexford's

12  region in the state of Florida who is involved in

13  making financial decisions?

14            MS. HUNTER:  Object to the form.

15            MR. WEAVER:  Object to the form.

16            THE WITNESS:  No.

17  BY MR. COLGAN:

18       Q.   Who is responsible for making financial

19  decisions for Wexford Health Sources?

20       A.   Someone in Pittsburgh that I'm not

21  aware of.

22       Q.   Do you have any sort of periodic review

23  with the corporate officers from the Pittsburgh

24  office or any regional office regarding the

25  administration of Wexford's activity in Florida?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    65

```
 1      A.   I'm not quite understanding your
 2 question.
 3      Q.   Understanding that you're no longer the
 4 regional medical record but you're an
 5 institutional physician for Homestead CI, when
 6 you were the regional medical director, did you
 7 have any sort of regular review, quarterly,
 8 annually, monthly or what have you with the
 9 corporate office regarding the operations in
10 Florida?
11           MR. WEAVER:  Object to the form.
12           THE WITNESS:  Only as far as medical
13      care given.
14 BY MR. COLGAN:
15      Q.   Okay.  Were there any -- has anybody
16 from the corporate office for Wexford had any
17 discussions with you regarding the overall
18 financial viability of Wexford operations in
19 Florida?
20      A.   No, I'm not involved in any of the
21 finances of Wexford Health Sources.
22      Q.   Have you been advised more generally to
23 avoid any types of medical treatments or use any
24 alternatives for certain types of medical
25 treatments?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    66

```
 1        A.   In terms of cost?

 2        Q.   Generally?

 3             MS. HUNTER:  Form.

 4             THE WITNESS:  Only in regards to a

 5        specific instance with the individual

 6        patient.

 7   BY MR. COLGAN:

 8        Q.   On the UM collegial call committee,

 9   does anybody represent the central office for

10   Wexford?

11        A.   No, there is the regional UM director

12   for Florida.

13        Q.   Okay.  In the UM committee that you

14   served on, has there been any person who works

15   for Wexford out of the state of Florida?

16        A.   The only person on the call outside of

17   the state of Florida is the one recording the

18   information.

19        Q.   That's the nurse who is recording the

20   notes of the committee meeting?

21        A.   That's correct.

22        Q.   Other than the change of providers to

23   Wexford from Kendall Regional Center to Larkin

24   Hospital were there any reasons that Wexford

25   Health Sources decided not to use the services of
```



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 68 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    67

 1   Dr. Arturo Corces?

 2        A.    No.

 3              MS. HUNTER:  Did you get his answer?

 4              MR. COLGAN:  Yes, I heard the answer.

 5              MS. HUNTER:  Okay.

 6   BY MR. COLGAN:

 7        Q.    Are you familiar with Dr. Marlene

 8   Hernandez?

 9        A.    Yes.

10        Q.    Did she work at South Florida Reception

11   Center at any time between 2011 and the present?

12        A.    Yes.

13        Q.    What date did she begin working at

14   South Florida Reception Center?

15        A.    December of 2013.

16        Q.    Were you involved in any medical

17   decision making that she made regarding any care

18   for George Horn?

19        A.    No, each individual physician makes

20   their own medical decisions.

21        Q.    Do you review any of the individual

22   physician's decisions?

23        A.    Just generally.

24        Q.    When you say just generally, what do

25   you mean?



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    68

```
 1      A.   Just in review of medical records.  We

 2  don't sit over the shoulder and review everything

 3  that they write.

 4      Q.   You stated earlier that you were

 5  involved in -- (inaudible)?

 6           MR. WEAVER:  I'm sorry, in what?

 7           MR. COLGAN:  Drug exception requests.

 8           MR. WEAVER:  Thanks.

 9           THE WITNESS:  For a time I was, yes.

10  BY MR. COLGAN:

11      Q.   What involvement do you have with drug

12  exception requests?

13           THE REPORTER:  I'm sorry.  Say that

14      again.

15  BY MR. COLGAN:

16      Q.   My question is, what involvement did

17  you have as regional medical director with drug

18  exception requests?

19           MS. HUNTER:  Object to the form.

20  BY MR. COLGAN:

21      Q.   Let me rephrase that.  As a regional

22  medical director what were your job duties with

23  regard to drug exception requests?

24      A.   Evaluate the nonformulary medication

25  for appropriateness.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          69

```
 1        Q.   Did you do that drug exception request

 2   under your -- under the area that you oversaw?

 3        A.   For a time.

 4        Q.   For a time?

 5        A.   For a time, yes.

 6        Q.   When did you start doing that and when

 7   did you stop doing that?

 8        A.   When did I stop, I'm not sure of the

 9   time exactly when I stopped, but it was changed

10   to have a pharmacist do the drug exception

11   request.  Prior to, I did it from 2007.

12        Q.   Did you review and approve any drug

13   exception requests for George Horn for liquid

14   morphine?

15        A.   Yes.

16        Q.   Those were approved, correct?

17        A.   Yes.

18        Q.   Were you approached at any time with

19   any concern that George Horn was addicted to

20   drugs?

21             MS. HUNTER:  Form.

22   BY MR. COLGAN:

23        Q.   Do you understand the question?

24        A.   Are you asking me if I was approached

25   about George Horn being addicted to drugs?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                 70

```
 1       Q.    Yes.

 2       A.    I would have to say no.

 3       Q.    Were you ever approached with a concern

 4   from anybody at the South Florida Reception

 5   Center there was a drug dealing ring going on

 6   with regard to any requests for painkillers?

 7       A.    Yes.

 8       Q.    At what time?

 9       A.    I believe it was December 2013.

10       Q.    Who contacted you?

11       A.    It was a Dr. Gaxiola.

12       Q.    What did Dr. Gaxiola tell you?

13       A.    There was a drug ring going on.

14       Q.    Did you make the decision at that time

15   to discontinue approval for drug exception

16   requests for morphine?

17       A.    I didn't discontinue any drug exception

18   request for morphine.

19       Q.    Were you given any details about the

20   drug ring at South Florida Reception Center?

21            MR. WEAVER:  Object to the form.

22            THE WITNESS:  No, that's really a

23       security issue.

24   BY MR. COLGAN:

25       Q.    Do you know whether George Horn was
```



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 72 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        71

1    suspected in participating in that?

2         A.    Yes.

3         Q.    Who informed you of that?

4         A.    Dr. Gaxiola.

5         Q.    Had she specifically notified you that

6    George Horn was suspected of being involved in

7    the drug ring?

8         A.    Among others, yes.

9         Q.    Did she say how the drugs were being

10   trafficked?

11        A.    Say again, please.

12        Q.    Did she indicate what types of drugs

13   were being sold in this drug ring?

14        A.    She mentioned that morphine was being

15   sold.

16        Q.    Did she state whether it was liquid or

17   in pill form?

18        A.    She stated both forms.

19        Q.    Did you terminate any prescriptions for

20   morphine for Mr. Horn, at that time?

21        A.    I didn't terminate any prescriptions

22   for Mr. Horn.

23        Q.    Do you know if Mr. Horn was placed on

24   single dose for the medication?

25             MS. HUNTER:  Form.  Can you read that



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                   72

1        back?  I didn't understand it.  I'm sorry.

2              (The requested proceedings were read

3        back by the court reporter.)

4              THE WITNESS:  Narcotics are generally

5        single dosed.

6    BY MR. COLGAN:

7        Q.   **Just for the record, what is a single**

8    **dose?**

9        A.   Single dose means that the medication

10   is administered by a nurse who then watches the

11   patient consume the medication at that time.

12       Q.   **Mr. Horn was administered liquid**

13   **morphine single dose?**

14       A.   That's correct.

15       Q.   **Are you aware that an inmate could take**

16   **a liquid medication in a single dose context and**

17   **then that be sold to a third party?**

18             MR. WEAVER:  Object to the form.

19             THE WITNESS:  Yes.

20   BY MR. COLGAN:

21       Q.   **How would that be done?**

22       A.   They cheek the liquid and spit it out

23   later.

24       Q.   **Do you know if Mr. Horn was ever caught**

25   **doing this?**



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    73

```
 1        A.   I have no idea.

 2        Q.   Do you know if Mr. Horn was ever, had

 3   ever been recommended for a hip abductor brace?

 4        A.   Yes.

 5        Q.   Okay.  And was that brace given to him?

 6        A.   As far as I know, he received a brace.

 7        Q.   Did he receive the brace that was

 8   recommended for him?

 9        A.   I just know that he received a brace.

10        Q.   Let me show you what's been marked as

11   Plaintiff's Exhibit C.

12        A.   C is in front of me.

13        Q.   All right.  Do you recognize this

14   document?

15        A.   You said do I recognize the doctor or

16   the document?

17        Q.   The document?

18             MR. WEAVER:  Object to the form.  There

19        is more than one document in Exhibit C.

20             MS. HUNTER:  Yes, there is.

21             MR. WEAVER:  I think.

22             THE WITNESS:  Yes, there is.

23             MR. WEAVER:  All right.

24             MS. HUNTER:  Tell him what you

25        recognize and what you don't.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                      74

 1  BY MR. COLGAN:

 2      Q.    Could you read the last paragraph of

 3  the letter on page two?

 4      A.    Accordingly, I'm enclosing a cost

 5  estimate based on my suggested orthosis for

 6  Mr. Horn.  I would be happy to discuss this with

 7  the physicians involved.

 8      Q.    Okay.  I'm looking at the remaining

 9  pages of Exhibit C.  Do those appear to be

10  consistent with cost estimates that would be

11  involved according to the letter?

12          MS. HUNTER:  Form.

13          THE WITNESS:  And I'm really not aware

14      of cost estimates for abductor braces or any

15      other durable medical equipment.

16  BY MR. COLGAN:

17      Q.    Your name is on at least the first two

18  pages of this document, correct?

19      A.    That's correct.

20      Q.    Were you involved with the decision

21  making for a brace for George Horn?

22      A.    No the stat means that I reviewed the

23  letter.

24      Q.    You reviewed this on January 9th, 2014?

25      A.    That's correct.



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      75

```
 1        Q.    Do you know whether he received that

 2   brace --

 3             MS. HUNTER:  Form.

 4   BY MR. COLGAN:

 5        Q.    -- that was recommended for him?

 6             MS. HUNTER:  Form.

 7             THE WITNESS:  I'm just aware that he

 8        received a brace.

 9   BY MR. COLGAN:

10        Q.    I think I'm almost done.  Let me just

11   look at my notes.

12             MS. HUNTER:  Then afterwards, I would

13        like to take a quick break.

14             MR. COLGAN:  That's fine.

15             MS. HUNTER:  And use the restroom and

16        get drinks and stuff.

17   BY MR. COLGAN:

18        Q.    As a regional medical director do you

19   have the authority to override a decision made by

20   an institutional physician?

21        A.    Yes, if necessary.

22        Q.    Is that spelled out in a policy by

23   Wexford?

24        A.    No.

25        Q.    Is that just an inherent responsibility
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    76

```
 1   of your office, or where does that authority come

 2   from?

 3           MS. HUNTER:  Form.

 4   BY MR. COLGAN:

 5       Q.   Let me scratch that.  Where does the

 6   authority to override the decision of an

 7   institutional physician come from?

 8       A.   From the hierarchy of the position.

 9       Q.   Were you aware at any time that the

10   medical treatment for George Horn's abscess in

11   his leg was being delayed?

12           MS. HUNTER:  Object to the form.

13           THE WITNESS:  No.

14   BY MR. COLGAN:

15       Q.   Were you aware at any time that pain

16   relieving medication had been discontinued to

17   George Horn?

18           MS. HUNTER:  Form.

19           THE WITNESS:  Yes.

20   BY MR. COLGAN:

21       Q.   When were you made aware of this?

22           MS. HUNTER:  Don't disclose anything I

23       talked to you about as far as this case.  I

24       instruct you not to answer anything about

25       the allegations that you learn from me.
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      77

```
1      Okay?

2           MR. COLGAN:  I didn't understand your

3      instruction.  Are you instructing him not to

4      answer the question?

5           MS. HUNTER:  I'm instructing him not to

6      answer the question if his knowledge is

7      based upon anything he gained from me as his

8      lawyer in discussing the allegations of the

9      case.

10          MR. COLGAN:  Okay.  That's fine.

11 BY MR. COLGAN:

12     Q.   Other than any conversations that you

13 had with your attorneys when were you made aware

14 that he was being denied pain medication?

15          MS. HUNTER:  Okay.  I'm going to object

16     to the form.

17          THE WITNESS:  I can't really answer

18     that question.

19 BY MR. COLGAN:

20     Q.   I'm sorry.  Dr. Reddick, did you say

21 you won't answer the question or you couldn't

22 answer the question?

23     A.   Could not.

24     Q.   What is it about the question you can't

25 answer?  What is it about the question that is
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                              78

```
 1  unclear?

 2            MS. HUNTER:  It's not that it's

 3        unclear, it's based upon my instruction.

 4            MR. COLGAN:  Oh, okay.

 5  BY MR. COLGAN:

 6        Q.   So are you saying that outside of any

 7  privileged communications that you had with your

 8  attorney you were not made aware that pain

 9  medication was being denied to George Horn?

10        A.   He was not denied pain medication at

11  any time.

12        Q.   Was he denied morphine at any time?

13            MS. HUNTER:  I'm going to object to the

14        form.

15            THE WITNESS:  He was switched from

16        morphine to lesser addicting medication.

17  BY MR. COLGAN:

18        Q.   When you say lesser medication, what

19  medication are you referring to?

20        A.   I said lesser addicting medication.

21        Q.   Okay.  When you say lesser addicting

22  medication, what medication are you referring to?

23        A.   Well, nonsteroidal anti-inflammatory

24  agents such as Toradol, ibuprofen.

25        Q.   Is ibuprofen as effective for treating
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          79

```
 1   pain as morphine?

 2       A.   That's a subjective question.

 3       Q.   In other words, let me phrase it this

 4   way.  Both morphine and ibuprofen or used to

 5   treat pain in various contexts, correct?

 6       A.   Yes.

 7            MS. HUNTER:  Form.

 8   BY MR. COLGAN:

 9       Q.   Is there any application that you would

10   prescribe morphine for, for which ibuprofen would

11   be inappropriate?

12            MS. HUNTER:  Object to the form.

13            THE WITNESS:  Immediate postop care

14       would be one instance.

15   BY MR. COLGAN:

16       Q.   Could the absence of a right hip be

17   another instance?

18            MS. HUNTER:  Form.

19            THE WITNESS:  Not necessarily so.

20       There are other pain managements available.

21       I believe George Horn was also on Elavil at

22       one time.

23   BY MR. COLGAN:

24       Q.   What is Elavil?

25       A.   It's a psychiatric medication that's
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    80

```
 1   used off label for neuropathic pain.
 2        Q.    Was Mr. Horn experiencing neuropathic
 3   pain?
 4        A.    According to the record.
 5        Q.    Was he experiencing neuropathic pain in
 6   connection with his right hip removal?
 7             MR. WEAVER:  Is that right hip removal,
 8        that last part?
 9   BY MR. COLGAN:
10        Q.    The right hip replacement removal?
11             MS. HUNTER:  Object to the form.
12             THE WITNESS:  According to the medical
13        record, yes.
14   BY MR. COLGAN:
15        Q.    When was he prescribed Elavil?
16             MS. HUNTER:  Okay.  I'm having him look
17        at the medical chart to review the order
18        sheets, physician order sheets for
19        medications, okay?
20             MR. COLGAN:  Okay.  Thank you.
21             MS. HUNTER:  The records are very
22        difficult to read but he's going to do the
23        best he can.  The copying is not great as
24        far as the dates.
25             THE WITNESS:  Looks like December 18 of
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      81

```
 1      2013.

 2  BY MR. COLGAN:

 3      Q.   Are there any medical concerns

 4  associated with abruptly discontinuing that type

 5  of pain medication such as morphine to the

 6  patient?

 7      A.   There can be.

 8      Q.   What sorts of concerns are there?

 9           MS. HUNTER:  Form.

10           THE WITNESS:  Symptoms of withdrawal.

11  BY MR. COLGAN:

12      Q.   What are the symptoms of withdrawal

13  from morphine?

14      A.   Upset stomach, chills, no life

15  threatening symptoms.

16      Q.   Other than chills and upset stomach are

17  there any other symptoms?

18      A.   May have a low grade fever, may not.

19      Q.   Anything else?

20      A.   No, not that I'm aware of.

21      Q.   During 2013 was Mr. Horn placed on any

22  other controlled pain relief medication other

23  than morphine?

24           MS. HUNTER:  During all of 2013?  Oh,

25      boy.  Can you narrow that down?  I mean,
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                82

```
 1      there is a lot of records for him to look

 2      through as to all the different medications

 3      Mr. Horn was on.  Can you help us a little?

 4  BY MR. COLGAN:

 5      Q.    What is MS Contin?

 6      A.    It's a pain medication.

 7      Q.    Is that morphine?

 8      A.    No.

 9      Q.    Was Mr. Horn placed on MS Contin at any

10  time?

11          MS. HUNTER:  Do you want him to review

12      the medical records or do you want him to go

13      by his memory of looking at the medical

14      records?

15  BY MR. COLGAN:

16      Q.    If you could look at the records for

17  November and December of 2013?

18          MS. HUNTER:  November and December of

19      2013.  Okay.

20          Is there a particular day that you know

21      that's there.  Because -- go ahead.  Answer

22      the question.  Object to the form because

23      it's vague and ambiguous.  Answer what you

24      have been able to find.

25          THE WITNESS:  Not from the chart could
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                          83

```
 1       I make that determination.

 2   BY MR. COLGAN:

 3       Q.   Well, the charts speak for themselves.

 4            MS. HUNTER:  No, that's not real fair.

 5       I mean, if there is a particular part of the

 6       chart you know it's there, tell us so he can

 7       look at it.

 8            MR. COLGAN:  Give me a moment.

 9            MS. HUNTER:  Okay.

10            MR. COLGAN:  Give me a moment.  I'm

11       trying to look through the medication

12       administration records.  May have been that

13       it was in Kendall Regional Medical Center's

14       records.

15   BY MR. COLGAN:

16       Q.   But I just want to explore for now, MS

17   Contin, is MS Contin in the same class as

18   morphine?

19       A.   Yes.

20       Q.   Does that have similar withdrawal

21   symptoms?

22       A.   It could.

23       Q.   During the review of medical records

24   that you perform did you review the records of

25   every patient in the Florida Department of
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                84

```
 1  Corrections at one time or another?

 2              MS. HUNTER:  Form.

 3              THE WITNESS:  That would be an

 4       impossibility.  We have over 15,000 inmates

 5       in this region.

 6  BY MR. COLGAN:

 7       Q.    How are the selection of the records

 8  done for your review?

 9       A.    The random selection is based upon the

10  chronic care clinics.

11       Q.    Okay.  So you review the records of

12  only inmates who are at chronic care clinics?

13       A.    Not just chronic care clinics.  So

14  consults, some sick calls, but it's a random

15  selection.

16       Q.    Other than speaking to your attorneys,

17  what did you do to prepare for this deposition?

18       A.    Reviewed the medical record.

19       Q.    Did you speak to anybody other than

20  your attorney?

21       A.    No.

22              MR. COLGAN:  I have no further

23       questions.

24              MS. HUNTER:  Let's take a quick break

25       before we start any questions from
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    85

```
 1        Mr. Weaver.

 2             MR. COLGAN:  Okay.  Take five minutes,

 3        10 minutes.

 4             MS. HUNTER:  10 minutes would be great.

 5             (Recess taken.)

 6                  CROSS-EXAMINATION

 7   BY MR. WEAVER:

 8        Q.    I just have a few questions.  Should

 9   only take five, 10 minutes at the most.  All

10   right.

11             First of all, Dr. Reddick, was there a

12   Dr. Seyed Hosseini at SFRC, South Florida

13   Reception Center, at time you were regional

14   director?

15        A.    Yes.

16        Q.    Did he have any particular title at

17   SFRC?

18        A.    He was the chief health officer.

19        Q.    Is he still the chief health officer?

20        A.    No.

21        Q.    Is he still at SFRC?

22        A.    No.

23        Q.    Do you know when he left SFRC?

24        A.    Roundabout, not specifically.  The

25   month was late November to early December.
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                        86

```
 1              MS. HUNTER:  Of...

 2              THE WITNESS:  2013.  Sorry.

 3  BY MR. WEAVER:

 4       Q.   How sure are you of those dates?

 5       A.   Roundabout.  I'm not positive of the

 6  exact dates.

 7       Q.   Toward the end it was sometime in the

 8  later part of 2013?

 9       A.   That's correct.

10       Q.   That was before Mr. Horn saw or

11  consulted with Dr. Ponce de Leon?

12              MR. COLGAN:  Object to the form.

13  BY MR. WEAVER:

14       Q.   Do you recall when Mr. Horn's

15  appointment for a consultation with Dr. Ponce de

16  Leon late in 2013, do you remember when that was,

17  the month at least?

18       A.   I believe Dr. Hosseini was gone at the

19  time that he saw Dr. Ponce de Leon in 2013.  He

20  did see Dr. Ponce de Leon in 2012.

21       Q.   Right.  As far as specifically the

22  consultation with Dr. Ponce de Leon about a

23  possible hip replacement, was Dr. Hosseini still

24  there?

25       A.   Can I refer to the note?
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    87

```
 1              MS. HUNTER:  Which one you want to see?

 2              THE WITNESS:  Dr. Ponce de Leon's note

 3         he didn't advise surgery at this time.

 4              MR. COLGAN:  I'm sorry.  Could you

 5         speak up, please?

 6              MR. WEAVER:  We're trying to pull up

 7         Dr. Ponce de Leon's report.

 8              MS. HUNTER:  Got it.

 9              THE WITNESS:  All right.  Ponce de

10         Leon's note is 12/13/13 and Dr. Hosseini was

11         not on staff with Wexford Health Sources at

12         that time.

13    BY MR. WEAVER:

14         Q.   And a similar question about the issue

15    that you discussed with the morphine, the

16    discontinuation of the morphine, was Dr. Hosseini

17    or as the plaintiff is alleging, was Dr. Hosseini

18    there at that time?

19         A.   No.

20         Q.   And just so I'm clear, you said the

21    morphine was never discontinued.  He was switched

22    from one form to another?

23              MS. HUNTER:  Form.

24              MR. COLGAN:  Object to the form.

25              THE WITNESS:  The medication was
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    88

```
 1       switched to another medication after a

 2       titration downward.

 3   BY MR. WEAVER:

 4       Q.    Do you know if any of that would have

 5   provided a similar level of pain relief?

 6       A.    When they did the titration, he was

 7   placed on additional medication.  So it should

 8   have compensated for his pain management.

 9       Q.    Okay.  And just in case it's not clear

10   for nonmedical professionals, when you say

11   titration, what do you mean by that?

12       A.    Lowering the dose.

13       Q.    Did you mention he was on Toradol at

14   some point?

15       A.    Yes.

16       Q.    That's a prescription medication?

17       A.    Yes.

18       Q.    And Elavil, for the use that you

19   discussed for neuropathic pain, that's a

20   prescription medication?

21       A.    Yes.

22       Q.    And do you know, was he on a dosage of

23   ibuprofen that would also require a prescription?

24       A.    Yes.

25       Q.    Does the CHO of the facility, does he
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        89

1   have any role in the collegiate call process?

2       A.    Only in the presentation of the cases.

3       Q.    Does the CHO actually have any decision

4   making authority during the collegiate call?

5       A.    No.

6       Q.    Did you have any -- have you ever

7   communicated with Dr. Hosseini regarding

8   Mr. Horn's treatment that's being discussed in

9   this case?

10      A.    No.

11      Q.    And have you ever reviewed any of

12  Dr. Hosseini' notes or any other type of record

13  regarding Mr. Horn's treatment of his hip issue

14  in this case?

15          MS. HUNTER:  Object to the form as to

16      timing of that review.  Obviously, he

17      testified he already looked at the records

18      in preparation of the depo.

19  BY MR. WEAVER:

20      Q.    I'm sorry.  Let me clarify that.  Not

21  subsequent.  I meant during the time that he was

22  being treated, while you were both -- while he

23  was still at SFRC?

24      A.    Not as to the specific care, no.

25      Q.    Okay.  In anything that you, at the



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      90

 1    time, that you had seen or read of Dr. Hosseini's

 2    notes and records, did he ever suggest that

 3    Mr. Horn should not receive a certain treatment

 4    in order to save money?

 5        A.   No, not at all.

 6        Q.   Speaking of your involvement with

 7    Wexford, was there any decision that you are

 8    aware of that anyone from Wexford made regarding

 9    Mr. Horn's treatment specifically to save money?

10        A.   No.

11        Q.   Or to increase its profits?

12        A.   No, not at all.

13        Q.   One second.  I'm going to show you a

14    document.  It was part of the large group of

15    Kendall records that I think was previously

16    marked as D?

17            MS. HUNTER:  Okay.

18    BY MR. WEAVER:

19        Q.   I've pulled out one of the records in

20    there just for ease of reference because it's not

21    Bates stamped.  I'll show you what we'll have

22    marked as -- let's start at Defense 1.  Can you

23    take a look at this?  I'm showing it to your

24    counsel first.

25            MR. WEAVER:  Mike, I'm trying to figure



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                          91

```
 1      out how to direct you to this.  It is the,

 2      it's in the Kendall records.  It's in the

 3      Kendall records.

 4          MR. FREEDMAN:  It's what we have from

 5      Corces.

 6          MR. WEAVER:  So I'm clear from the

 7      record, what was the exhibit number on that?

 8          MS. HUNTER:  He didn't mark the

 9      exhibit.  He had Dr. Reddick review

10      Dr. Corces' records to outline the dates of

11      treatment.

12          MR. WEAVER:  Mike, if you have all the

13      records in front of you, we're going to be

14      talking about, since you're not here, is

15      the -- it's got a heading for the Miami

16      Institute for Joint Reconstruction.  It's a

17      progress note from Dr. Corces dated 6/25/13.

18      So I don't know how your records are

19      arranged, if you want to flip through that.

20      While Dr. Reddick is reviewing that, let me

21      know when you're done, Dr. Reddick.  Just

22      look up when you've gotten a chance to read

23      it.

24          THE WITNESS:  Okay.

25   BY MR. WEAVER:
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    92

```
 1      Q.   Okay.  Again, what's the date on that

 2   report?

 3      A.   6/25/13.

 4      Q.   And does it recommend any course of

 5   treatment for Mr. Horn's hip?

 6      A.   Yes, it does.

 7      Q.   What does it say?

 8      A.   In his plan it says I discussed again

 9   at length with the patient the significance of

10   the type of injury that he has sustained.  It is

11   rather clear as time goes by we should consider a

12   hip replacement.  I would suggest, however, that

13   we spend one year without a prosthesis in order

14   to allow for the body to resolve the marked and

15   extremely severe infection the patient had.

16      Q.   So there is nothing in that report that

17   you're reading that suggests that Mr. Horn was

18   ready to have his surgery at that time?

19      A.   No.

20      Q.   It would be at least a year for

21   re-evaluation?

22      A.   That's what it says, sir.

23      Q.   And the consultation with Dr. Ponce de

24   Leon was December of 2013?

25      A.   That's correct.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                  93

```
 1      Q.   Is that still within the one year time

 2  frame that Dr. Corces had specified?

 3      A.   Yes, it is.  It's approximately six

 4  months later.

 5      Q.   So it's again, within the one year of

 6  no surgery that Dr. Corces recommended?

 7      A.   That's correct.

 8      Q.   So previously, I guess if you could

 9  take back what had been marked as plaintiff's A

10  earlier in the deposition.  Yes, that's it on

11  top.  So this is a grievance as well as a

12  response saying that his grievance is approved.

13  Would that approval mean, as far as your

14  understanding of this process, would mean he's

15  automatically getting a surgery?

16      A.   No.

17      Q.   The surgeon would actually still have

18  to agree to do the surgery?

19      A.   That's correct.

20          MR. COLGAN:  Object to the form of the

21      question.

22  BY MR. WEAVER:

23      Q.   Was Dr. Ponce de Leon the contracted

24  provider who would have done the surgery if he

25  had recommended it was necessary?
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    94

```
 1      A.   Yes.

 2      Q.   That was the purpose why Mr. Horn was

 3  sent to Dr. Ponce de Leon in December of 2013?

 4      A.   That's correct.

 5      Q.   And, again, it was Dr. Ponce de Leon's

 6  conclusion that he should not get the surgery?

 7      A.   Surgery was not advised, at that time.

 8      Q.   And even though, again, I'm not, since

 9  I'm not on the medical, you know, obviously not

10  on the medical side of things and I don't know

11  how the process works, although this grievance

12  said that he's approved, Wexford can't force the

13  surgeon to perform surgery, right?

14      A.   That's correct.

15           MR. COLGAN:  Object to the form of the

16      question.

17  BY MR. WEAVER:

18      Q.   Any approval of a grievance of a

19  procedure is still subject to the doctor's actual

20  consent to that, right?

21      A.   Yes.

22           MR. COLGAN:  Object to the form of the

23      question.

24  BY MR. WEAVER:

25      Q.   I'm sorry.  When did you say you left
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    95

```
 1   Wexford -- I'm sorry -- that's SFRC?

 2       A.   It was February of 2013.

 3       Q.   Okay, and I meant to say when you left

 4   your position as regional medical director to

 5   become chief health officer of Homestead, when

 6   was that?

 7       A.   January of 2015.

 8       Q.   During the time that you were still the

 9   regional director, did Mr. Horn receive a

10   consultation at Shands Hospital?

11       A.   Do you have a specific date?

12       Q.   If you don't know anything about it,

13   that's fine.

14       A.   I don't.

15       Q.   That's okay.  I just didn't know if it

16   was something you might have been familiar with.

17            Does a chief health officer of an

18   institution have the ability to override a

19   Wexford/UM decision?

20            MS. HUNTER:  Form.

21            THE WITNESS:  There is an appeal

22       process if they feel it's necessary.

23   BY MR. WEAVER:

24       Q.   Do you have any idea what -- let me ask

25   this more generally.  Is liquid morphine, is that
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    96

1   a relatively expensive drug?

2       A.   Morphine in general is very

3   inexpensive, actually.

4       Q.   Is there a cost difference, any type of

5   a significant cost difference between liquid

6   morphine and something like MS Contin?

7       A.   No.

8           MR. WEAVER:  I don't think I have

9       anything further.  I don't know if you want

10      to, or if you need to review your notes.

11          MS. HUNTER:  No, I don't.  I only have

12      a couple questions.

13                  CROSS-EXAMINATION

14  BY MS. HUNTER:

15      Q.   Dr. Reddick, how long have you been a

16  physician?

17      A.   Since 1989.

18      Q.   How long have you worked as a prison

19  healthcare provider?

20      A.   Since 2003.

21      Q.   During your time as a prison healthcare

22  provider, specifically at SFRC, did there come a

23  time when you were employed by the Department of

24  Corrections?

25      A.   Yes, ma'am.



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                            97

1      Q.    Okay.  And when did that employment

2   with the Department of Corrections directly end?

3      A.    In February of 2013.

4      Q.    Why did it end?

5      A.    The State of Florida had privatized

6   their medical services.  Wexford Health Sources

7   was the vendor picked for the South Region.  And

8   I came over to Wexford about a month and a half

9   before Wexford's contract was to take place with

10   the Florida Department of Corrections.

11      Q.    Do you have any idea when that contract

12   with Wexford for the Department of Corrections

13   started as to specifically South Florida

14   Reception Center?

15      A.    It was in March of 2013.

16      Q.    When you are talking about the region,

17   you referred to the region several times.  What

18   is the region --

19      A.    The region --

20      Q.    -- that the South Florida Reception

21   Center was in?

22      A.    It was previously Region IV, which was

23   changed to the southern half of Region III which

24   extended from Hardy County south.

25      Q.    When Wexford Health Sources came in to



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                98

1  provide medical care to South Florida Reception

2  Center and you were first employed by them, were

3  you at any point in time instructed by Wexford

4  Health Sources to provide care to inmates that

5  was cheaper in order to save money?

6         MR. COLGAN:  Object to the form of the

7     question.

8         THE WITNESS:  No.

9  BY MS. HUNTER:

10     Q.    The medical care that was provided at

11  South Florida Reception Center, was it based upon

12  the need of the patient?

13     A.    Yes.

14     Q.    With regard to Mr. Horn, there are

15  voluminous medical records pertaining to his stay

16  at South Florida Reception Center, is that

17  accurate?

18     A.    Yes, it is.

19     Q.    Where was he staying at South Florida

20  Reception Center, for lack of better terminology?

21     A.    He was in multiple locations.  He was

22  in C dorm which is a medical dorm, he was in F

23  dorm which is a palliative care dorm but also a

24  long-term treatment dorm and he was in the

25  infirmary.



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                99

```
 1       Q.   So all the different places that
 2   Mr. Horn was housed at South Florida Reception
 3   Center were locations in which he was receiving
 4   medical care?
 5       A.   Yes.
 6            MR. COLGAN:  Object to the form of the
 7       question.
 8   BY MS. HUNTER:
 9       Q.   Okay.  Let me ask it a different way.
10   The different places that he stayed in at South
11   Florida Reception Center, why was he placed in
12   those different locations?
13       A.   He was placed in F dorm because of his
14   chronic condition.  He was in C dorm because he
15   did have a medical issue which is our medical
16   dorm and he was in the infirmary because of some
17   administrative issues with security.
18       Q.   Okay.  Did he receive medical care in
19   all those locations?
20            MR. COLGAN:  Object to the form of the
21       question.
22            MS. HUNTER:  What's wrong with the
23       form?
24            MR. COLGAN:  Medical care is vague.
25   BY MS. HUNTER:
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        100

1       Q.    Do you know what I mean by medical care

2   as a physician who has practiced medicine in the

3   state of Florida and provided care to inmates?

4       A.    Yes, did he receive care from licensed

5   physicians, which he did, at all times.

6       Q.    Okay.  I know you have looked at a lot

7   of medical records today.  And we appreciate the

8   time you have spent doing that.  In reviewing the

9   medical records both today and in preparation for

10  your deposition, were you able to identify any

11  documentation suggesting that Mr. Horn went

12  through withdrawal from morphine at any point in

13  time, either being reduced or discontinued?

14      A.    No indication whatsoever.

15      Q.    When you were looking at the medical

16  chart today for answering Mr. Colgan's questions,

17  during November of 2013 and December of 2013 did

18  you identify any occasions in which Mr. Horn

19  actually refused medication that would have been

20  for pain control?

21      A.    Yes.

22      Q.    Let me see if we can find that.  Can

23  you tell me where you have located that

24  information?

25      A.    It's in the medical record dated



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                101

```
 1  11/27/13 at 10:00 o'clock where he refused all

 2  tentative medications.

 3       Q.   Would he have been refusing pain

 4  medication by doing that?

 5       A.   Yes.

 6       Q.   In your experience as a healthcare

 7  provider over the many years that you have been a

 8  physician and also providing care to people in

 9  the prison setting, if someone is in pain that is

10  continuous, would they refuse pain medicine?

11            MR. COLGAN:  Object to the form of the

12       question.

13            MS. HUNTER:  What's wrong with the

14       form?

15            MR. COLGAN:  Speculation.

16  BY MS. HUNTER:

17       Q.   Do you need to speculate to answer this

18  question, sir?

19       A.   No.

20       Q.   Based open your training and experience

21  and the years you provided medical care what does

22  your experience tell you about people who are in

23  pain refusing pain medication?

24       A.   They don't.

25            MR. COLGAN:  Object to the form.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                     102

1        Vague, same objection as before.

2   BY MS. HUNTER:

3        Q.    Now, you mentioned as part of your

4   review of the medical records that you believe

5   that Mr. Horn was titrated, his dose of morphine

6   was titrated.  What does that mean again?

7        A.    That his dose was lowered.

8        Q.    Okay.  And how is that done?

9        A.    In incremental steps.

10        Q.    And so let's take a look.  I mean, at

11   one point in time he was receiving 60 milligrams

12   of morphine, is that correct?

13        A.    That's correct.

14        Q.    And then it was titrated to what?

15        A.    30.

16        Q.    What's the purpose of doing that?

17        A.    To prevent any kind of withdrawal

18   symptoms and to remove somebody from a

19   potentially addicting narcotic.

20        Q.    Is it healthy for someone to stay on a

21   narcotic medication such as morphine over a long

22   period of time?

23        A.    No.

24        Q.    Why?

25              MR. COLGAN:  Object to the form of the



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    103

```
 1      question.

 2   BY MS. HUNTER:

 3      Q.    Why?

 4      A.    There are two reasons.  One you'll

 5   develop a tolerance to the medication.  And, two,

 6   there is a high potential for addiction to that

 7   medication.

 8      Q.    Toradol is what type of medication?

 9      A.    Nonsteroidal anti-inflammatory agent.

10      Q.    Okay.  Elavil we already have been told

11   is a neuropathic medication?

12      A.    Yes.

13      Q.    So in place of one medication Mr. Horn

14   was actually given several medications to help

15   control his pain, correct?

16      A.    Yes.

17      Q.    Are those medications somehow cheaper

18   than the morphine that he was given?

19      A.    They're actually more expensive.

20      Q.    With regard to the decision to titrate

21   down the morphine or to allegedly stop the

22   medication of the morphine, did you have any

23   direct involvement with that decision?

24      A.    No.

25      Q.    Do you have any recollection of
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                          104

```
 1   Mr. Horn specifically?

 2        A.   Yes.

 3        Q.   And tell me what is your recollection

 4   of where you encountered Mr. Horn, other than the

 5   one you told us about in the hallway, was there

 6   another encounter you had with him?

 7        A.   In the infirmary.

 8        Q.   Do you remember when that was?

 9        A.   It was in December or January,

10   December 2013 or early January 2014.

11        Q.   Okay.  And why were you seeing him in

12   the infirmary at that point?

13        A.   I was with Dr. Hernandez and we were

14   explaining to him his options as far as his

15   surgery was concerned and the decision not to

16   proceed, at that time.

17        Q.   Okay.  Did he seem to understand what

18   you explained to him?

19        A.   He understood.  He didn't like it.

20        Q.   Right.

21             MR. COLGAN:  Object to the form of the

22        question.  Motion to strike.  I don't think

23        that Dr. Reddick was in Mr. Horn's mind.

24   BY MS. HUNTER:

25        Q.   Did he express something to you that
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      105

```
 1   would indicate to you that he wasn't happy with

 2   Dr. Ponce de Leon's decision?

 3        A.   Yes, he did.

 4        Q.   What did he say?

 5        A.   He said Dr. Ponce de Leon is not a

 6   professor of orthopedics like Dr. Corces is.

 7        Q.   Is Dr. Corces a professor of

 8   orthopedics?

 9        A.   Not that I know of.

10        Q.   Do you know where Mr. Horn would have

11   possibly got that information?

12        A.   No, I don't.

13        Q.   As far as you know, is Dr. Ponce de

14   Leon a licensed physician in the state of

15   Florida?

16        A.   Yes, he is.

17        Q.   Is he a specialist in orthopedics?

18        A.   Yes, he is.

19        Q.   Is Dr. Ponce de Leon's care somehow

20   cheaper than Dr. Corces' care, to your knowledge?

21        A.   Not that I'm aware of.

22        Q.   Now, you've told us today that it's

23   your belief that Mr. Horn received a hip brace?

24        A.   Yes.

25        Q.   Okay.  And what is that based upon?
```



Orange Legal
800-275-7991

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    106

```
 1       A.   I actually saw him with a hip brace.
 2       Q.   Okay.  And when did you see him with
 3  it?
 4       A.   In the infirmary.
 5       Q.   Did you somehow receive as the
 6  representative for the Southern District some
 7  type of increase in your salary or bonuses by
 8  saving money for the care of patients?
 9       A.   Not at all.  I wish.
10       Q.   No, you didn't, did you?
11       A.   No, I didn't.
12       Q.   In your position with Wexford, did you
13  make any decisions one way or the other in the
14  care and treatment that you reviewed for Mr. Horn
15  based upon some type of cost cutting measure?
16       A.   Not at all.
17       Q.   Now, Mr. Horn gave a deposition in this
18  case already and it was his testimony that he
19  believes there was a conspiracy to prevent him
20  from having the hip surgery?
21            MR. COLGAN:  Object to the form of the
22       question.
23            MS. HUNTER:  What's wrong with the
24       form?
25            MR. COLGAN:  I don't believe it's a
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                      107

```
 1      proper characterization of what he said.

 2          MS. HUNTER:  All right.  I'm going to

 3      read it from his deposition then so I make

 4      sure I get it right.

 5          MR. COLGAN:  That's fine.

 6          MS. HUNTER:  Give me a second.

 7  BY MS. HUNTER:

 8      Q.    Let me ask you this:  Are you aware of

 9  any type of discussions, plan, secretive talks to

10  send Mr. Horn to see Dr. Ponce de Leon in order

11  to avoid him receiving a hip replacement?

12      A.    No.

13      Q.    Did that have anything at all to do

14  with why Mr. Horn was sent to see Dr. Ponce de

15  Leon?

16      A.    No.

17      Q.    One last question.  I'll withdraw that.

18  Did Wexford ever incentivize you to deny

19  nonemergent surgical care to patients at SFRC?

20      A.    No.

21      Q.    Did Wexford in your experience with

22  working with them on a regular and customary

23  basis deny nonemergency surgical care,

24  disregarding medical necessity in order to

25  maximize the profitability of South Florida
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                              108

```
 1   Reception Center?

 2        A.   No.

 3        Q.   Did you ever have a concern with that

 4   in the care of the patients that were under the

 5   supervision of Wexford while you were at South

 6   Florida Reception Center?

 7        A.   No.

 8             MS. HUNTER:  Okay.  That's all I have.

 9        One more, I got one more.

10   BY MS. HUNTER:

11        Q.   Did the Department of Corrections ever

12   come to you and say, you know, we're going to

13   incentivize you to deny medical care to prisoners

14   in the South Florida Reception Center?

15        A.   No.

16        Q.   At some point in time you were aware

17   Mr. Horn left South Florida Reception Center and

18   went to another facility in the northern part of

19   the state?

20        A.   Yes.

21        Q.   Do you happen to know when that was?

22   If you don't, that's okay.

23        A.   Not specifically.

24        Q.   If the records reflect that he left

25   sometime at the end of January of 2013, would
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                            109

```
 1   that kind of correspond to when you did a review

 2   of his chart based upon the date of the middle

 3   of January 2014 -- I'm sorry -- that you have

 4   looked over the chart?

 5       A.   Yes.

 6       Q.   Is that something you would do before

 7   transferring the patient to another facility, you

 8   would look through the chart and make sure the

 9   right things are being sent to that next

10   facility?

11       A.   Yes.

12           MS. HUNTER:  All right.  That's all I

13       have.

14               REDIRECT EXAMINATION

15   BY MR. COLGAN:

16       Q.   I just have a few follow-up questions.

17           You indicated that Mr. Horn was

18   titrated from his prescription of morphine, is

19   that correct?

20       A.   Yes.

21       Q.   When did that titration begin?

22       A.   From September 2013 through

23   October 2013, through November 2013 and December.

24   So those four months of the fall.

25       Q.   Who ordered Mr. Horn be titrated off
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                              110

1    the morphine?

2              MS. HUNTER:  Object to the form.

3              THE WITNESS:  You mean as to specific

4        physicians?  There were a couple, I believe.

5    BY MR. COLGAN:

6        Q.   You said a couple physicians?

7        A.   There were different physicians, yes.

8        Q.   Was there a determination that he

9    should be titrated off morphine?

10       A.   I was not involved in that decision.

11       Q.   Was there a decision made by a

12   particular physician?

13             MS. HUNTER:  Form, predicate.

14             THE WITNESS:  There were various

15       physicians.

16   BY MR. COLGAN:

17       Q.   To the best of your knowledge?

18       A.   There were different physicians

19   involved in his care at that time.

20       Q.   Did each physician independently decide

21   that he should have his dose of morphine reduced?

22       A.   I have no knowledge of that one way or

23   the other.

24       Q.   Where is the decision to titrate him in

25   the medical records?



Case 1:14-cv-20341-DPG  Document 148-1  Entered on FLSD Docket 08/15/2016  Page 112 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    111

1        MS. HUNTER:  Okay.  We're going to try

2     to figure out if we can find a note or a

3     date.  Okay.  It's going to take us a few

4     minutes.

5        MR. COLGAN:  Okay.

6        THE WITNESS:  There is a note from

7     10/29/13 saying decrease the morphine

8     sulfate for 14 days.

9  BY MR. COLGAN:

10     **Q.   You said 8/29/13?**

11     A.   No, 10/29/13.

12     **Q.   Okay.  And it states that he titrated**

13  **off the medication?**

14     A.   No, it says they were decreasing the

15  morphine and then doctor's orders after that

16  decreasing the morphine.

17     **Q.   Did that indicate it was part of a plan**

18  **that Mr. Horn be titrated off his course of**

19  **morphine?**

20     A.   Not specifically, just indicates that

21  they're decreasing the morphine.

22     **Q.   You mentioned before that morphine is**

23  **cheaper than some of the alternative drugs?**

24     A.   Say again, please?

25     **Q.   You mentioned before that morphine is**



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                         112

```
 1   cheaper than some of the alternative medications
 2   for Mr. Horn, is that correct?
 3       A.   In combination thereof, yes.
 4       Q.   How do you know the cost of those
 5   drugs?
 6       A.   I've seen it.  Morphine costs like a
 7   dollar or something a pill.
 8       Q.   YOU testified before you had nothing to
 9   do with the financial side for Wexford, is that
10   correct?
11       A.   I didn't understand the question.
12   Please repeat.
13       Q.   You stated before that you had nothing
14   to do with the financial side of decision making
15   for Wexford, correct?
16       A.   That's correct, but I have seen the
17   prices of medication independent of Wexford.
18       Q.   When did you see that?
19       A.   Throughout the course of my career.
20       Q.   I'm sorry?
21       A.   Throughout the course of my career.
22       Q.   You don't know what the cost is
23   currently?
24       A.   No, I don't.
25       Q.   Do you have access to, or did you have
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                113

```
 1   access as regional medical director to a list of

 2   drug prices in your office?

 3       A.   That came out very garbled.

 4            THE REPORTER:  Better repeat that,

 5       Counsel.

 6            MS. HUNTER:  Hello?

 7            MR. COLGAN:  Can you hear me?  What was

 8       the answer to my question?

 9            MS. HUNTER:  We couldn't understand

10       your question and the court reporter asked

11       you to repeat it.

12   BY MR. COLGAN:

13       Q.   My question was as regional medical

14   director did you have access to a list of drug

15   prices in your office?

16       A.   No.

17       Q.   Is not having a hip replacement surgery

18   performed cheaper than having a hip replacement

19   surgery performed?

20            MS. HUNTER:  Object to the form.

21            THE WITNESS:  That's difficult to

22       answer.  That's an individual case

23       determination.  I can't answer that.

24   BY MR. COLGAN:

25       Q.   Do you know approximately how much a
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    114

```
 1   hip replacement would cost?

 2       A.   No.

 3       Q.   What?

 4       A.   No.

 5       Q.   Let's say for the sake of argument that

 6   it costs $20,000 to perform the hip replacement

 7   surgery and you have one doctor who recommends

 8   the hip replacement surgery be done and another

 9   doctor who recommends that surgery not be done.

10   Is the latter course cheaper than the former

11   course?

12            MR. WEAVER:  Object to the form.

13            MS. HUNTER:  Form.

14            THE WITNESS:  And not necessarily so.

15       You know, that's individualized per patient.

16       So you can't really generalize like that.

17   BY MR. COLGAN:

18       Q.   Does it cost more to spend $20,000 or

19   not to spend $20,000?

20            MS. HUNTER:  Object to the form.  That

21       wasn't your question.  You're being

22       argumentative.  Go ahead.  If you can answer

23       that question, go for it.

24            THE WITNESS:  You're asking me is it

25       cheaper to spend 20,000 than to not spend
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    115

```
 1      it?
 2   BY MR. COLGAN:
 3      Q.    Correct.
 4      A.    Of course it is.
 5            MR. COLGAN:  I don't have anything
 6      further.
 7            MS. HUNTER:  I do.
 8                RECROSS-EXAMINATION
 9   BY MS. HUNTER:
10      Q.    Let me ask you something.  How much
11   does pain medicine and continual medical care
12   over a person's lifetime time mount up to, do you
13   have any idea?
14      A.    No, I don't.
15      Q.    For example, are you aware of any
16   estimate by any physician in this case saying
17   that Mr. Horn's hip replacement was going to cost
18   $20,000?
19      A.    No.
20      Q.    Are you aware of any evidence in this
21   medical record that indicates that a decision was
22   made not to give Mr. Horn a hip replacement
23   because it cost $20,000?
24      A.    No.
25            MS. HUNTER:  That's all I have.
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        116

```
 1          MR. WEAVER:  Hang on, Mike.  I have a

 2     quick follow-up based on previous questions.

 3          MR. COLGAN:  Okay.  Go ahead.

 4               RECROSS-EXAMINATION

 5  BY MR. WEAVER:

 6     Q.   You were questioned regarding whether

 7  DOC incentivized you to deny medical care at any

 8  point.  Related to that, did DOC, when you were a

 9  DOC employee, did anybody from DOC instruct you

10  to deny necessary medical care to save money or

11  increase profits?

12     A.   Not at all.

13     Q.   Were you ever, anybody from DOC ever

14  pressure you to deny necessary medical care to

15  save money?

16     A.   No.

17     Q.   In your capacity as the Wexford

18  Regional Medical Director, did anybody from DOC

19  ever instruct or pressure to deny necessary

20  medical care to save money?

21     A.   No.

22          MR. WEAVER:  Nothing further.

23          MS. HUNTER:  We'll read.

24          MR. COLGAN:  We'll order.

25          THE REPORTER:  Mr. Weaver, do you want
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                117

```
 1   a copy?

 2        MR. WEAVER:  Yes, we'll order a copy.

 3        THE REPORTER:  Ma'am, copy?

 4        MS. HUNTER:  Yes, absolutely.

 5       (The deposition was concluded at 1:35

 6   p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                              118

```
 1              CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF PALM BEACH

 5          I, EDWARD F. KIDD, RPR, LCR, Shorthand

 6   Reporter and Notary Public, State of Florida,

 7   certify that DAVID REDDICK, M.D., personally

 8   appeared before me and was duly sworn.

 9          Dated this 22nd day of July, 2015.

10

11          Edward F. Kidd

12          _____
            EDWARD F. KIDD, RPR, LCR
13          Notary Public, State of Florida
            My Commission:  FF028201
14          Expires 6/19/17

15

16

17

18

19

20

21

22

23

24

25
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                119

```
 1                CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF PALM BEACH

 5            I, EDWARD F. KIDD, RPR, LCR, Shorthand

 6   Reporter and Notary Public, State of Florida, do

 7   hereby certify that I was authorized to and did

 8   stenographically report the deposition of DAVID

 9   REDDICK, M.D.; that a review of the transcript

10   was requested; and the foregoing transcript,

11   pages 4 through page   , is a true and accurate

12   record of my stenographic notes.

13       I FURTHER CERTIFY that I am not a relative,

14   employee, attorney, or counsel of any of the

15   parties, nor am I a relative or employee of any

16   of the parties' attorney or counsel connected

17   with the action, nor am I financially interested

18   in the action.

19       Dated this 22nd day of July, 2015.

20
          Edward F. Kidd
21        _____

22        EDWARD F. KIDD, RPR, LCR
          Notary Public, State of Florida
23

24

25
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

120

```
 1               READING AND SIGNING

 2      I, DAVID REDDICK, M.D., have read the
    transcript in the case of HORN VS. CREWS, ET AL
 3  and I find:

 4  (MARK ONE)

 5  (  ) Under penalty of perjury, I declare the
    transcript is true, correct and completely
 6  accurate.

 7  (  ) Under penalty of perjury, I declare the
    transcript is true, correct and accurate, except
 8  as noted below, and citing page and line and
    reason for the correction.

 9

10               CORRECTIONS

11  Page - Line - Correction:

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23

                 _____
24  _____
         DATE                    DAVID REDDICK, M.D.
25
```



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                                    121

```
JULY 25, 2015

DAVID REDDICK, M.D.
c/o M. KATHERINE HUNTER, ESQUIRE
OF:     CHIMPOULIS, HUNTER & LYNN, P.A.
        150 South Pine Island Road
        Suite 510
        Plantation, Florida 33324

In Re:     7/15/15 deposition of DAVID REDDICK,
M.D.  HORN VS. CREWS, ET AL

Dear Dr. Reddick:

This letter is to advise that the transcript for
the above-referenced deposition has been
completed and is available for review.  Please
contact our office at (800) 275-7991 to make
arrangements to read and sign, or sign below to
waive review of this transcript.

It is suggested that the review of this
transcript be completed within 30 days of your
receipt of this letter, as considered reasonable
under Federal Rules*; however, there is no
Florida Statute to this regard.

The original of this transcript has been
forwarded to the ordering party and your errata,
once received, will be forwarded to all ordering
parties for inclusion in the transcript.

Sincerely,

Edward F. Kidd, RPR. LCR
Orange Legal

cc:     Shane Weaver, Michael Colgan

Waiver:

I, DAVID REDDICK, M.D., hereby waive the reading
& signing of my deposition transcript.

_____

_____
DAVID REDDICK, M.D.                        Date

                *Federal Civil Procedure Rule
30(e)/Florida Civil Procedure Rule 1.310(e)
```



**Orange Legal**
**800-275-7991**

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

Index: $20,000..attention

**$**

**$20,000** 114:6,18,19 115:18,23

**1**

**1** 90:22

**1/31/12** 49:10

**1/9/14** 21:8 54:10

**10** 85:3,4,9

**10/29/13** 111:7,11

**10:00** 101:1

**11/15/11** 39:11,17

**11/27/13** 101:1

**12/13/13** 49:19,23 50:2 53:12 60:18 87:10

**120** 38:24

**13** 16:22 17:1

**13th** 46:23

**14** 111:8

**15** 17:1 53:5

**15,000** 84:4

**15th** 52:23 53:1,6

**18** 80:25

**1983** 51:22

**1985** 6:25

**1989** 7:5,6 96:17

**1993** 8:1,2

**1:35** 117:5

**2**

**2/22/13** 48:11

**20,000** 114:25

**2003** 8:8,9,23 96:20

**2007** 8:23 12:5 69:11

**2011** 25:6 27:21 28:5,7 30:7 33:1,4,

17 34:5,14,21 37:2, 9,13,25 38:14,16 39:20 41:1,3 67:11

**2012** 34:22 49:2 86:20

**2013** 12:5,6 19:17 46:23,24 47:14,18 48:17 52:23,24 53:2, 5,10 58:18 67:15 70:9 81:1,21,24 82:17,19 86:2,8,16, 19 92:24 94:3 95:2 97:3,15 100:17 104:10 108:25 109:22,23

**2014** 54:16 74:24 104:10 109:3

**2015** 16:21,25 95:7

**20th** 37:2

**27** 47:18

**28th** 47:14

**3**

**30** 102:15

**31st** 49:2

**3rd** 52:24

**4**

**4** 8:1,2

**4/22/13** 21:7

**5**

**5/7/13** 47:17

**51** 55:16

**6**

**6/25/13** 48:10 91:17 92:3

**60** 102:11

**7**

**7/23/13** 48:10

**8**

**8/21/13** 55:8

**8/28/13** 55:14,21

**8/29/13** 111:10

**9**

**9** 54:16

**9/15/11** 37:16 40:8

**9/20/11** 37:2

**9/2011** 37:22

**9th** 74:24

**A**

**abductor** 73:3 74:14

**ability** 95:18

**abruptly** 81:4

**abscess** 30:8,19 34:4 76:10

**absence** 79:16

**absolutely** 23:15 34:11 117:4

**accept** 60:21

**access** 112:25 113:1, 14

**accurate** 28:16 34:10 98:17

**acknowledging** 21:24

**activity** 64:25

**actual** 32:21 94:19

**addicted** 69:19,25

**addicting** 78:16,20, 21 102:19

**addiction** 103:6

**addition** 31:8

**additional** 88:7

**administered** 72:10,12

**administration** 64:25 83:12

**administrative** 9:25 10:10 99:17

**admissible** 26:15

**admission** 33:7 34:1 37:9,25

**admitted** 32:25 33:12,16,19,22,25 34:4 37:16

**advise** 60:6,18 87:3

**advised** 53:13 65:22 94:7

**agent** 103:9

**agents** 78:24

**agree** 93:18

**ahead** 21:23 22:20, 21 26:16,23 27:8,17 29:9,18 36:22 52:10 82:21 114:22 116:3

**allegation** 27:25 28:3

**allegations** 22:9,24 33:17 24:15,18,20 28:10 76:25 77:8

**allegedly** 103:21

**alleging** 87:17

**allowed** 27:14,16

**alternate** 55:21 56:12,14,18 63:24 64:4

**alternative** 13:19 56:3,4 111:23 112:1

**alternatives** 65:24

**ambiguous** 33:11, 12 82:23

**amended** 22:9,18

**and/or** 25:1

**annually** 65:8

**answering** 100:16

**answers** 26:9

**anti-inflammatory** 78:23 103:9

**antibiotics** 21:16

**anymore** 26:21 50:17,20

**appeal** 95:21

**appears** 37:1

**application** 79:9

**appointment** 86:15

**approached** 69:18, 24 70:3

**appropriateness** 68:25

**approval** 10:7 15:9 70:15 93:13 94:18

**approve** 13:18 69:12

**approved** 52:19,21 53:18 55:12 69:16 93:12 94:12

**approving** 9:25 15:11

**approximately** 17:7,10 93:3 113:25

**area** 69:2

**areas** 58:5

**argument** 114:5

**argumentative** 28:8 32:11 114:22

**arranged** 91:19

**artificial** 27:23 30:9 31:15 32:6,18

**Arturo** 42:2 67:1

**association** 42:13

**assuming** 55:22

**attach** 35:24 36:2 46:15

**attention** 51:1 54:12



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

**attorney** 5:16 78:8 84:20

**attorneys** 77:13 84:16

**August** 52:23 53:1, 5,6,10 58:18

**authority** 24:3 75:19 76:1,6 89:4

**authorization** 52:19

**automatically** 93:15

**avoid** 65:23 107:11

**aware** 28:13 49:25 61:12 64:21 72:15 74:13 75:7 76:9,15, 21 77:13 78:8 81:20 90:8 105:21 107:8 108:16 115:15,20

---

**B**

**B-o-r-r-e-r-o** 38:8

**back** 20:22 26:17 29:22,24 35:9,11 36:15,21 39:5,9,25 41:23 52:14 72:1,3 93:9

**ball** 27:23

**Baptist** 50:6,12,14, 19

**Barros** 37:16

**based** 11:21,23 74:5 77:7 78:3 84:9 98:11 101:20 105:25 106:15 109:2 116:2

**basically** 29:13 52:2

**basis** 10:13,18,19 24:24 26:12 27:17 29:1,2,8 34:2 107:23

**Bates** 90:21

**begin** 12:21 67:13 109:21

**beginning** 47:25 48:1

**belief** 105:23

**believes** 106:19

**Belle** 7:14,22

**blood** 30:25

**blue** 14:11

**body** 92:14

**bone** 27:24

**bonuses** 106:7

**Borrero** 38:8

**Boston** 6:22,23

**boy** 81:25

**brace** 73:3,5,6,7,9 74:21 75:2,8 105:23 106:1

**braces** 74:14

**break** 6:6,9 75:13 84:24

**bring** 26:10

**broad** 27:7 43:16

**Broward** 9:5 10:25

---

**C**

**C-a-l-d-e-r-o-n** 38:7

**Calderon** 38:7

**call** 13:3,22 14:4,14 52:18 56:14,25 57:15,19,21 62:16 66:8,16 89:1,4

**called** 5:11 12:24

**calls** 27:7 84:14

**capacity** 116:17

**care** 11:24,25 12:1 18:5 34:8 43:11,22 49:13 50:9,17,20 59:21 62:2,6,12 63:5,13,14 65:13 67:17 79:13 84:10, 12,13 89:24 98:1,4, 10,23 99:4,18,24 100:1,3,4 101:8,21 105:19,20 106:8,14 107:19,23 108:4,13

110:19 115:11 116:7,10,14,20

**career** 112:19,21

**case** 5:17 26:8 42:13 52:17 76:23 77:9 88:9 89:9,14 106:18 113:22 115:16

**cases** 13:15,16 89:2

**CAT** 63:19,21

**catheter** 21:15

**caught** 72:24

**caused** 31:18

**Center** 19:5 32:25 33:17 38:13,23 43:10,21 50:10,18 58:14,20 60:20,21 61:10 66:23 67:11, 14 70:5,20 85:13 97:14,21 98:2,11,16, 20 99:3,11 108:1,6, 14,17

**Center's** 83:13

**central** 66:9

**chance** 91:22

**change** 66:22

**changed** 23:6 50:4, 8,24 69:9 97:23

**characterization** 107:1

**charge** 57:7

**chart** 21:6 47:23 49:18 54:18,20 80:17 82:25 83:6 100:16 109:2,4,8

**charts** 83:3

**cheaper** 98:5 103:17 105:20 111:23 112:1 113:18 114:10,25

**cheapest** 52:1

**cheek** 72:22

**chief** 6:17 9:2 12:17 14:1 18:3 85:18,19 95:5,17

**chills** 81:14,16

**CHO** 62:5 88:25 89:3

**chosen** 52:3

**chronic** 84:10,12,13 99:14

**chronological** 7:7

**CI** 65:5

**circumstances** 24:19

**civil** 51:22

**claiming** 51:23

**clarify** 13:7 29:9 89:20

**class** 83:17

**clear** 5:25 13:10 87:20 88:9 91:6 92:11

**client** 23:23 24:14 25:17

**clinics** 84:10,12,13

**code** 52:20

**Colgan** 5:14,15 8:17 9:23 10:20 11:1,5,22 13:4,8 16:14,19,24 17:4,12 19:2 20:7, 11,14,24 21:9 22:1, 12,15,22 23:2,4 24:2,9,12,17 25:10, 14 26:17,22,25 27:10,14,19 28:2,15, 21 29:5,21 30:2 31:21 32:4,13,23 33:3,9,14 34:11,19 35:8,17,23 36:2,15, 19,24 37:14 38:11, 18 39:2,12,19 40:3, 9,17 41:2,16 42:3,19 43:4,13 44:10,14,18, 24 45:18 46:1,5,11, 17,25 47:12 48:14, 21 49:20 51:10 52:5, 15 53:4,15,22 54:19 56:11 58:17 60:3 61:2,6,14,20 62:21 63:2,11 64:17 65:14 66:7 67:4,6 68:7,10, 15,20 69:22 70:24 72:6,20 74:1,16 75:4,9,14,17 76:4,

14,20 77:2,10,11,19 78:4,5,17 79:8,15,23 80:9,14,20 81:2,11 82:4,15 83:2,8,10,15 84:6,22 85:2 86:12 87:4,24 93:20 94:15, 22 98:6 99:6,20,24 101:11,15,25 102:25 104:21 106:21,25 107:5 109:15 110:5, 16 111:5,9 113:7,12, 24 114:17 115:2,5 116:3,24

**Colgan's** 100:16

**collegial** 12:25 13:2, 13,22 14:4,14 52:18 55:10,11,13,17,21 56:7,14,20,25 57:15, 21 62:5 66:8

**collegiate** 89:1,4

**combination** 112:3

**combined** 34:25

**comment** 23:17,24 55:22

**committee** 14:8,15, 21 15:1,5,10,17,20, 22,24 56:20 57:15, 16,21 59:17,20 62:16 64:3 66:8,13, 20

**common** 19:15 24:4

**communicated** 89:7

**communications** 78:7

**compensated** 88:8

**complaining** 51:19

**complaint** 22:9,18 23:16,22 24:5 25:9 52:6

**complete** 14:7 39:4 45:24

**complies** 5:3

**computer** 57:13

**concern** 69:19 70:3 108:3



**Orange Legal**
**800-275-7991**

Case 1:14-cv-20341-DPG   Document 148-1   Entered on FLSD Docket 08/15/2016   Page 125 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                    Index: concerned..difficult

**concerned** 104:15

**concerns** 81:3,8

**concluded** 117:5

**conclusion** 94:6

**conclusions** 23:18

**condition** 99:14

**conjunction** 13:17 56:15

**connection** 80:6

**consent** 94:20

**considered** 63:13,17

**consistent** 10:18 74:10

**conspiracy** 106:19

**consult** 13:18 15:9, 11 21:7,10,25 22:3,5 35:15 45:21 49:7,9, 10 52:17 54:4,5 58:8,11,13,18,25 59:3,6

**consultant** 13:17 14:6,11 42:21,22

**consultants** 13:16

**consultation** 43:1,8, 19,24 59:15 86:15, 22 92:23 95:10

**consultations** 47:2, 7 48:16

**consulted** 44:5,11, 12,20 86:11

**consults** 47:9 84:14

**consume** 72:11

**contact** 14:3 21:22

**contacted** 70:10

**content** 23:11

**contest** 27:25 28:3

**context** 18:20 42:20 72:16

**contexts** 79:5

**Contin** 82:5,9 83:17 96:6

**continual** 115:11

**continue** 28:25

**continuing** 39:16

**continuous** 101:10

**contract** 16:8 97:9, 11

**contracted** 50:15 93:23

**contrast** 39:14

**control** 61:23 100:20 103:15

**controlled** 81:22

**conversations** 19:13 77:12

**coordinator** 58:9, 12,13,19,25 59:3,6

**copy** 117:1,2,3

**copying** 80:23

**Corces** 42:2,4,7,16 43:2 44:6 45:2,6,11, 20,25 46:6,19,22 47:3,6 48:17,22 49:13,23 50:2,3,5,9 67:1 91:5,17 93:2,6 105:6,7

**Corces'** 46:9,15 47:9,23 91:10 105:20

**Corp** 7:20

**corporate** 57:5 60:25 61:3,9 64:23 65:9,16

**correct** 13:3 17:2 19:10 27:25 31:11, 12 33:17,18 37:13 44:21 45:11,12 48:23 49:4 50:11,22 51:16 56:21 59:8,9 63:15 66:21 69:16 72:14 74:18,19,25 79:5 86:9 92:25 93:7,19 94:4,14 102:12,13 103:15 109:19 112:2,10,15, 16 115:3

**correctional** 6:18 8:20 9:5 10:25

12:18,19

**Corrections** 8:12, 19,25 9:7 25:2 84:1 96:24 97:2,10,12 108:11

**correspond** 109:1

**cost** 11:24,25 12:2 51:25 52:1 61:23,25 62:23 63:13,15,17 66:1 74:4,10,14 96:4,5 106:15 112:4, 22 114:1,18 115:17, 23

**costs** 62:10 112:6 114:6

**counsel** 90:24 113:5

**count** 48:19

**County** 97:24

**couple** 5:21 10:19 58:21 96:12 110:4,6

**court** 5:25 29:24 35:11 36:21 39:9 40:1 41:23 72:3 113:10

**criteria** 13:20 14:25 63:22 64:2

**CROSS-EXAMINATION** 85:6 96:13

**CT** 39:14

**cultures** 32:1

**customary** 107:22

**cutting** 106:15

**cyst** 30:23 39:18

**D**

**date** 20:2,9,16 30:12 36:25 41:14,18 46:22 50:25 52:22 55:6 58:16 67:13 92:1 95:11 109:2 111:3

**dated** 21:7 91:17 100:25

**dates** 25:7,8 45:8,22 46:10,18 47:15,25 48:7,25 49:16 58:22 80:24 86:4,6 91:10

**David** 5:10 6:12

**day** 82:20

**day-to-day** 9:20 18:4

**days** 47:22 111:8

**DC4702** 14:13

**de** 44:1,3,11 45:1,4 48:25 49:3,11,12,22 50:1 60:5,11,17 86:11,15,19,20,22 87:2,7,9 92:23 93:23 94:3,5 105:2,5,13,19 107:10,14

**dealing** 50:7 70:5

**December** 67:15 70:9 80:25 82:17,18 85:25 92:24 94:3 100:17 104:9,10 109:23

**decide** 14:3 110:20

**decided** 66:25

**decision** 10:23 11:9 15:12,15,16 50:23 59:18,19,21 60:19, 20 61:1,3,9,16 62:7, 17 67:17 70:14 74:20 75:19 76:6 89:3 90:7 95:19 103:20,23 104:15 105:2 110:10,11,24 112:14 115:21

**decisions** 11:21,23 13:17 62:22 64:13, 19 67:20,22 106:13

**decrease** 111:7

**decreasing** 111:14, 16,21

**defect** 30:8 32:15,17, 20

**defective** 32:6,8,9

**defendant** 5:18

**Defense** 90:22

**define** 11:14 28:4

**definitively** 31:18

**degree** 6:19

**delayed** 76:11

**deliberate** 51:23

**denied** 77:14 78:9, 10,12

**denies** 24:18

**deny** 24:20 107:18, 23 108:13 116:7,10, 14,19

**department** 7:11 8:11,19 9:6,17,20 25:2 83:25 96:23 97:2,10,12 108:11

**depo** 89:18

**deposition** 5:19,22 25:12,16 84:17 93:10 100:10 106:17 107:3 117:5

**depositions** 29:6

**Describe** 13:12

**description** 28:16

**designated** 58:24

**details** 70:19

**determination** 32:17 83:1 110:8 113:23

**determine** 13:19 31:23 38:2 52:1

**determined** 56:6

**determines** 15:5,10

**determining** 15:1 64:4

**develop** 103:5

**developed** 30:7

**diagnosis** 39:18

**dictated** 61:23

**difference** 96:4,5

**difficult** 31:17 80:22 113:21



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

Index: direct..form

**direct** 5:13 10:2 91:1 103:23

**directed** 62:7

**direction** 29:16

**directly** 97:2

**director** 9:10,13 10:21 11:7 12:4,10 14:20 15:25 16:1 17:8 18:3 43:19 57:10 61:21 62:3,9, 13 65:6 66:11 68:17, 22 75:18 85:14 95:4, 9 113:1,14 116:18

**director's** 9:16

**directors** 10:11

**disclose** 76:22

**discontinuation** 87:16

**discontinue** 70:15, 17

**discontinued** 76:16 87:21 100:13

**discontinuing** 81:4

**discuss** 74:6

**discussed** 13:16 56:23 87:15 88:19 89:8 92:8

**discussing** 77:8

**discussion** 20:21 22:19 35:7 36:6 38:10

**discussions** 65:17 107:9

**dispute** 23:5,7

**disregarding** 107:24

**District** 106:6

**DOC** 116:7,8,9,13, 18

**doctor** 73:15 114:7,9

**doctor's** 94:19 111:15

**doctors** 37:3,6,10, 21,24

**document** 23:23 51:13 54:1,3,9,10,11 56:2 57:20,23 60:16 73:14,16,17,19 74:18 90:14

**documentation** 100:11

**documents** 51:6 56:25 57:1 62:16 63:3

**dollar** 112:7

**dorm** 19:11 98:22, 23,24 99:13,14,16

**dosage** 88:22

**dose** 71:24 72:8,9,13, 16 88:12 102:5,7 110:21

**dosed** 72:5

**downward** 88:2

**dozen** 48:17

**drafted** 23:22

**drinks** 75:16

**drug** 9:25 10:4,9 68:7,11,17,23 69:1, 10,12 70:5,13,15,17, 20 71:7,13 96:1 113:2,14

**drugs** 69:20,25 71:9, 12 111:23 112:5

**due** 31:14

**duly** 5:12

**durable** 74:15

**duties** 7:15 9:16,25 10:11 68:22

**E**

**earlier** 63:12 68:4 93:10

**early** 85:25 104:10

**ease** 90:20

**Eastern** 8:5

**effect** 10:2

**effective** 78:25

**Elavil** 79:21,24 80:15 88:18 103:10

**employed** 6:14 96:23 98:2

**employee** 11:2 25:1 61:22 116:9

**employment** 97:1

**enclosing** 74:4

**encounter** 104:6

**encountered** 104:4

**end** 86:7 97:2,4 108:25

**engaged** 51:25

**entitled** 24:21 26:7

**equipment** 74:15

**essence** 27:5

**essentially** 18:15

**estimate** 16:15 74:5 115:16

**estimates** 74:10,14

**Evaluate** 68:24

**evaluation** 44:16 45:11

**eventual** 52:20

**evidence** 24:5 26:3 115:20

**exact** 18:14 45:22 50:25 86:6

**examination** 5:13 31:22 39:10,13 109:14

**exception** 10:1,4,9 68:7,12,18,23 69:1, 10,13 70:15,17

**executive** 14:20

**exhibit** 35:25 36:3,7, 9,11,13 51:2 53:24 60:8 73:11,19 74:9 91:7,9

**exhibits** 51:7

**expensive** 52:3

63:21 96:1 103:19

**experience** 101:6, 20,22 107:21

**experienced** 52:3

**experiencing** 80:2,5

**explain** 32:7 62:10

**explained** 104:18

**explaining** 104:14

**explore** 83:16

**express** 104:25

**extended** 97:24

**extremely** 92:15

**F**

**facility** 11:2 88:25 108:18 109:7,10

**factor** 12:2

**factual** 23:20,25 24:24

**failure** 30:8 31:14 32:6,8,9

**fair** 48:16 83:4

**fall** 109:24

**familiar** 12:24 13:11 18:8 54:1 67:7 95:16

**February** 47:18 95:2 97:3

**feel** 95:22

**felt** 14:5

**female** 18:6

**femur** 27:25 39:14

**fever** 81:18

**figure** 90:25 111:2

**file** 59:11

**filed** 5:17 18:18

**fill** 58:5

**filled** 30:23 59:22

**finances** 62:14 63:9 65:21

**financial** 64:13,18 65:18 112:9,14

**find** 20:8,25 21:4 37:9 82:24 100:22 111:2

**fine** 17:5 20:14 26:22 35:17 41:18 46:19 75:14 77:10 95:13 107:5

**finish** 5:23 52:13

**finished** 8:3

**firsthand** 34:2

**Fisher** 16:2,4,6 17:6, 7

**Fisher's** 17:20

**fix** 29:3

**flip** 91:19

**Florida** 7:2,10,12,14 8:11,21 9:6 19:4 25:2 43:10,20 58:14, 19 64:12,25 65:10, 19 66:12,15,17 67:10,14 70:4,20 83:25 85:12 97:5,10, 13,20 98:1,11,16,19 99:2,11 100:3 105:15 107:25 108:6,14,17

**fluid** 30:23

**follow-up** 109:16 116:2

**force** 94:12

**form** 9:22 10:16 11:3,15 14:7,9,11,16 16:16 17:9 21:3,23 23:13 26:1,6 27:6 28:18 29:7,8,18 31:16,25 32:11,19 33:8,10 37:5 38:15 40:16,18,21 42:17 43:3,12 44:7,15,23 45:15 46:14 47:7 48:18 51:20 52:9 53:7,19 54:17 56:8 57:12,23,25 58:2,3, 4,15 60:23 61:4,11, 17 62:18,25 63:7 64:14,15 65:11 66:3 68:19 69:21 70:21



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

71:17,25 72:18
73:18 74:12 75:3,6
76:3,12,18 77:16
78:14 79:7,12,18
80:11 81:9 82:22
84:2 86:12 87:22,23,
24 89:15 93:20
94:15,22 95:20 98:6
99:6,20,23 101:11,
14,25 102:25 104:21
106:21,24 110:2,13
113:20 114:12,13,20

**format** 58:3

**forms** 71:18

**frame** 93:2

**free** 58:3

**FREEDMAN**
34:14,21,25 91:4

**front** 39:1 47:10,16
51:9 53:25 73:12
91:13

**full** 6:10

---

**G**

**gained** 77:7

**garbled** 113:3

**gave** 106:17

**Gaxiola** 70:11,12
71:4

**general** 10:1 27:2
96:2

**generalize** 114:16

**generally** 65:22
66:2 67:23,24 72:4
95:25

**generated** 54:9

**George** 5:16 18:9
38:8 43:10,18,21
45:5,10 47:2 48:16
51:16,17,19 59:21
67:18 69:13,19,25
70:25 71:6 74:21
76:10,17 78:9 79:21

**give** 5:5 16:15 20:2
22:17 37:19 51:18
63:20 83:8,10 107:6

115:22

**Glade** 7:14,22

**globally** 40:17

**God** 5:7

**Good** 5:15

**grade** 15:13 81:18

**graduate** 6:23

**great** 29:3 80:23
85:4

**grievance** 51:14,16
52:16,21,22 53:17
93:11,12 94:11,18

**grievances** 10:14

**ground** 5:21

**group** 90:14

**guess** 16:7,11 41:13
57:25 59:25 93:8

**guessing** 16:8

**guest** 8:4

**gynecologist** 18:6

---

**H**

**half** 7:18 48:17 97:8,
23

**hall** 19:14

**hallway** 104:5

**hand** 5:2 38:9 51:3

**handling** 23:14

**handset** 13:10

**handwriting** 60:13

**handy** 22:10

**Hang** 116:1

**happen** 108:21

**happy** 74:6 105:1

**hard** 32:22

**Hardy** 97:24

**harm** 64:7

**he'll** 29:4

**head** 6:5

**heading** 91:15

**health** 6:15,17 7:11,
20 9:2 12:7,9,17
14:1 18:3 51:24 63:9
64:19 65:21 66:25
85:18,19 87:11 95:5,
17 97:6,25 98:4

**healthcare** 96:19,21
101:6

**healthy** 102:20

**hear** 19:1 41:20
42:20 113:7

**heard** 19:22,25
42:12,15 67:4

**Hernandez** 67:8
104:13

**hierarchy** 76:8

**high** 103:6

**hip** 19:19,20,23 20:1
21:20 27:21,23
28:13,17,19 30:9
31:6,11,15 32:6,18,
21 39:22 40:12 41:4,
5 44:17,20 45:2,5
52:13 53:1 55:11,16,
18 60:6 73:3 79:16
80:6,7,10 86:23
89:13 92:5,12
105:23 106:1,20
107:11 113:17,18
114:1,6,8 115:17,22

**HMO** 11:20

**hold** 49:17

**Homestead** 6:18
12:18,20,21 18:4,7
65:5 95:5

**hoping** 20:16

**Horn** 5:16 18:9
38:13 43:18 44:5,20
45:5,6,10,20 46:19
47:2 48:16 49:22
50:1 51:16,17 55:16
59:21 67:18 69:13,
19,25 70:25 71:6,20,
22,23 72:12,24 73:2
74:6,21 76:17 78:9
79:21 80:2 81:21

82:3,9 86:10 90:3
92:17 94:2 95:9
98:14 99:2 100:11,
18 102:5 103:13
104:1,4 105:10,23
106:14,17 107:10,14
108:17 109:17,25
111:18 112:2 115:22

**Horn's** 43:11,21
76:10 86:14 89:8,13
90:9 92:5 104:23
115:17

**Horns** 51:19

**Hospital** 50:6,13,15,
16,19 66:24 95:10

**Hosseini** 53:17
85:12 86:18,23
87:10,16,17 89:7

**Hosseini'** 89:12

**Hosseini's** 90:1

**housed** 99:2

**huh-uh** 6:5

**Hunter** 8:15 9:22
10:16,24 11:3,15,17
13:2,5 14:16,18
16:10,13,16,23 17:2,
9 18:25 20:6,10,12,
15,20,22 21:2,23
22:11,14,16,20 23:1,
3,13 24:4,11,16,22
25:13,25 26:19,23
27:6,12,16 28:1,8,
11,18,24 29:15
31:16,25 32:11,19
33:2,8,11 34:6,15,23
35:2,6,12,20,24
36:22 37:4,17,23
38:15,20 39:3,16,23
40:2,4,15,18,21
41:9,14,19,24 42:17
43:3,12 44:8,12,15,
22 45:15 46:1,3,8,
12,20 47:4,15,19,21
48:3,7,12,18 49:17
51:5,20 52:8 53:3,7,
20 54:17 56:8 58:15
59:24 60:24 61:4,11,
18 62:18,25 63:7
64:14 66:3 67:3,5
68:19 69:21 71:25
73:20,24 74:12 75:3,

6,12,15 76:3,12,18,
22 77:5,15 78:2,13
79:7,12,18 80:11,16,
21 81:9,24 82:11,18
83:4,9 84:2,24 85:4
86:1 87:1,8,23 89:15
90:17 91:8 95:20
96:11,14 98:9 99:8,
22,25 101:13,16
102:2 103:2 104:24
106:23 107:2,6,7
108:8,10 109:12
110:2,13 111:1
113:6,9,20 114:13,
20 115:7,9,25
116:23 117:4

---

**I**

**ibuprofen** 78:24,25
79:4,10 88:23

**idea** 73:1 95:24
97:11 115:13

**identification** 36:7,
9,11,13

**identify** 37:11
100:10,18

**III** 97:23

**implant** 39:22 40:12
41:4

**implanting** 27:22

**impossibility** 84:4

**inappropriate**
23:15 26:1 79:11

**inaudible** 12:25
18:15 22:3 23:11
30:15,16 68:5

**incentivize** 107:18
108:13

**incentivized** 116:7

**inception** 16:7

**Including** 48:15

**incomplete** 38:24

**increase** 90:11
106:7 116:11

**increases** 6:2



Case 1:14-cv-20341-DPG   Document 148-1   Entered on FLSD Docket 08/15/2016   Page 128 of 133

GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

Index: incremental..medical

**incremental** 102:9

**independent** 112:17

**independently** 110:20

**indication** 100:14

**indifference** 51:23

**individual** 66:5 67:19,21 113:22

**individualized** 64:10 114:15

**inexpensive** 96:3

**infection** 21:20 30:7,11,13,16,19 31:1,3,4,6,10,14,19, 20,24 92:15

**infirmary** 18:23,24 19:3,6,11 98:25 99:16 104:7,12 106:4

**information** 34:10 56:16 62:23 63:20 66:18 100:24 105:11

**informed** 15:23 71:3

**inherent** 75:25

**injury** 92:10

**inmate** 18:8 51:14 58:7 62:2,6 63:5,14 64:5,8 72:15

**inmate's** 59:10

**inmates** 18:5 50:7, 17,20 60:22 62:11 84:4,12 98:4 100:3

**inserted** 22:7

**insist** 25:16

**installed** 21:18

**instance** 63:18 66:5 79:14,17

**Institute** 91:16

**institution** 6:18 8:20,25 9:5 10:3 12:18,19 14:1 15:8 18:7 62:5 95:18

**institutional** 13:14, 20 65:5 75:20 76:7

**institutions** 10:13 13:14

**instruct** 76:24 116:9,19

**instructed** 26:4 98:3

**instructing** 29:13 77:3,5

**instruction** 77:3 78:3

**intent** 51:21

**interested** 50:7,16, 19

**interrogatories** 24:13

**interrupt** 13:6

**intervention** 40:7

**invoices** 62:1,6

**involved** 10:22 11:25 18:4 21:21 25:8 54:6 59:17,20 61:24 62:14 63:8 64:12 65:20 67:16 68:5 71:6 74:7,11,20 110:10,19

**involvement** 68:11, 16 90:6 103:23

**issue** 70:23 87:14 89:13 99:15

**issues** 99:17

**IV** 9:6,11 11:8 12:4 21:15 97:22

### J

**January** 12:23 49:2 54:16 74:24 95:7 104:9,10 108:25 109:3

**Jerome** 6:12

**job** 23:6 59:2,4,5 68:22

**Join** 44:8 53:20 60:24 61:18

**joint** 27:23,24 30:9 31:15 32:6,18,21 91:16

**Jose** 37:15

**Juan** 38:5

**judge** 25:20 26:10

**July** 16:18,20 30:7

**June** 16:18,20

**jury** 24:6 26:10

### K

**Katherine** 33:10

**Kendall** 32:25 33:16 34:24 35:1,20 38:13, 23 45:23 50:10,16, 18 60:19,21 61:10 66:23 83:13 90:15 91:2,3

**kind** 102:17 109:1

**knowledge** 24:15 30:10 77:6 105:20 110:17,22

### L

**label** 80:1

**lack** 28:1 29:2,10 46:14 98:20

**large** 90:14

**Larkin** 50:15 66:23

**late** 85:25 86:16

**law** 25:12

**lawsuit** 18:17,19

**lawyer** 77:8

**learn** 30:13 76:25

**lecturer** 8:4

**left** 55:11 85:23 94:25 95:3 108:17, 24

**leg** 76:11

**legal** 23:17,23 24:2 26:2,12 27:17 29:2

**length** 92:9

**Leon** 44:2,3,11 45:1, 4 49:1,3,11,12,22 50:1 60:5,11,17 86:11,16,19,20,22 92:24 93:23 94:3 105:5,14 107:10,15

**Leon's** 87:2,7,10 94:5 105:2,19

**lesser** 78:16,18,20, 21

**lesson** 25:11

**letter** 57:24,25 58:1, 3,6 74:3,11,23

**level** 88:5

**licensed** 7:1,4,9 100:4 105:14

**life** 81:14

**lifetime** 115:12

**liquid** 69:13 71:16 72:12,16,22 95:25 96:5

**list** 7:7 37:5,9 113:1, 14

**listening** 26:6

**located** 19:4 100:23

**locations** 98:21 99:3,12,19

**long** 7:17,24 8:7 12:3 96:15,18 102:21

**long-term** 21:15 98:24

**longer** 65:3

**looked** 89:17 100:6 109:4

**lot** 82:1 100:6

**lots** 54:25

**loud** 6:4 51:12

**low** 81:18

**Lowell** 8:20,25

**lowered** 102:7

**Lowering** 88:12

### M

**M.D.** 5:10

**made** 11:23 13:18 24:19 38:13 43:9 50:23 55:22 57:19 60:20 61:9,16 63:19 67:17 75:19 76:21 77:13 78:8 90:8 110:11 115:22

**make** 11:20 23:23 48:8 62:17 70:14 83:1 106:13 107:3 109:8

**makes** 15:15,16 57:14 67:19

**making** 10:1,23 11:9 19:7,9 57:17 62:7 64:13,18 67:17 74:21 89:4 112:14

**management** 10:22 11:9,11,19 13:15 56:13 59:7,14 63:23 64:3 88:8

**managements** 79:20

**manual** 61:22

**March** 16:8 46:23 97:15

**mark** 55:24 91:8

**marked** 36:4,7,9,11, 13 51:2 53:24 73:10 90:16,22 92:14 93:9

**markup** 56:1

**Marlene** 67:7

**material** 30:24,25

**maximize** 107:25

**means** 34:13 72:9 74:22

**meant** 89:21 95:3

**measure** 106:15

**measures** 61:23

**medical** 6:19,21 8:5 9:10,13,15,17,19 10:11,12,21 11:7,20



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

Index: medication..pain

12:4,10 14:19,20
18:2 20:3,4 30:14,
15,18 31:5,13 32:25
33:17,23 34:7,9,12
35:16,21 38:13,23
43:19,21 50:10,18
51:24,25 54:13,16,
22,23,25 55:4 58:6
59:11 60:20,21
61:10,21 62:2,3,6,9,
10,13,19 63:13 65:4,
6,12,23,24 67:16,20
68:1,17,22 74:15
75:18 76:10 80:12,
17 81:3 82:12,13
83:13,23 84:18 94:9,
10 95:4 97:6 98:1,
10,15,22 99:4,15,18,
24 100:1,7,9,15,25
101:21 102:4 107:24
108:13 110:25
113:1,13 115:11,21
116:7,10,14,18,20

**medication** 19:19
68:24 71:24 72:9,11,
16 76:16 77:14 78:9,
10,16,18,19,20,22
79:25 81:5,22 82:6
83:11 87:25 88:1,7,
16,20 100:19 101:4,
23 102:21 103:5,7,8,
11,13,22 111:13
112:17

**medications** 10:6
80:19 82:2 101:2
103:14,17 112:1

**medicine** 6:22 7:1,9
100:2 101:10 115:11

**meet** 18:13

**meeting** 18:21,22
66:20

**memory** 5:23 34:16
82:13

**mention** 88:13

**mentioned** 71:14
102:3 111:22,25

**met** 18:11 19:10,12

**Miami** 91:15

**middle** 109:2

**Mike** 5:15 90:25
91:12 116:1

**milligrams** 102:11

**mind** 34:8 104:23

**minute** 22:14,16
24:10 35:18 37:17

**minutes** 20:13 85:2,
3,4,9 111:4

**misspoke** 17:3

**misunderstandings**
17:6

**mixed** 30:25 51:7

**moment** 40:8 83:8,
10

**money** 63:4 90:4,9
98:5 106:8 116:10,
15,20

**month** 37:20 85:25
86:17 97:8

**monthly** 65:8

**months** 17:7,13 93:4
109:24

**morning** 5:15

**morphine** 69:14
70:16,18 71:14,20
72:13 78:12,16 79:1,
4,10 81:5,13,23 82:7
83:18 87:15,16,21
95:25 96:2,6 100:12
102:5,12,21 103:18,
21,22 109:18 110:1,
9,21 111:7,15,16,19,
21,22,25 112:6

**Motion** 104:22

**mount** 115:12

**move** 23:19 26:7
51:5

**moving** 25:17

**MRI** 63:19

**muffled** 13:5

**multiple** 45:14,16
98:21

**N**

**N-e-i-l** 17:24

**named** 5:18 18:8
38:4

**names** 37:19

**narcotic** 102:19,21

**Narcotics** 72:4

**narrow** 81:25

**National** 7:19

**nature** 21:10

**necessarily** 79:19
114:14

**necessity** 107:24

**needed** 14:5

**Neil** 17:22,23

**neuropathic** 80:1,2,
5 88:19 103:11

**nonemergency**
107:23

**nonemergent**
107:19

**nonformulary** 10:7
68:24

**nonmedical** 88:10

**nonsteroidal** 78:23
103:9

**Norfolk** 8:6

**northern** 108:18

**note** 40:6,8 42:1
47:13 53:12 60:4,5,
15,17 86:25 87:2,10
91:17 111:2,6

**notes** 46:9 47:5
51:21 55:15 60:10
66:20 75:11 89:12
90:2 96:10

**notice** 45:23

**notified** 71:5

**November** 40:5
82:17,18 85:25
100:17 109:23

**number** 8:4 14:12
22:25 23:1,10 25:6
27:8 48:22 57:9 91:7

**numbers** 25:23

**nurse** 56:24 66:19
72:10

**O**

**object** 11:3 16:16
17:9 21:2 22:15
23:13 25:13 29:7,17
37:4 40:16,21 43:3,
12 44:7,22 46:13
47:7 48:18 52:8
53:7,19 54:17 61:17
64:14,15 65:11
68:19 70:21 72:18
73:18 76:12 77:15
78:13 79:12 80:11
82:22 86:12 87:24
89:15 93:20 94:15,
22 98:6 99:6,20
101:11,25 102:25
104:21 106:21 110:2
113:20 114:12,20

**objecting** 26:6

**objection** 25:21,24,
25 26:13 27:2,6,11,
13,17 28:8 29:7
40:18 102:1

**objectionable** 23:18

**objections** 27:15
29:1,12

**Ocala** 8:21

**Occasionally** 14:22

**occasions** 100:18

**October** 109:23

**offhand** 38:17

**office** 64:24 65:9,16
66:9 76:1 113:2,15

**officer** 6:17 9:2
12:17 14:1 18:3
85:18,19 95:5,17

**officers** 64:23

**offices** 57:5

**official** 58:2 59:4,5

**open** 101:20

**operation** 46:23

**operations** 10:2
47:1 48:15 65:9,18

**operative** 46:22

**options** 104:14

**order** 20:15,16
62:17 80:17,18 90:4
92:13 98:5 107:10,
24 116:24 117:2

**ordered** 109:25

**orders** 111:15

**original** 55:6

**ortho** 52:12

**orthopedic** 29:25
42:8,10 44:4 52:17

**orthopedics** 105:6,
8,17

**orthosis** 74:5

**osteomyelitis** 55:17

**outcome** 64:9

**outline** 91:10

**overbroad** 25:4
58:15

**override** 75:19 76:6
95:18

**oversaw** 69:2

**oversee** 9:17,19

**oversight** 10:2

**P**

**p.m.** 117:6

**pages** 38:25 74:9,18

**Pahokee** 7:14,22

**pain** 76:15 77:14
78:8,10 79:1,5,20
80:1,3,5 81:5,22
82:6 88:5,8,19
100:20 101:3,9,10,
23 103:15 115:11



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

**painkillers** 70:6

**palliative** 98:23

**paragraph** 22:25 23:10,12 25:23 27:1, 3 30:6 74:2

**part** 7:19 11:23 19:7, 9 39:24 47:9 48:3,4 54:13 59:23 80:8 83:5 86:8 90:14 102:3 108:18 111:17

**participate** 11:8

**participating** 71:1

**party** 72:17

**patient** 11:21 14:2,5 46:10 55:16 64:6 66:6 72:11 81:6 83:25 92:9,15 98:12 109:7 114:15

**patient's** 54:13,16

**patients** 12:1 60:22 106:8 107:19 108:4

**pay** 15:12

**pelvis** 27:24

**pending** 6:8 52:19

**Pennsylvania** 57:4

**people** 6:2 57:10 101:8,22

**perform** 9:21 28:19 83:24 94:13 114:6

**performed** 41:8 53:1 113:18,19

**period** 50:5 102:22

**periodic** 10:13 64:22

**person** 15:4,14 57:7 58:24 59:3 61:13 64:11 66:14,16

**person's** 59:4 115:12

**personal** 59:11

**pertaining** 23:25 98:15

**pharmacist** 69:10

**phrase** 79:3

**physician** 7:8,16 9:1 14:10 15:8 38:4,5 41:17 43:9,20 57:14, 16,20 58:24 65:5 67:19 75:20 76:7 80:18 96:16 100:2 101:8 105:14 110:12,20 115:16

**physician's** 67:22

**physicians** 13:14,21 74:7 100:5 110:4,6, 7,15,18

**PICC** 21:11,13,14, 17 22:7

**pick** 55:2

**picked** 97:7

**pill** 71:17 112:7

**Pittsburgh** 57:2,3,4 64:20,23

**place** 7:7 27:23 97:9 103:13

**places** 99:1,10

**plaintiff** 5:16 27:21 30:7 32:24 34:3 42:14 49:12 87:17

**plaintiff's** 51:2 53:1,24 73:11 93:9

**plaintiffs** 42:23

**plan** 13:19 55:21 56:3,4,5,13,14,18 63:24 64:4 92:8 107:9 111:17

**pleading** 26:2

**point** 16:17,22 23:20 40:11 41:3 45:10 55:23 88:14 98:3 100:12 102:11 104:12 108:16 116:8

**policy** 14:25 75:22

**Ponce** 44:1,3,11 45:1,4 48:25 49:3, 11,12,22 50:1 60:5, 11,17 86:11,15,19, 20,22 87:2,7,9 92:23 93:23 94:3,5 105:2, 5,13,19 107:10,14

**position** 6:16 8:24 9:8 12:8,12,15,22 16:4,6 17:8 24:1,3 76:8 95:4 106:12

**positions** 23:6

**positive** 64:8 86:5

**possibly** 56:15 105:11

**postop** 79:13

**potential** 103:6

**potentially** 102:19

**practice** 7:1,9,19,21, 24 8:3 25:11

**practiced** 50:5 100:2

**predicate** 28:1,18, 20 29:2,11,18 46:14 110:13

**preparation** 54:7 89:18 100:9

**prepare** 84:17

**preparing** 54:6

**preprinted** 58:4

**prescribe** 79:10

**prescribed** 80:15

**prescription** 88:16, 20,23 109:18

**prescriptions** 71:19,21

**present** 13:15 30:11 53:14 67:11

**presentation** 89:2

**presented** 52:18 55:9,13,17,21

**pressure** 116:14,19

**pretty** 20:13

**prevent** 102:17 106:19

**previous** 39:25 116:2

**previously** 36:18 90:15 93:8 97:22

**prices** 112:17 113:2, 15

**prior** 18:19 25:6 27:20 28:4,7 45:2,5, 7 69:11

**prison** 96:18,21 101:9

**prisoners** 108:13

**private** 7:19,21,24

**privatized** 97:5

**privilege** 25:15

**privileged** 78:7

**privy** 15:3,7

**problem** 6:3

**problems** 51:24

**procedure** 62:23 94:19

**proceed** 104:16

**proceedings** 29:23 35:10 36:20 39:8 41:22 72:2

**process** 12:24 13:11, 12,13 62:8 89:1 93:14 94:11 95:22

**professionals** 88:10

**professor** 52:12 105:6,7

**profitability** 107:25

**profits** 90:11 116:11

**progress** 47:13 91:17

**proper** 107:1

**prosthesis** 31:18 32:3 92:13

**provide** 98:1,4

**provided** 13:21 46:7 52:2 88:5 98:10 100:3 101:21

**provider** 14:6 93:24 96:19,22 101:7

**providers** 50:4 66:22

**providing** 50:9,20 101:8

**psychiatric** 79:25

**pull** 22:16 34:15 87:6

**pulled** 90:19

**pure** 24:4

**purpose** 33:6 34:1 94:2 102:16

**purposes** 36:8,10, 12,14

**pursued** 64:5

**put** 15:9 43:1 52:13

---

**Q**

**quarterly** 65:7

**question** 5:24 6:8 11:6 13:24 18:25 21:1,3 26:5,7,24,25 27:8,18,20 29:17,19, 21 30:4 32:22 35:9, 13 36:16,17 37:23 39:6,24,25 40:25 41:21 43:5,6,14,17 44:13,25 45:3 60:2 61:7,8 65:2 68:16 69:23 77:4,6,18,21, 22,24,25 79:2 82:22 87:14 93:21 94:16, 23 98:7 99:7,21 101:12,18 103:1 104:22 106:22 107:17 112:11 113:8,10,13 114:21, 23

**questioned** 116:6

**questioning** 23:14

**questions** 23:19,21, 25 24:23 25:5,15,18, 21 26:14 29:14 84:23,25 85:8 96:12 100:16 109:16 116:2

**quick** 75:13 84:24 116:2



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

## R

**raise** 5:1

**Ramirez** 38:4

**random** 55:2,5 84:9, 14

**re-evaluation** 92:21

**read** 22:13 26:9 29:21,23 35:9,10 36:15,18,20 39:5,8, 25 41:22 47:21,25 48:2 71:25 72:2 74:2 80:22 90:1 91:22 107:3 116:23

**reading** 28:9 51:11 92:17

**ready** 92:18

**real** 83:4

**reason** 19:8 21:17 23:5,7 49:21,25 55:3 61:15

**reasons** 66:24 103:4

**recall** 18:14,20 43:7 86:14

**receive** 12:1 62:1,5, 10 73:7 90:3 95:9 99:18 100:4 106:5

**received** 27:21 38:25 73:6,9 75:1,8 105:23

**receives** 57:20 63:14

**receiving** 99:3 102:11 107:11

**recently** 23:7

**Reception** 19:5 43:10,21 58:14,19 67:10,14 70:4,20 85:13 97:14,20 98:1, 11,16,20 99:2,11 108:1,6,14,17

**recess** 34:20 35:19 85:5

**recognize** 73:13,15, 25

**recollection** 50:3 103:25 104:3

**recommend** 92:4

**recommended** 39:21 62:24 63:25 73:3,8 75:5 93:6,25

**recommends** 114:7, 9

**Reconstruction** 91:16

**record** 5:25 6:11 20:3,18,20,21,23 21:19 22:19 24:9 26:18,19,20 30:14, 15,18 33:24 35:5,7, 16 36:6 38:9,10,21 45:21 48:4 49:5 54:14,16,22,24 55:4 62:20 65:4 72:7 80:4,13 84:18 89:12 91:7 100:25 115:21

**recording** 56:24 66:17,19

**records** 20:4 21:4 31:5,8,9,13 34:9,12, 23 35:3,21 37:5,7,8, 11,18 38:1,19,22 41:10,12 42:10 45:24,25 46:15,18 47:9,22 55:1 57:8 58:7 59:7 68:1 80:21 82:1,12,14,16 83:12, 14,23,24 84:7,11 89:17 90:2,15,19 91:2,3,10,13,18 98:15 100:7,9 102:4 108:24 110:25

**RECROSS-EXAMINATION** 115:8 116:4

**Reddick** 5:10 6:12, 13 24:25 26:4 29:18 33:15 35:22 46:8 77:20 85:11 91:9,20, 21 96:15 104:23

**REDIRECT** 109:14

**reduced** 100:13 110:21

**refer** 10:5 13:22 20:3 26:1 33:23 36:1

**reference** 25:22 90:20

**referred** 16:25 97:17

**referring** 60:15 78:19,22

**reflect** 108:24

**refresh** 5:23

**refuse** 101:10

**refused** 60:21 100:19 101:1

**refusing** 101:3,23

**regard** 27:1 43:17 59:14 68:23 70:6 98:14 103:20

**region** 9:6,11,18 11:8 12:4,11 62:11 64:12 84:5 97:7,16, 17,18,19,22,23

**regional** 9:10,12,15 10:21 11:7 12:3,10 14:19,20 32:25 33:16 35:21 38:13, 23 43:18 50:10,18 60:20,21 61:10,21 62:2,9,13 64:24 65:4,6 66:11,23 68:17,21 75:18 83:13 85:13 95:4,9 113:1,13 116:18

**regular** 10:19 65:7 107:22

**related** 30:8 116:8

**relief** 81:22 88:5

**relieving** 76:16

**remaining** 74:8

**remember** 19:16 86:16 104:8

**removal** 41:25 80:6, 7,10

**remove** 39:21 40:11 102:18

**removed** 41:4

**rendered** 11:24

60:4,10 86:25

**reference** 25:22 90:20

49:13

**repeat** 8:16 9:14 49:24 60:7 64:1 112:12 113:4,11

**rephrase** 45:9 68:21

**replaced** 19:21

**replacement** 27:22 28:14,17 52:13 60:6 80:10 86:23 92:12 107:11 113:17,18 114:1,6,8 115:17,22

**report** 22:5 44:1 87:7 92:2,16

**reporter** 5:1,4 6:1 28:23 29:24 35:4,8, 11,14 36:5,17,21 39:7,9 40:11 41:23 51:3 68:13 72:3 113:4,10 116:25 117:3

**reports** 46:22 62:10

**represent** 66:9

**representative** 106:6

**request** 15:9 19:23 20:1 43:24 54:4,5 55:7,10 56:17 57:14, 17 63:18 69:1,11 70:18

**requested** 29:23 35:10 36:20 39:8 40:7 41:22 56:14 72:2

**requests** 10:1,5,10 43:1,9,20 68:7,12, 18,23 69:13 70:6,16

**require** 88:23

**requires** 14:2

**resolve** 92:14

**respond** 10:14

**responded** 52:24 53:17

**response** 57:16 59:7,14 93:12

**responsibility** 75:25

**responsible** 64:18

**rest** 37:18

**restate** 11:6

**restroom** 75:15

**reveal** 30:18

**review** 38:1 42:25 43:8,19,25 54:8,15, 18,20 55:10,11,17 62:16,22 63:3 64:22 65:7 67:21 68:1,2 69:12 80:17 82:11 83:23,24 84:8,11 89:16 91:9 96:10 102:4 109:1

**reviewed** 42:9 54:10 55:3 62:19 74:22,24 84:18 89:11 106:14

**reviewing** 30:14 91:20 100:8

**reviews** 10:12

**rights** 51:22

**ring** 70:5,13,20 71:7, 13

**Robert** 18:1 38:6

**role** 89:1

**room** 19:15

**Roundabout** 85:24 86:5

**rounds** 19:7,9

**rules** 5:21 29:5

## S

**sake** 114:5

**salary** 106:7

**sat** 56:20

**satisfaction** 30:5

**save** 90:4,9 98:5 116:10,15,20

**saving** 106:8

**scan** 63:19,20,21

**scheduled** 52:6,11



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.

Index: scheduling..time

scheduling 52:20

school 6:21,22 8:5

scratch 76:5

sebaceous 39:18

secretive 107:9

security 70:23 99:17

sees 47:23

selection 84:7,9,15

send 107:10

senior 7:16 9:1

sense 24:5

separate 35:1,2

September 37:2,13, 25 40:15 52:24 109:22

seroma 30:20,22 31:9

serosanguinous 30:24

serous 30:23,25

served 62:15 66:14

Service 7:20

services 66:25 97:6

set 45:24

setting 101:9

severe 30:8,19 92:15

Seyed 85:12

SFRC 85:12,17,21, 23 89:23 95:1 96:22 107:19

shake 6:5

Shands 95:10

sheets 80:18

shoulder 68:2

show 24:6 53:23 73:10 90:13,21

showing 90:23

sick 84:14

side 39:15 94:10 112:9,14

signed 49:10

significance 92:9

significant 96:5

similar 11:20 83:20 87:14 88:5

single 71:24 72:5,7, 9,13,16

sir 8:16 15:13 17:14 27:18 29:20 37:7 92:22 101:18

sit 29:10 68:2

situation 18:23

Smith 16:3,21 17:17, 19,20,25

snark 28:24

socket 27:24

sold 71:13,15 72:17

solemnly 5:4

sort 61:22 64:22 65:7

sorts 63:22 64:2 81:8

source 31:23

Sources 6:15 12:7,9 63:10 64:19 65:21 66:25 87:11 97:6,25 98:4

south 19:4 43:10,20 58:14,19 67:10,14 70:4,20 85:12 97:7, 13,20,24 98:1,11,16, 19 99:2,10 107:25 108:5,14,17

southern 97:23 106:6

speak 21:4 83:3 84:19 87:5

speaking 6:2 27:11, 12,15 29:12 84:16 90:6

specialist 105:17

specific 5:22 9:18,20 10:10,12 18:22 19:8 20:2 22:24 24:23 25:4,22 41:21 64:6

66:5 89:24 95:11 110:3

specifically 41:24 43:7 71:5 85:24 86:21 90:9 96:22 97:13 104:1 108:23 111:20

speculate 59:24 101:17

speculation 27:7 59:23 101:15

spelled 75:22

spend 92:13 114:18, 19,25

spent 63:4 100:8

spit 72:22

spoken 42:4

staff 87:11

stamped 90:21

stands 37:23

start 69:6 84:25 90:22

started 97:13

stat 74:22

state 6:10 7:2,9,12 27:16 29:1,7 38:21 64:12 66:15,17 71:16 97:5 100:3 105:14 108:19

stated 33:15 50:21 63:12 68:4 71:18 112:13

statement 25:3

statements 24:17

states 40:6 55:9 111:12

stating 26:12 45:4

stationed 8:18

stay 98:15 102:20

stayed 99:10

staying 98:19

steps 102:9

stomach 81:14,16

stop 16:23 69:7,8 103:21

stopped 19:14,15 26:11 69:9

stopping 25:16

story 26:15

stretch 45:19

strike 23:19 25:17 26:8 104:22

stuff 75:16

subject 94:19

subjective 79:2

submitted 14:8

subsequent 89:21

substitute 15:21

successor 17:16

sue 51:22

suggest 90:2 92:12

suggested 74:5

suggesting 100:11

suggests 92:17

sulfate 111:8

summarizing 52:9

summary 51:15,18

supervision 108:5

surgeon 28:19 30:1 41:7 42:8,10 44:4 52:3 93:17 94:13

surgery 19:23 20:1 21:11,13 28:20 39:21 40:11 45:11 52:7,12,13,19,25 53:10,13,18 55:9,11, 18 60:18 87:3 92:18 93:6,15,18,24 94:6, 7,13 104:15 106:20 113:17,19 114:7,8,9

surgical 107:19,23

suspected 71:1,6

sustained 92:10

swear 5:4

switched 78:15 87:21 88:1

sworn 5:12

symptoms 81:10,12, 15,17 83:21 102:18

system 13:13

— T —

T-e-l-l-e-r-i-a 38:6

taking 50:17

talk 19:18 24:7

talked 76:23

talking 10:24 11:1 40:17 41:24 46:3 91:14 97:16

talks 107:9

tasks 9:20

Telleria 38:5

telling 25:17

tentative 101:2

term 46:5

terminate 71:19,21

terminology 98:20

terms 13:23 15:16 42:22 66:1

testified 5:12 89:17 112:8

testifying 28:21

testimony 5:5 106:18

thereof 112:3

thigh 34:5

thing 6:1,7 51:11

things 94:10 109:9

thought 35:2

threatening 81:15

time 6:2,6 10:15 15:2,6 18:2,14,17 19:25 23:20 27:5



GEORGE HORN vs. MICHAEL CREWS
DAVID REDDICK, M.D.                                                        Index: times..years

30:12 33:13,25 41:3
42:14 43:18 45:19
49:13 50:5 52:20
53:14,16 54:9,24
59:22 67:11 68:9
69:3,4,5,9,18 70:8,
14 71:20 72:11 76:9,
15 78:11,12 79:22
82:10 84:1 85:13
86:19 87:3,12,18
89:21 90:1 92:11,18
93:1 94:7 95:8
96:21,23 98:3 100:8,
13 102:11,22 104:16
108:16 110:19
115:12

**times** 33:22 48:17,23
97:17 100:5

**timing** 89:16

**title** 8:24 59:2,4,5
85:16

**titrate** 103:20
110:24

**titrated** 102:5,6,14
109:18,25 110:9
111:12,18

**titration** 88:2,6,11
109:21

**today** 100:7,9,16
105:22

**told** 47:22 48:11
103:10 104:5 105:22

**tolerance** 103:5

**top** 55:15 93:11

**Toradol** 78:24 88:13
103:8

**total** 27:21 28:17

**town** 7:23

**trafficked** 71:10

**training** 101:20

**transferring** 109:7

**treat** 45:1 79:5

**treated** 44:6 45:5
89:22

**treating** 44:19 78:25

**treatment** 13:19
14:2 42:15 43:2
46:6,7 52:1 56:5,18
63:24 64:5 76:10
89:8,13 90:3,9 91:11
92:5 98:24 106:14

**treatments** 65:23,25

**trial** 24:6 26:15

**truth** 5:6,7

**turn** 51:1

**Turning** 23:10

**type** 6:1 81:4 89:12
92:10 96:4 103:8
106:7,15 107:9

**types** 65:23,24 71:12

**typical** 15:4

U

**uh-huh** 6:5

**unclear** 78:1,3

**undergoing** 42:15

**understand** 23:6
28:6 39:24 40:22,25
43:5,6,14 44:25 56:9
61:7,8 69:23 72:1
77:2 104:17 112:11
113:9

**understanding** 6:3
13:23 65:1,3 93:14

**understood** 104:19

**University** 6:22,24

**upper** 34:4

**upset** 81:14,16

**utilization** 10:22
11:8,11,19 13:15
56:13 59:7,13 63:23
64:3

V

**vague** 11:4 25:4 27:7
33:11,12 82:23
99:24 102:1

**varies** 14:17

**vendor** 50:24 97:7

**vendors** 50:4,7

**verbal** 57:18

**versus** 63:19

**viability** 65:18

**violation** 51:22

**Virginia** 8:5,6

**visit** 38:12,15 39:20
40:2,3 45:13

**visiting** 19:6,8

**visits** 40:5 45:14,17

**voluminous** 20:13
98:15

W

**Wait** 5:23 8:15
22:14,16 37:17

**Walter** 38:4

**wanted** 19:21

**watches** 72:10

**Weaver** 13:1 20:18
28:9 37:21 44:7
53:19 60:23 61:17
64:15 65:11 68:6,8
70:21 72:18 73:18,
21,23 80:7 85:1,7
86:3,13 87:6,13 88:3
89:19 90:18,25 91:6,
12,25 93:22 94:17,
24 95:23 96:8
114:12 116:1,5,22,
25 117:2

**Wexford** 6:15 12:7,
9 15:12,14 25:1
50:15 61:5,22 63:9
64:19 65:16,18,21
66:10,15,23,24
75:23 87:11 90:7,8
94:12 95:1 97:6,8,
12,25 98:3 106:12
107:18,21 108:5
112:9,15,17 116:17

**Wexford's** 57:5
62:11 64:11,25 97:9

**Wexford/um** 95:19

**whatsoever** 100:14

**withdraw** 107:17

**withdrawal** 81:10,
12 83:20 100:12
102:17

**word** 13:1

**words** 13:25 56:9
57:19 79:3

**work** 8:3,10 9:4 12:6
34:16 67:10

**worked** 7:8 10:25
25:7 96:18

**working** 67:13
107:22

**works** 66:14 94:11

**wound** 32:2

**write** 60:4 68:3

**written** 52:23 57:18

**wrong** 24:13 33:9
99:22 101:13 106:23

Y

**year** 12:23 16:20
19:16 41:1 92:13,20
93:1,5

**year-old** 55:16

**years** 7:18 8:5,22
25:6 27:20 28:4,6
101:7,21

