UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

GEORGE HORN,

    Plaintiff,

vs.

MICHAEL D. CREWS, Secretary
of the Florida Department of
Corrections, in his official capacity,
WEXFORD HEALTH SOURCES,
INC., a Florida corporation,
MARLENE HERNANDEZ, M.D.,
SEYED HOSSEINI, M.D. and
DAVID REDDICK, M.D.,

    Defendants.
_____/

Civil Action No.: 14-20341-DPG
Magistrate Judge William C. Turnoff

## DEFENDANT, MARLENE HERNANDEZ, M.D.'S MOTION FOR SUMMARY JUDGMENT

The Defendant, MARLENE HERNANDEZ, M.D., by and through her undersigned counsel, and pursuant to Fed. R. Civ. P. 56, hereby files her Motion for Summary Judgment and in support thereof states as follows:

### INTRODUCTION

The Plaintiff, GEORGE HORN, brought this action under the Civil Rights Act, 42 U.S.C. §1983 against multiple Defendants including MARLENE HERNANDEZ, M.D., alleging that, while incarcerated at South Florida Reception Center ("SFRC"), Dr. HERNANDEZ was deliberately indifferent to his serious medical needs of pain management medication. Because the evidence taken in light most favorable to the Plaintiff does not support a claim of deliberate indifference, Dr. HERNANDEZ is entitled to summary judgment as a matter of law.

## UNDISPUTED FACTS[1]

1. The Plaintiff, GEORGE HORN, was an inmate at SFRC from September 15, 2011 until his transfer to Columbia Correctional Institution on January 24, 2014. *See* FDOC Transfer/Arrival Summary, attached hereto as Exhibit "A".

2. On March 15, 2013, WEXFORD HEALTH SOURCES, INC. commenced its contract with the Florida Department of Corrections for the provision of staffing and the operation of medical care and treatment to various institutions throughout the State of Florida, including SFRC. *See* Contract between Florida Department of Corrections and WEXFORD HEALTH SOURCES, INC., attached to Affidavit of Thomas Reimers, attached hereto as Exhibit "B".

3. By way of background, the Plaintiff underwent a first-stage reimplantation at Shands Medical Center on January 21, 2003 after presenting with a chronically infected, well-fixed Intermedics total hip replacement and numerous sinus tracts. Dr. Richard Vlasak performed the surgery and placed a PROSTALAC prosthesis. The Plaintiff's active infection alleviated with IV antibiotic treatment, and Dr. Vlasak performed the second-stage reimplantation on June 3, 2003. However, the Plaintiff developed recurrent infections and dislocations and ultimately underwent a revision right hip replacement by Dr. Vlasak on August 25, 2003. *See* Medical Records from Richard Vlasak, MD, attached hereto as Composite Exhibit "C"; [D.E.147 at pages 8-13].

4. On September 15, 2011, the Plaintiff presented to Kendall Regional Medical Center with chest pain. Incidental to the cardiology evaluation, Dr. Jose Barros discovered a large mass at the Plaintiff's right thigh. The Plaintiff underwent a procedure to drain synovial

---

[1] The Plaintiff's Second Amended Complaint contains markedly different facts and allegations from this Motion that are merely a product of the Plaintiff's memory and are devoid of any evidentiary basis.

fluid that reduced the size of the mass considerably. Dr. Barros noted that "there is a high chance of recurrence of this cyst" and possible surgical excision would be considered. *See* Medical Records from Kendall Regional Medical Center, attached hereto as Composite Exhibit "D".

5. On January 31, 2012, the Plaintiff consulted for the first time with Dr. Jose Ponce de Leon, an orthopedic surgeon, who assessed the mass at the medial aspect of the Plaintiff's right thigh. Dr. Ponce de Leon advised surgical removal of the mas after the performance of an MRI with contrast. *See* Medical Records from Jose Ponce de Leon, MD, attached hereto as Composite Exhibit "E"; [D.E. 150 at page 18].

6. On June 14, 2012, the Plaintiff was admitted to Kendall Regional Medical Center and underwent incision and draining of "abundant infected type" fluid from the mass at the right thigh. *See* attached Composite Exhibit "D".

7. On June 23, 2012, Dr. Pedro Kiliddjian, a general surgeon, consulted with Mr. Horn at Kendall Regional Medical Center and explained that his recurrent infection and fluid drainage was possibly the product of his initial hip prosthesis surgery from 1999. Dr. Kiliddjian proposed incision and further drainage of the fluid with a Jackson-Pratt Drain. *See* attached Composite Exhibit "D".

8. The Plaintiff underwent a surgical incision and drainage of the fluid collection at the right thigh on July 3, 2012 by Dr. Orlando Llorente. Dr. Llorente diagnosed an infected right hip implant. *See* attached Composite Exhibit "D".

9. Dr. Barros discharged the Plaintiff from Kendall Regional Medical Center on July 11, 2012. In his Discharge Summary, Dr. Barros noted that Mr. Horn was at an enhanced risk

of infection and the chance of salvaging his hip was low. *See* attached Composite Exhibit "D".

10. On February 21, 2013, the Plaintiff presented again to Kendall Regional Medical Center with persistent drainage from the right hip and right thigh and was seen by Dr. Angel Perez-Tirse. Dr. Perez-Tirse consulted with orthopedic surgery and recommended intra-articular antibiotic therapy in the hopes of improving the drainage and maintaining the Plaintiff's chronic osteomyelitis. He added that the ideal treatment considering the Plaintiff's condition was removal of his prosthetic hip. *See* attached Composite Exhibit "D".

11. At the recommendation of Dr. Perez-Tirse, Dr. Arturo Corces, an orthopedic surgeon, consulted with the Plaintiff at Kendall Regional Medical Center on February 22, 2013. Dr. Corces noted that the Plaintiff had a long-standing infection and ongoing drainage for over one year. He recommended removal of the Plaintiff's total hip replacement and placement of antibiotic beads, as we all as a Hickman catheter for intra-articular antibiotic delivery. Dr. Corces obtained medical clearance and performed the procedure on February 27, 2013. *See* Medical Records from Arturo Corces, MD, attached hereto as Composite Exhibit "F"; [D.E.146].

12. Per Dr. Corces's recommendation, the Plaintiff returned on March 13, 2013 for removal of the antibiotic beads and placement of a cement spacer for the proximal femur. Dr. Corces noted that the procedure was "fraught with complications, especially the possibility of dislocation." He also documented that the Plaintiff's cement spacer would likely fail secondary to recurrent infection. *See* attached Composite Exhibit "F"; [D.E.146].

13. From March 15, 2013 to March 18, 2013, the Plaintiff was administered 30mg of Morphine sulfate, four times a day. *See* Medication Administration Records and Physician Medication Orders, attached hereto as Composite Exhibit "G".

14. From March 18, 2013 to April 2, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

15. On March 20, 2013 Dr. Rodriguez-Garcia, a Senior Physician at SFRC, noted that he spoke with Dr. Barros about the treatment plan for the Plaintiff. Specifically, the Plaintiff was to receive continued intra-articular antibiotic delivery, as a well as a follow-up with Dr. Corces. *See* attached March 20, 2013 Chronological Record of Health Care, attached hereto as Exhibit "H".

16. During that period, from March 25, 2013 to March 31, 2013, the Plaintiff was also administered 200mg ibuprofen, three times a day. *See* attached Composite Exhibit "G".

17. On April 17, 2013, Dr. Rodriguez-Garcia again consulted with the Plaintiff at SFRC and noted that the Plaintiff's Hickman catheter had "come out." Dr. Rodriguez-Garcia and Dr. SEYED HOSSEINI, the Medical Director at the time, collaboratively decided that Plaintiff needed to be sent to the hospital for placement of a new one. *See* attached April 17, 2013 Chronological Record of Health Care, attached hereto as Exhibit "I".

18. On April 19, 2013, Dr. Rodriguez-Garcia submitted a Consultation Request so that the Plaintiff could be seen by an orthopedist, specifically Dr. Corces. *See* Consultation Request dated April 19, 2013, attached hereto as Exhibit "J". On April 22, 2013, Dr. Hosseini likewise submitted a Consultation Request so that the Plaintiff could undergo a Hickman catheter reinsertion. On that same day, Dr. Hosseini additionally placed a Consultation Request so that the Plaintiff could undergo a CT scan of the hip without

contrast. See Consultation Requests dated April 22, 2013, attached hereto as Composite Exhibit "K".

19. The next day, April 23, 2013, the Plaintiff underwent both the CT scan and placement of the Hickman catheter at Kendall Regional Medical Center (in order to complete his intra-articular antibiotic treatment). *See* attached Composite Exhibit "K".

20. From April 20, 2013 to May 9, 2013, the Plaintiff was administered 60mg of Morphine sulfate, twice a day. *See* attached Composite Exhibit "G".

21. On May 7, 2013, in response to the April 19, 2013 Consultation Request, Dr. Corces again saw the Plaintiff and noted continued infection. *See* attached Composite Exhibit "F"; [D.E.146].

22. From May 10, 2013 to May 12, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

23. On May 13, 2013, the Plaintiff returned to Dr. Corces at Kendall Regional Medical Center for removal of the cement spacer and Girdlestone arthroplasty. Dr. Corces noted the inherent complications associated with the surgery, namely continued pain, recurrent infection, loosening, vascular complications, wound complications, probable leg length discrepancy, external rotation, and damage to the sciatic nerve. Dr. Corces suggested six months to a year without *considering* any kind of reimplantation. Most significantly, Dr. Corces never definitively told the Plaintiff that he would perform a hip reimplantation, and he stressed the possibility that the Plaintiff's infection might continue with the potential for amputation and/or hip disarticulation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 60 and 64-65]. The Plaintiff was discharged from Kendall Regional Medical Center on May 17, 2013. *See* attached Composite Exhibit "D".

24. From May 17, 2013 to May 20, 2013, the Plaintiff was administered 30mg of MS Contin (extended-release Morphine), three times a day. *See* attached Composite Exhibit "G".

25. From May 22, 2013 to June 21, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

26. Dr. Corces next saw the Plaintiff for a routine follow-up on May 28, 2013 and noted significant improvement. The Plaintiff returned to Dr. Corces as instructed on June 25, 2013, at which time Dr. Corces suggested that the Plaintiff spend one year without a prosthesis in order to allow for the body to resolve the infection. Again, Dr. Corces never definitively told the Plaintiff that he would performed a hip reimplantation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 64-65].

27. From June 19, 2013 to July 19, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

28. The Plaintiff last saw Dr. Corces on July 23, 2013. Dr. Corces noted that the Plaintiff wished to attempt reimplantation, but Dr. Corces again emphasized the procedure's inherent complications and said it was much too early to consider reimplantation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 64-65].

29. From July 19, 2013 to August 9, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

30. From September 10, 2013 to October 29, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

31. On October 25, 2013, WEXFORD HEALTH SOURCES, INC. commenced its contract with Larkin Community Hospital for the provision of inpatient and outpatient hospital

services in the Miami area. *See* Contract between Florida Department of Corrections and Larkin Community Hospital, attached to Exhibit "L".

32. From November 13, 2013 to November 26, 2013, the Plaintiff was administered 30mg of Morphine sulfate, twice daily. *See* attached Composite Exhibit "G".

33. On November 27, 2013, the Plaintiff was prescribed Toradol and Clonidine. Both medications are used to relieve and manage chronic pain. *See* attached Composite Exhibit "G".

34. On December 13, 2013, the Plaintiff presented to another orthopedic surgeon, Dr. Jose Ponce de Leon, at the request of Dr. Dora Gaxiola, a senior physician at SFRC at the time. Dr. Ponce de Leon addressed the Plaintiff's desires for a further hip reimplantation and indicated that "no surgery was advised at the present time." *See* attached Composite Exhibit "E"; [D.E.150 at pages 34, 36, and 49].

35. From December 18, 2013 to December 21, 2013, the Plaintiff was administered 30mg of Morphine sulfate, twice a day, per the order of the Regional Medical Director, Dr. DAVID REDDICK. That prescription expired on December 21, 2013. *See* attached Composite Exhibit "G"; Affidavit of Marlene Hernandez, attached hereto as Exhibit "M"; Affidavit of Carl Keldie, MD, attached hereto as Exhibit "N".

36. On that same day, ARNP William Bass ordered a prescription for 400mg of Motrin to be administered three times daily for six months, and a prescription for Elavil to be administered at bedtime for six months. ARNP Bass noted on his December 18, 2013 Physician Order Sheet that both Elavil and Motrin were prescribed to ameliorate the Plaintiff's neuropathic pain in his right hip. *See* attached Composite Exhibit "G"; Exhibits "M" and "N".

37. On December 23, 2013, Dr. HERNANDEZ began her tenure at SFRC as the Site Medical Director. In that capacity, Dr. HERNANDEZ's responsibilities were limited to overseeing the care and treatment rendered to the Plaintiff *only* from December 23, 2013 until the removal of his Medical Hold on January 16, 2014, and subsequent transfer to Columbia Correctional Institution. *See* attached Exhibit "M".

38. On December 30, 2013, based upon her chart review of the Plaintiff coupled with his history of Hepatitis C, Dr. HERNANDEZ lessened ARNP Bass' December 18, 2013 Motrin prescription to provide for the Motrin to be given twice daily for ten days, for a total of 800mg, PRN ("when necessary"). The PRN notation gave the Plaintiff the discretion to request Motrin when he experienced pain up to two times a day. *See* attached Composite Exhibit "G"; Exhibit "M".

39. On January 6, 2014, Dr. HERNANDEZ personally met with the Plaintiff for the first and only time regarding his continued insistence on a right hip reimplantation and explained to the Plaintiff the recommendation of Dr. Jose Ponce de Leon. There is no evidence that Dr. HERNANDEZ discontinued the Plaintiff's pain management medication at that time. In fact, the records reflect the order by Dr. HERNANDEZ for PRN Motrin up to 800mg a day *expired* on January 10, 2014. Furthermore, the order for Elavil was also still in place and not discontinued. *See* attached Chronological Record of Health Care dated January 6, 2014, attached hereto as Exhibit "O"; Exhibit "M"; Affidavit of David Reddick, attached hereto as Exhibit "P"; [D.E.149 at page 11].

40. On January 24, 2014, following weeks of stability and no voiced complaints of discomfort by the Plaintiff, Dr. HERNANDEZ removed the Plaintiff from Medical Hold and he was thereafter transferred to Columbia Correctional Institution. At the time,

Columbia Correctional Institution's medical department was under the management of Corizon Correctional Healthcare. *See* attached Exhibit "A".

41. On January 28, 2014, the Plaintiff brought this action under the Civil Rights Act, 42 U.S.C. §1983 against multiple defendants including Dr. HERNANDEZ, alleging he was denied adequate medical while incarcerated at SFRC. [D.E. 1]; *See also* [D.E.77].

42. On December 13, 2014, the Plaintiff presented to Dr. Richard Vlasak at Shands Medical Center regarding the prospect of a hip reimplantation. Dr. Vlasak noted that the Plaintiff had no active complaints of an infection. Nonetheless, Dr. Vlasak "strongly" recommended to the Plaintiff that he not attempt any further hip reimplantations and that the Plaintiff's recurrent infections were probably not curable short of a hemipelvectomy. *See* attached Composite Exhibit "C"; [D.E.147 at pages 18-19].

43. On December 10, 2015, the Plaintiff again presented to Dr. Richard Vlasak at Shands Medical Center, at which time Dr. Vlasak adopted his previous recommendations from December 13, 2014, namely that the Plaintiff not attempt any further hip reimplantations. *See* attached Composite Exhibit "C"; [D.E.147 at pages 22-23].

## MEMORANDUM OF LAW

### Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587 (1986). "[T]he plain language of Rule

56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Cetolex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a *genuine* issue of material fact." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the record, taken in its entirety, could lead a rational trier of fact to find for the non-moving party. *See id.*; *Matsushita*, 475 U.S. at 586. Ultimately, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

### Legal Argument

Detention facility officials violate a detainee's rights under §1983 if they withhold appropriate medical care "with deliberate indifference to the inmate's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim of deliberate indifference to a serious medical need, the plaintiff must show (1) an objectively serious medical need; (2) defendant's deliberate indifference to the need; and (3) causation between that indifference and the plaintiff's injury. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). Negligence

is not enough, and a mere difference of opinion between an inmate and the institutional medical staff concerning his diagnosis and treatment does not rise to the level of a constitutional deprivation. *Enriquez v. Kearney*, 694 F. Supp. 2d 1282, 1296 (S.D. Fla. 2010). *See Estelle*, 429 U.S. at 107 (holding that "matters of medical judgment" do not give rise to a §1983 claim); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (relying on the premise that federal courts are reluctant to second guess the medical judgments of those providing care). Consequently, "[d]eliberate indifference is not established where an inmate received care but desired different modes of treatment." *Hamm*, 774 F.2d at 1575 (emphasis added). Most significantly, as long as an inmate receives medical care, courts are hesitant to find that defendants have been deliberately indifferent to the inmate's medical needs. *See generally Estelle*, 429 U.S. at 107; *Hamm*, 774 F.2d at 1575; *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (although nurse's actions may have violated professional standards, the objective standard was not met – the nurse ordered *some* medical care to be provided to the inmate and thus her actions were not sufficiently worse than negligence).

**I.     Dr. HERNANDEZ Did Not Discontinue The Plaintiff's Morphine Prescription.**

In his Complaint, the Plaintiff principally alleges that "on or about January 7, 2014 . . . Dr. HERNANDEZ discontinued Mr. Horn's morphine prescription and all other pain management treatments under the pre-text that another inmate had been caught trafficking in prescription pain medication." However, Dr. HERNANDEZ's sworn affidavit and deposition testimony coupled with the medical records establish that she had no involvement in the discontinuing of the Plaintiff's morphine prescription. *See* attached Composite Exhibit "G"; Exhibit "M"; [D.E.149]

It is first worth noting that from the time WEXFORD HEALTH SOURCES, INC. assumed responsibility for the management and provision of medical care to inmates at SFRC on March 15, 2013 until the time Dr. HERNANDEZ began her tenure there as the Site Medical Director on December 23, 2013, the Plaintiff was continually prescribed some sort of pain management medication, whether it was Morphine sulfate, MS Contin, ibuprofen, Motrin, Toradol, Elavil, or Clonidine. *See* attached Composite Exhibit "G"; [D.E.149 at page 26]. Namely, on December 18, 2013, the Regional Medial Director at the time, Dr. David Reddick, ordered a prescription for 30mg of Morphine sulfate to be administered to the Plaintiff twice daily for three days. *See* attached Composite Exhibit "G"; Exhibit "M". That prescription *expired* on December 21, 2013. *See* attached Composite Exhibit "G"; Exhibits "M" and "N". Additionally on December 18, 2013, ARNP Williams Bass ordered a prescription for 400mg of Motrin to be administered to the Plaintiff three times daily for six months, for a total of 1200mg daily, and a prescription for 50mg of Elavil to be administered at bedtime for six months. *See* attached Composite Exhibit "G"; Exhibits "M" and "N". ARNP Bass notated on his December 18, 2013 Physician Order Sheet that both Elavil and Motrin were prescribed to ameliorate the Plaintiff's neuropathic pain in his right hip. *See* attached Composite Exhibit "G".

On December 30, 2013, Dr. HERNANDEZ conducted an initial chart review of the Plaintiff. *See* attached Exhibit "M". She noted the Plaintiff's Hepatitis C and modified ARNP Bass' December 18, 2013 Motrin prescription to only be administered twice daily for ten days, for a total of 800mg, PRN ("when necessary"). *See id*. The PRN notation gave the Plaintiff the sole discretion to request Motrin when he experienced pain up to two times a day. *See id*. Dr. HERNANDEZ utilized sound medical experience and judgment in lessening the Plaintiff's prior Motrin prescription. *See id*. Patients with chronic Hepatitis C, like the Plaintiff, typically have

mild elevations of liver enzymes in their blood, and high dosage or long-term administration of over-the-counter non-steroidal drugs, such as Motrin, can cause sharp elevations in those enzymes, suggesting significant liver injury. *See id*. Most importantly, it is worth noting that as of Dr. HERNANDEZ's first day at SFRC on December 23, 2013 *and* as of the day of her chart review on December 30, 2013, the Plaintiff was no longer prescribed Morphine sulfate. *See* attached Composite Exhibit "G"; Exhibits "M" and "N". Thus, Dr. HERNANDEZ could not have possibly "discontinued" a prescription that was no longer active. *See* attached Exhibit "N".

The Plaintiff specifically alleges that on January 7, 2014, following a January 6, 2014 meeting with Dr. HERNANDEZ and Dr. REDDICK regarding a potential hip reimplantation, Dr. HERNANDEZ discontinued his morphine prescription. [D.E.77]. As shown by the uncontroverted record evidence above, this allegation is completely devoid of any evidentiary basis. The Plaintiff was last administered Morphine sulfate on December 21, 2013 in accordance with the three-day December 18, 2013 prescription ordered by Dr. REDDICK. *See* attached Composite Exhibit "G"; Exhibits "M" and "N". Dr. HERNANDEZ could thus not "discontinue" a prescription on January 7, 2013 that had expired more than two weeks prior. Additionally, the medical records establish that the January 6, 2013 meeting between the Plaintiff, Dr. HERNANDEZ, and Dr. REDDICK merely addressed the Plaintiff's continued insistence on a hip reimplantation. *See* attached Exhibits "M", "N", and 'P". The records are undisputed: Dr. HERNANDEZ did not and could not have discontinued the Plaintiff's Morphine Sulfate prescription. As such, Dr. HERNANDEZ is entitled to summary judgment.

### II. Assuming Arguendo That Dr. HERNANDEZ Discontinued The Plaintiff's Morphine Prescription, She Prescribed Alternative Medication To Alleviate The Plaintiff's Pain That Merely Constitutes "Medical Judgment."

The Plaintiff alleges in his Complaint that, despite Dr. HERNANDEZ's knowledge of his serious medical needs and the authority to address them, she "willfully and maliciously failed to take any action to address those needs and intentionally denied medical treatment for severe pain" to the Plaintiff. [D.E.77]. Even though such a contention is devoid of any evidentiary support, assuming arguendo that Dr. HERNANDEZ *discontinued* the Plaintiff's morphine prescription, the Plaintiff was prescribed alternative pain management medication that entitles Dr. HERNANDEZ to summary judgment.

In *DeBoer v. Luy*, 70 Fed.Appx. 880 (7th Cir. 2003), DeBoer brought a claim for deliberate indifference against the prison physician, Dr. Luy, after he became dissatisfied with the strength of the pain medication he received for his chronic mastoiditis. Specifically, Dr. Luy had referred DeBoer to an Ear, Nose, and Throat Clinic where DeBoer was prescribed Vicodin, a narcotic drug indicated for relief of moderate to moderately severe pain. Upon his return to the facility, Dr. Luy changed the prescription to Tylenol #3, a drug containing codeine indicated for relief of mild to moderately severe pain. In affirming summary judgment on behalf of Dr. Luy, the Seventh Circuit held that the Eighth Amendment "does not guarantee that an inmate receive specific treatment; it guarantees only 'reasonable measures to meet a substantial risk of serious harm.'" *Id*. at 883. Most notably, the Court proceeded to reason that the Eighth Amendment "does not prohibit a prison doctor from exercising his own independent medical judgment regarding an appropriate medical treatment, and a prisoner's mere disagreement with a doctor's medical judgment concerning treatment does not support a claim of cruel and unusual punishment." *Id*. See also *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("Whether and

how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference . . ..”); *Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir. 1985) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (1st Cir. 1981) (“Where a prisoner has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law.”)); *Bass v. Sullivan*, 550 F.2d 229, 231-32 (5th Cir. 1977) (Although an inmate-patient may *desire* different modes of treatment, the decision to administer alternative treatment does not rise to the level of deliberate indifference).

It is difficult to address the Plaintiff's contentions that are patently false, but the rationales in *DeBoer*, *Snipes*, *Hamm,* and *Bass* are dispositive in the instant case. While the Plaintiff contends that Dr. HERNANDEZ discontinued his Morphine prescription and denied further medical treatment, the record evidence reveals the exact opposite: from the time Dr. HERNANDEZ began her tenure at SFRC on December 23, 2013, through the time Dr. HERNANDEZ removed the Plaintiff from Medical Hold on January 16, 2014 and he was thereafter transferred to Columbia Correctional Institution, Dr. HERNANDEZ ensured that the Plaintiff was always administered pain management medication, specifically Motrin or Elavil. *See* attached Composite Exhibit "G"; Exhibits "M" and "N".

As previously referenced, on November 12, 2013, Dr. Paula Medina prescribed 30mg of Morphine sulfate to be administered twice daily, for 14 days. *See* attached Composite Exhibit "G". After the expiration of Dr. Medina's ordered Morphine sulfate prescription, Dr. Dora Gaxiola prescribed *alternative* pain management medication to be administered to the Plaintiff, namely Toradol and Clonidine. *See* attached Composite Exhibit "G". According to Dr. HERNANDEZ, Morphine sulfate is an addicting drug, and the ultimate goal of Morphine

treatment is to "taper down and discontinue," which goal was achieved through Dr. Medina lessening the Plaintiff's dosage, and thereafter Dr. Gaxiola prescribing alternative medications. *See* [D.E.149 at pages 25-27]. On December 18, 2013, in addition to Dr. REDDICK prescribing 30mg of Morphine Sulfate to be administered to the Plaintiff twice daily for three days, ARNP William Bass prescribed 400mg of Motrin to be administered three times daily for six months, and a prescription for Elavil to be administered at bedtime for six months. *See* attached Composite Exhibit "G". Both the Motrin and Elavil were prescribed to alleviate the Plaintiff's neuropathic pain in his right hip. *See* attached Composite Exhibit "G"; Exhibits "M" and "N".

While *only* the Motrin and Elavil prescriptions were active, Dr. HERNANDEZ began her tenure at SFRC as the Medical Site Director on December 23, 2013. *See* attached Exhibit "M"; [D.E.149 at page 8]. On December 30, 2013, based upon her chart review of the Plaintiff coupled with his history of Hepatitis C, Dr. HERNANDEZ utilized her medical judgment and experience and lessened ARNP Bass' December 18, 2013 Motrin prescription to be administered twice daily for ten days, for a total of 800mg, PRN ("when necessary"). *See* attached Composite Exhibit "G"; Exhibit "M". Specifically, Dr. HERNANDEZ reasoned that high dosage administration of over-the-counter non-steroidal drugs, such as Motrin, can cause significant liver injury. *See* attached Exhibit "M".

Thus, even assuming arguendo that Dr. HERNANDEZ somehow discontinued the Plaintiff's Morphine sulfate prescription that had expired more than two weeks prior to her January 6, 2014 meeting with the Plaintiff, there is no evidence supporting the contention that Dr. HERNANDEZ acted with deliberate indifference to the Plaintiff's medical need. On the contrary, Dr. HERNANDEZ was diligent and attentive in ensuring that the Plaintiff was always prescribed alternative pain management medication during his time at SFRC. In fact, Dr.

HERNANDEZ *ordered* Motrin for the Plaintiff to be administered as needed in addition to ARNP Bass' order for Elavil that had already been prescribed. As the *Snipes* Court aptly stated, medical providers like Dr. HERNANDEZ should be able to exercise their medical judgment in mitigating pain that is free from judicial interference.

Although the Plaintiff may have *desired* Morphine sulfate as a continued mode of treatment Dr, Medina's decision to begin "titrating" the Plaintiff's Morphine sulfate administration; Dr. Gaxiola's decision to prescribe alternative pain management medication, namely Toradol and Clonidine; and, most importantly, Dr. HERNANDEZ's decision to adjust the Plaintiff's Motrin prescription and maintain the Plaintiff's Elavil prescription are *all* examples of the utilization of sound medical judgment and opinion, which are not sufficient to give rise to liability under §1983. *See Estelle*, 429 U.S. at 107; *Hamm*, 774 F.2d at 1575. As such, Dr. HERNANDEZ is entitled to summary judgment as a matter of law.

## CONCLUSION

For the foregoing reasons, the Defendant, MARLENE HERNANDEZ, M.D., is entitled to summary judgment as a matter of law.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed with the Clerk of Court through the CM/ECF system on August 16, 2016 to Karen Marcell, Esq.**,** Attorney for Plaintiff, Katzman Garfinkel, P.A., 300 North Maitland Avenue, Maitland, FL 32751 at kmarcell@likeyourlawyer.com and Shane Weaver, Esquire, counsel for Florida

Department of Corrections, Office of the Attorney General, 110 S. E. 6th Street, 10th Floor, Fort Lauderdale, FL 33301 at Shane.Weaver@myfloridalegal.com.

                                                               CHIMPOULIS, HUNTER & LYNN, P.A.
Attorneys for Defendants, Wexford Health Sources, Inc., Marlene Hernandez, M.D. and David Reddick, M.D.
150 South Pine Island Road, Suite 510
Plantation, FL  33324
Phone: (954) 463-0033


BY: */s/ M. Katherine Hunter*
      M. KATHERINE HUNTER, ESQUIRE
      Florida Bar No.  981877
      Email:  khunter@chl-law.com
      ERIC D. FREEDMAN, ESQUIRE
      Florida Bar No. 111490
      Email: efreedman@chl-law.com

\\chl-sbs1\files-28-65\49-4007\court docs\msj hernandez.docx