## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

GEORGE HORN,

      Plaintiff,

vs.
                                    Civil Action No.: 14-20341-DPG
                                    Magistrate Judge William C. Turnoff

MICHAEL D. CREWS, Secretary
of the Florida Department of
Corrections, in his official capacity,
WEXFORD HEALTH SOURCES,
INC., a Florida corporation,
MARLENE  HERNANDEZ, M.D.,
SEYED HOSSEINI, M.D. and
DAVID REDDICK, M.D.,

      Defendants.

_____/

## DEFENDANT, WEXFORD HEALTH SOURCES, INC.'S
## MOTION FOR SUMMARY JUDGMENT

      The Defendant, WEXFORD HEALTH SOURCES, INC., by and through its undersigned

counsel, and pursuant to Fed. R. Civ. P. 56, hereby files its Motion for Summary Judgment and

in support thereof states as follows:

### INTRODUCTION

      The Plaintiff, GEORGE HORN, brought this action under the Civil Rights Act, 42 U.S.C.

§1983 against multiple Defendants including WEXFORD HEALTH SOURCES, INC., alleging

that, while incarcerated at South Florida Reception Center ("SFRC"), WEXFORD HEALTH

SOURCES, INC. employed a policy, practice, and custom of denying necessary medical care to

the Plaintiff for the purpose of cost containment and profit maximization. Because the evidence

taken in light most favorable to the Plaintiff fails to establish that WEXFORD HEALTH

SOURCES, INC. was either directly involved in the alleged denial of medical care to the

Plaintiff, or that a policy, practice, or custom promulgated by WEXFORD HEALTH SOURCES, INC. contributed to the alleged denial of medical care to the Plaintiff, WEXFORD HEALTH SOURCES, INC. is entitled to summary judgment as a matter of law.

## UNDISPUTED FACTS[1]

1. The Plaintiff, GEORGE HORN, was an inmate at SFRC from September 15, 2011 until his transfer to Columbia Correctional Institution on January 24, 2014. *See* FDOC Transfer/Arrival Summary, attached hereto as Exhibit "A".

2. On March 15, 2013, WEXFORD HEALTH SOURCES, INC. commenced its contract with the Florida Department of Corrections for the provision of staffing and the operation of medical care and treatment to various institutions throughout the State of Florida, including SFRC. *See* Contract between Florida Department of Corrections and WEXFORD HEALTH SOURCES, INC., attached to Affidavit of Thomas Reimers, attached hereto as Exhibit "B".

3. By way of background, the Plaintiff underwent a first-stage reimplantation at Shands Medical Center on January 21, 2003 after presenting with a chronically infected, well-fixed Intermedics total hip replacement and numerous sinus tracts. Dr. Richard Vlasak performed the surgery and placed a PROSTALAC prosthesis. The Plaintiff's active infection alleviated with IV antibiotic treatment, and Dr. Vlasak performed the second-stage reimplantation on June 3, 2003. However, the Plaintiff developed recurrent infections and dislocations and ultimately underwent a revision right hip replacement by Dr. Vlasak on August 25, 2003. *See* Medical Records from Richard Vlasak, MD, attached hereto as Composite Exhibit "C"; [D.E.147 at pages 8-13].

---

[1] The Plaintiff's Second Amended Complaint contains markedly different facts and allegations from this Motion that are merely a product of the Plaintiff's memory and are devoid of any evidentiary basis.

4.  On September 15, 2011, the Plaintiff presented to Kendall Regional Medical Center with chest pain. Incidental to the cardiology evaluation, Dr. Jose Barros discovered a large mass at the Plaintiff's right thigh. The Plaintiff underwent a procedure to drain synovial fluid that reduced the size of the mass considerably. Dr. Barros noted that "there is a high chance of recurrence of this cyst" and possible surgical excision would be considered. *See* Medical Records from Kendall Regional Medical Center, attached hereto as Composite Exhibit "D".

5.  On January 31, 2012, the Plaintiff consulted for the first time with Dr. Jose Ponce de Leon, an orthopedic surgeon, who assessed the mass at the medial aspect of the Plaintiff's right thigh. Dr. Ponce de Leon advised surgical removal of the mas after the performance of an MRI with contrast. *See* Medical Records from Jose Ponce de Leon, MD, attached hereto as Composite Exhibit "E"; [D.E. 150 at page 18].

6.  On June 14, 2012, the Plaintiff was admitted to Kendall Regional Medical Center and underwent incision and draining of "abundant infected type" fluid from the mass at the right thigh. *See* attached Composite Exhibit "D".

7.  On June 23, 2012, Dr. Pedro Kiliddjian, a general surgeon, consulted with Mr. Horn at Kendall Regional Medical Center and explained that his recurrent infection and fluid drainage was possibly the product of his initial hip prosthesis surgery from 1999. Dr. Kiliddjian proposed incision and further drainage of the fluid with a Jackson-Pratt Drain. *See* attached Composite Exhibit "D".

8.  The Plaintiff underwent a surgical incision and drainage of the fluid collection at the right thigh on July 3, 2012 by Dr. Orlando Llorente. Dr. Llorente diagnosed an infected right hip implant. *See* attached Composite Exhibit "D".

9. Dr. Barros discharged the Plaintiff from Kendall Regional Medical Center on July 11, 2012. In his Discharge Summary, Dr. Barros noted that Mr. Horn was at an enhanced risk of infection and the chance of salvaging his hip was low. *See* attached Composite Exhibit "D".

10. On February 21, 2013, the Plaintiff presented again to Kendall Regional Medical Center with persistent drainage from the right hip and right thigh and was seen by Dr. Angel Perez-Tirse. Dr. Perez-Tirse consulted with orthopedic surgery and recommended intra-articular antibiotic therapy in the hopes of improving the drainage and maintaining the Plaintiff's chronic osteomyelitis. He added that the ideal treatment considering the Plaintiff's condition was removal of his prosthetic hip. *See* attached Composite Exhibit "D".

11. At the recommendation of Dr. Perez-Tirse, Dr. Arturo Corces, an orthopedic surgeon, consulted with the Plaintiff at Kendall Regional Medical Center on February 22, 2013. Dr. Corces noted that the Plaintiff had a long-standing infection and ongoing drainage for over one year. He recommended removal of the Plaintiff's total hip replacement and placement of antibiotic beads, as we all as a Hickman catheter for intra-articular antibiotic delivery. Dr. Corces obtained medical clearance and performed the procedure on February 27, 2013. *See* Medical Records from Arturo Corces, MD, attached hereto as Composite Exhibit "F"; [D.E.146].

12. Per Dr. Corces's recommendation, the Plaintiff returned on March 13, 2013 for removal of the antibiotic beads and placement of a cement spacer for the proximal femur. Dr. Corces noted that the procedure was "fraught with complications, especially the possibility of dislocation." He also documented that the Plaintiff's cement spacer would

likely fail secondary to recurrent infection. *See* attached Composite Exhibit "F"; [D.E.146].

13. From March 15, 2013 to March 18, 2013, the Plaintiff was administered 30mg of Morphine sulfate, four times a day. *See* Medication Administration Records and Physician Medication Orders, attached hereto as Composite Exhibit "G".

14. From March 18, 2013 to April 2, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

15. On March 20, 2013 Dr. Rodriguez-Garcia, a Senior Physician at SFRC, noted that he spoke with Dr. Barros about the treatment plan for the Plaintiff. Specifically, the Plaintiff was to receive continued intra-articular antibiotic delivery, as a well as a follow-up with Dr. Corces. *See* attached March 20, 2013 Chronological Record of Health Care, attached hereto as Exhibit "H".

16. During that period, from March 25, 2013 to March 31, 2013, the Plaintiff was also administered 200mg ibuprofen, three times a day. *See* attached Composite Exhibit "G".

17. On April 17, 2013, Dr. Rodriguez-Garcia again consulted with the Plaintiff at SFRC and noted that the Plaintiff's Hickman catheter had "come out." Dr. Rodriguez-Garcia and Dr. SEYED HOSSEINI, the Medical Director at the time, collaboratively decided that Plaintiff needed to be sent to the hospital for placement of a new one. *See* attached April 17, 2013 Chronological Record of Health Care, attached hereto as Exhibit "I".

18. On April 19, 2013, Dr. Rodriguez-Garcia submitted a Consultation Request so that the Plaintiff could be seen by an orthopedist, specifically Dr. Corces. *See* Consultation Request dated April 19, 2013, attached hereto as Exhibit "J". On April 22, 2013, Dr. Hosseini likewise submitted a Consultation Request so that the Plaintiff could undergo a

Hickman catheter reinsertion. On that same day, Dr. Hosseini additionally placed a Consultation Request so that the Plaintiff could undergo a CT scan of the hip without contrast. See Consultation Requests dated April 22, 2013, attached hereto as Composite Exhibit "K".

19. The next day, April 23, 2013, the Plaintiff underwent both the CT scan and placement of the Hickman catheter at Kendall Regional Medical Center (in order to complete his intra-articular antibiotic treatment). *See* attached Composite Exhibit "K".

20. From April 20, 2013 to May 9, 2013, the Plaintiff was administered 60mg of Morphine sulfate, twice a day. *See* attached Composite Exhibit "G".

21. On May 7, 2013, in response to the April 19, 2013 Consultation Request, Dr. Corces again saw the Plaintiff and noted continued infection. *See* attached Composite Exhibit "F"; [D.E.146].

22. From May 10, 2013 to May 12, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

23. On May 13, 2013, the Plaintiff returned to Dr. Corces at Kendall Regional Medical Center for removal of the cement spacer and Girdlestone arthroplasty. Dr. Corces noted the inherent complications associated with the surgery, namely continued pain, recurrent infection, loosening, vascular complications, wound complications, probable leg length discrepancy, external rotation, and damage to the sciatic nerve. Dr. Corces suggested six months to a year without *considering* any kind of reimplantation. Most significantly, Dr. Corces never definitively told the Plaintiff that he would perform a hip reimplantation, and he stressed the possibility that the Plaintiff's infection might continue with the potential for amputation and/or hip disarticulation. *See* attached Composite Exhibit "F";

[D.E.146 at pages 60 and 64-65]. The Plaintiff was discharged from Kendall Regional Medical Center on May 17, 2013. *See* attached Composite Exhibit "D".

24. From May 17, 2013 to May 20, 2013, the Plaintiff was administered 30mg of MS Contin (extended-release Morphine), three times a day. *See* attached Composite Exhibit "G".

25. From May 22, 2013 to June 21, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

26. Dr. Corces next saw the Plaintiff for a routine follow-up on May 28, 2013 and noted significant improvement. The Plaintiff returned to Dr. Corces as instructed on June 25, 2013, at which time Dr. Corces suggested that the Plaintiff spend one year without a prosthesis in order to allow for the body to resolve the infection. Again, Dr. Corces never definitively told the Plaintiff that he would performed a hip reimplantation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 64-65].

27. From June 19, 2013 to July 19, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

28. The Plaintiff last saw Dr. Corces on July 23, 2013. Dr. Corces noted that the Plaintiff wished to attempt reimplantation, but Dr. Corces again emphasized the procedure's inherent complications and said it was much too early to consider reimplantation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 64-65].

29. From July 19, 2013 to August 9, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

30. From September 10, 2013 to October 29, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

31. On October 25, 2013, WEXFORD HEALTH SOURCES, INC. commenced its contract with Larkin Community Hospital for the provision of inpatient and outpatient hospital services in the Miami area. *See* Contract between Florida Department of Corrections and Larkin Community Hospital, attached to Exhibit "L".

32. From November 13, 2013 to November 26, 2013, the Plaintiff was administered 30mg of Morphine sulfate, twice daily. *See* attached Composite Exhibit "G".

33. On November 27, 2013, the Plaintiff was prescribed Toradol and Clonidine. Both medications are used to relieve and manage chronic pain. *See* attached Composite Exhibit "G".

34. On December 13, 2013, the Plaintiff presented to another orthopedic surgeon, Dr. Jose Ponce de Leon, at the request of Dr. Dora Gaxiola, a senior physician at SFRC at the time. Dr. Ponce de Leon addressed the Plaintiff's desires for a further hip reimplantation and indicated that "no surgery was advised at the present time." *See* attached Composite Exhibit "E"; [D.E.150 at pages 34, 36, and 49].

35. From December 18, 2013 to December 21, 2013, the Plaintiff was administered 30mg of Morphine sulfate, twice a day, per the order of the Regional Medical Director, Dr. DAVID REDDICK. That prescription expired on December 21, 2013. *See* attached Composite Exhibit "G"; Affidavit of Marlene Hernandez, attached hereto as Exhibit "M"; Affidavit of Carl Keldie, MD, attached hereto as Exhibit "N".

36. On that same day, ARNP William Bass ordered a prescription for 400mg of Motrin to be administered three times daily for six months, and a prescription for Elavil to be administered at bedtime for six months. ARNP Bass notated on his December 18, 2013 Physician Order Sheet that both Elavil and Motrin were prescribed to ameliorate the

Plaintiff's neuropathic pain in his right hip. *See* attached Composite Exhibit "G"; Exhibits "M" and "N".

37. On December 23, 2013, Dr. HERNANDEZ began her tenure at SFRC as the Site Medical Director. In that capacity, Dr. HERNANDEZ's responsibilities were limited to overseeing the care and treatment rendered to the Plaintiff *only* from December 23, 2013 until the removal of his Medical Hold on January 16, 2014, and subsequent transfer to Columbia Correctional Institution. *See* attached Exhibit "M".

38. On December 30, 2013, based upon her chart review of the Plaintiff coupled with his history of Hepatitis C, Dr. HERNANDEZ lessened ARNP Bass' December 18, 2013 Motrin prescription to provide for the Motrin to be given twice daily for ten days, for a total of 800mg, PRN ("when necessary"). The PRN notation gave the Plaintiff the discretion to request Motrin when he experienced pain up to two times a day. *See* attached Composite Exhibit "G"; Exhibit "M".

39. On January 6, 2014, Dr. HERNANDEZ personally met with the Plaintiff for the first and only time regarding his continued insistence on a right hip reimplantation and explained to the Plaintiff the recommendation of Dr. Jose Ponce de Leon. There is no evidence that Dr. HERNANDEZ discontinued the Plaintiff's pain management medication at that time. In fact, the records reflect the order by Dr. HERNANDEZ for PRN Motrin up to 800mg a day *expired* on January 10, 2014. Furthermore, the order for Elavil was also still in place and not discontinued. *See* attached Chronological Record of Health Care dated January 6, 2014, attached hereto as Exhibit "O"; Exhibit "M"; Affidavit of David Reddick, attached hereto as Exhibit "P"; [D.E.149 at page 11].

40. On January 24, 2014, following weeks of stability and no voiced complaints of discomfort by the Plaintiff, Dr. HERNANDEZ removed the Plaintiff from Medical Hold and he was thereafter transferred to Columbia Correctional Institution. At the time, Columbia Correctional Institution's medical department was under the management of Corizon Correctional Healthcare. *See* attached Exhibit "A".

41. On January 28, 2014, the Plaintiff brought this action under the Civil Rights Act, 42 U.S.C. §1983 against multiple defendants including Dr. HERNANDEZ, alleging he was denied adequate medical while incarcerated at SFRC. [D.E. 1]; *See also* [D.E.77].

42. On December 13, 2014, the Plaintiff presented to Dr. Richard Vlasak at Shands Medical Center regarding the prospect of a hip reimplantation. Dr. Vlasak noted that the Plaintiff had no active complaints of an infection. Nonetheless, Dr. Vlasak "strongly" recommended to the Plaintiff that he not attempt any further hip reimplantations and that the Plaintiff's recurrent infections were probably not curable short of a hemipelvectomy. *See* attached Composite Exhibit "C"; [D.E.147 at pages 18-19].

43. On December 10, 2015, the Plaintiff again presented to Dr. Richard Vlasak at Shands Medical Center, at which time Dr. Vlasak adopted his previous recommendations from December 13, 2014, namely that the Plaintiff not attempt any further hip reimplantations. *See* attached Composite Exhibit "C"; [D.E.147 at pages 22-23].

## MEMORANDUM OF LAW

### Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Cetolex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a *genuine* issue of material fact." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the record, taken in its entirety, could lead a rational trier of fact to find for the non-moving party. *See id.*; *Matsushita*, 475 U.S. at 586. Ultimately, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

## Legal Argument

Detention facility officials violate a detainee's rights under §1983 if they withhold appropriate medical care "with deliberate indifference to the inmate's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim of deliberate indifference to a

serious medical need, the plaintiff must show (1) an objectively serious medical need; (2) defendant's deliberate indifference to the need; and (3) causation between that indifference and the plaintiff's injury. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). Negligence is not enough, and a mere difference of opinion between an inmate and the institutional medical staff concerning his diagnosis and treatment does not rise to the level of a constitutional deprivation. *Enriquez v. Kearney*, 694 F. Supp. 2d 1282, 1296 (S.D. Fla. 2010). *See Estelle*, 429 U.S. at 107 (holding that "matters of medical judgment" do not give rise to a §1983 claim); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (relying on the premise that federal courts are reluctant to second guess the medical judgments of those providing care). Consequently, "[d]eliberate indifference is not established where an inmate received care but desired different modes of treatment." *Hamm*, 774 F.2d at 1575 (emphasis added). Most significantly, as long as an inmate receives medical care, courts are hesitant to find that defendants have been deliberately indifferent to the inmate's medical needs. *See generally Estelle*, 429 U.S. at 107; *Hamm*, 774 F.2d at 1575; *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (although nurse's actions may have violated professional standards, the objective standard was not met – the nurse ordered *some* medical care to be provided to the inmate and thus her actions were not sufficiently worse than negligence).

To recover against WEXFORD HEALTH SOURCES, INC., the Plaintiff must establish that his injury was caused by a WEXFORD HEALTH SOURCES, INC. policy, practice, or custom of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *See Woodward v. Corr. Med. Serv. Of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997); *Monell v. Dept. of Social Serv's of NY*, 436 U.S. 658, 694 (1978). However, boilerplate allegations of a policy, custom, or

practice, without supporting facts and evidence, are insufficient to sustain a §1983 claim against a private entity. *See City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985). Instead, the Plaintiff needs to establish that the private medical services provider was directly involved in the alleged civil rights violation, or that a policy, practice, or custom of the private entity actually contributed to the alleged violation. *See Howell v. Evans*, 922 F.2d 712, 724 (11th Cir. 1991). Even more, the Plaintiff must allege and establish a series of incidents or a pattern of misconduct pursuant to such a policy, practice, or custom. Specifically stated, while there is no clear consensus as to how frequently [certain] conduct must occur to impose *Monell* liability [under the custom and practice theory] . . . it must be more than one instance, or even three." *Hardy v. Wexford Health Sources, Inc.*, No. 12C6554, 2015 WL 1593597, at *13 (N.D. Ill. April 2, 2015). Most significantly, however, "it is necessarily more difficult for a plaintiff to demonstrate an official policy or custom based only on his experience because what is needed is evidence that there is a true municipal policy at issue, not a random event." *Id.* at *15 (quoting *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

I.      **The Plaintiff Has Failed To Demonstrate That Any Alleged Injury Was Caused By A WEXFORD HEALTH SOURCES, INC. Policy, Practice, Or Custom**

In light of the Plaintiff's conclusory allegations attempting to impute liability on behalf of WEXFORD HEALTH SOURCES, INC., the record evidence in this case demonstrates that WEXFORD HEALTH SOURCES, INC. does not have a policy, practice, or custom that would cause any of the alleged constitutional violations in this case. To the contrary, the record evidence demonstrates promulgated policies designed to ensure that all inmate-patients receive medically necessary and timely medical care at the appropriate level of service through Utilization Management. Ultimately, WEXFORD HEALTH SOURCES, INC., through its Utilization Management, employees comprehensive criteria to facilitate its goal of providing

cost-effective, clinically appropriate care based on each individual patient's own medical necessities. *See* Affidavit Neil Fisher, MD, attached hereto as Exhibit "Q". Concededly, while cost is a factor in assessing the potential modes and methods of treatment, "efficiency and cost management are established principles in the provision of quality healthcare and do not interfere with a respective patient's ability to obtain medically adequate and necessary care and treatment." *See* Affidavit of Carl Keldie, MD, attached hereto as Exhibit "N".

The Plaintiff alleges that WEXFORD HEALTH SOURCES, INC. has a "policy of directing and/or incentivizing its healthcare employees to deny non-emergency surgical care whenever feasible for cost containment, regardless of medical necessity, through the [Utilization Management] Collegial Review process." [D.E.77]. The Plaintiff proceeds to contend that such policy was the "driving force" that motivated Dr. HERNANDEZ and Dr. REDDICK's deliberate indifference to the serious medical needs of the Plaintiff. [D.E.77]. However, such allegations constitute nothing more than self-serving statements that are devoid of any evidentiary basis. In fact, both Dr. HERNANDEZ and Dr. REDDICK testified, under oath, that they have never denied any care whatsoever – to *any* inmate-patient – based on cost containment and/or profit maximization.

> Q: When you came to work at SFRC and were employed by Wexford at SFRC, did you at any point in time with regard to George Horn's care make a decision to deny him medical care because of some profit that you would get from that?
> A: No, ma'am.
> Q: Did you at any point in time make a decision to deny George Horn medical care with the knowledge that denial of medical care would cause him serious harm?
> A: No, ma'am.
> Q: Would you do that as a physician?
> A: I would not.
> Q: If you felt that Mr. Horn needed some type of medical care, and that medical care was necessary to prevent serious medical harm, would you do your best to get that for him?

A: I would go above and beyond to make sure the patient gets what is medically necessary.

Q: There have been some suggestions in this case that there was a conspiracy to deny Mr. Horn medical care for his hip. Are you aware of any such conspiracy?

A: I am not.

Q: Are you aware of any conversations that have occurred between medical providers and Wexford in George Horn's case in which the decision was made to deny him hip surgery?

A: No, ma'am.

Q: That there was some ulterior motive to cause Mr. Horn pain or discomfort to deny him this hip surgery?

A: No, ma'am.

Q: Are you aware of any conversations that occurred with Wexford or any of the people that worked for Wexford where a decision was made to deny him the ability to have hip surgery to save money?

A: No, ma'am.

Q: Did you at all profit personally in any way, shape, or form by the denial of any medical care to George Horn?

A: Not at all.

Q: Did you have any kind of deal with Wexford that your ability to cut costs in the care of patients would give you a bonus or an increase I your salary?

A: No, ma'am.

Q: In your experience at working at SFRC and dealing with the care for George Horn, did you ever encounter a situation where the utilization management system of Wexford was used to deny medical care that was necessary to patients?

A: No.

[D.E.149 at pages 35-37].

Q: Did you somehow receive as the representative for the Southern District some type of increase in your salary or bonuses by saving money for the care of patients?

A: Not at all. I wish.

Q: No, you didn't, did you?

A: No, I didn't.

Q: In your position with Wexford, did you make any decisions one way or the other in the care and treatment that you reviewed for Mr. Horn based upon some type of cost cutting measure?

A: Not at all.

. . .

Q: Let me ask you this: Are you aware of any type of discussions, plan, secretive talks to send Mr. Horn to see Dr. Ponce de Leon in order to avoid him receiving a hip replacement?

A: No.

. . .

Q: One last question. I'll withdraw that. Did Wexford ever incentivize you to deny nonemergent surgical care to patients at SFRC?

A: No.

Q: Did Wexford in your experience with working with them on a regular and customary basis deny nonemergency surgical care, disregarding medical necessity in order to maximize the profitability of South Florida Reception Center?

A: No.

Q: Did you ever have a concern with that in the care of the patients that were under the supervision of Wexford while you were at South Florida Reception Center?

A: No.

[D.E.148 at pages 106-108].

Additionally, Neil Fisher, who served as the Corporate Director of Utilization Management from March 2013 to August 2014, testified that WEXFORD HEALTH SOURCES, INC.'s Utilization Management program focuses on each individual inmate-patient's medical needs and uses extensive criteria to provide cost-effective, clinically appropriate care for each respective inmate-patient. *See* attached Exhibit "Q". *See also* attached Exhibit "P" (Dr. REDDICK testified that medical decisions are "individually tailored to each respective inmate-patient in accordance with medical judgment and necessity."). Further, WEXFORD HEALTH SOURCES, INC.'s retained correctional medicine expert, Dr. Carl Keldie, has reviewed the entirety of the medical records pertaining to the Plaintiff and opined that WEXFORD HEALTH SOURCES, INC. expended significant resources to provide adequate care to the Plaintiff. *See* attached Exhibit "N".

Even more significantly – aside from Dr. HERNANDEZ, Dr. REDDICK, Dr. Fisher, and Dr. Keldie's sworn testimony – the uncontroverted record evidence establishes that the Plaintiff

in this case received a constitutionally adequate level of care consistent with both community and correctional healthcare parameters.

## **Pain Management Medication**

From the time WEXFORD HEALTH SOURCES, INC. commenced its contract with the Florida Department of Corrections on March 15, 2013, until the time the Plaintiff was transferred from SFRC to Columbia Correctional Institution on January 16, 2014, the Plaintiff was at all times prescribed pain management medication to alleviate his alleged serious medical needs. *See* attached Composite Exhibit "G"; [D.E.149 at page 26]. Specifically, from March 15, 2013 through October 29, 2013, the Plaintiff was administered 60mg of Morphine Sulfate between two and four times daily. *See* attached Composite Exhibit "G". On November 12, 2013, Dr. Paula Medina prescribed 30mg of Morphine sulfate to be administered twice daily, for 14 days. *See* attached Composite Exhibit "G". After the expiration of Dr. Medina's ordered Morphine sulfate prescription, Dr. Dora Gaxiola prescribed *alternative* pain management medication to be administered to the Plaintiff, namely Toradol and Clonidine. *See* attached Composite Exhibit "G". According to Dr. HERNANDEZ, Morphine sulfate is an addicting drug, and the ultimate goal of Morphine treatment is to "taper down and discontinue," which goal was achieved through Dr. Medina lessening the Plaintiff's dosage, and thereafter Dr. Gaxiola prescribing alternative medications. *See* [D.E.149 at pages 25-27].

On December 18, 2013, the Regional Medial Director at the time, Dr. REDDICK, ordered a prescription for 30mg of Morphine sulfate to be administered to the Plaintiff twice daily for three days. *See* attached Composite Exhibit "G"; Exhibit "M". That prescription *expired* on December 21, 2013. *See* attached Composite Exhibit "G"; Exhibits "M" and "N". Additionally on December 18, 2013, ARNP Williams Bass ordered a prescription for 400mg of

Motrin to be administered to the Plaintiff three times daily for six months, for a total of 1200mg daily, and a prescription for 50mg of Elavil to be administered at bedtime for six months. *See* attached Composite Exhibit "G"; Exhibits "M" and "N". ARNP Bass notated on his December 18, 2013 Physician Order Sheet that both Elavil and Motrin were prescribed to ameliorate the Plaintiff's neuropathic pain in his right hip. *See* attached Composite Exhibit "G"; Exhibit "M".

On December 30, 2013, Dr. HERNANDEZ conducted an initial chart review of the Plaintiff. *See* attached Exhibit "M". She noted the Plaintiff's Hepatitis C and modified ARNP Bass' December 18, 2013 Motrin prescription to only be administered twice daily for ten days, for a total of 800mg, PRN ("when necessary"). *See* attached Composite Exhibit "G"; Exhibit "M". The PRN notation gave the Plaintiff the sole discretion to request Motrin when he experienced pain up to two times a day. *See* attached Exhibit "M". Dr. HERNANDEZ utilized sound medical experience and judgment in lessening the Plaintiff's prior Motrin prescription. *See id*. Patients with chronic Hepatitis C, like the Plaintiff, typically have mild elevations of liver enzymes in their blood, and high dosage or long-term administration of over-the-counter non-steroidal drugs, such as Motrin, can cause sharp elevations in those enzymes, suggesting significant liver injury. *See id*. Most importantly, it is worth noting that as of Dr. HERNANDEZ's first day at SFRC on December 23, 2013, *and* as of the day of her chart review of the Plaintiff on December 30, 2013, the Plaintiff was no longer prescribed Morphine sulfate. *See* attached Composite Exhibit "G"; Exhibit "M".

While the Plaintiff's above-discussed medication prescription records reveal the falsehood of his allegations, even assuming arguendo that Dr. HERNANDEZ somehow discontinued the Plaintiff's Morphine sulfate prescription that had expired more than two weeks prior to her January 6, 2014 meeting with the Plaintiff, the record evidence shows that Dr.

HERNANDEZ, as well as the other SFRC medical providers, were diligent and attentive in ensuring that the Plaintiff was *always* prescribed alternative pain management medication. While the Plaintiff contends that "Dr. HERNANDEZ discontinued [the Plaintiff's] morphine prescription *and all other pain management treatments*," the records are clear that, even after the January 6, 2014 meeting between Dr. HERNANDEZ, Dr. REDDICK, and the Plaintiff, the Plaintiff was still prescribed both Motrin and Elavil. While the Plaintiff may have *desired* Morphine sulfate as a continued mode of treatment, Dr. HERNANDEZ's (and the other medical providers') decision to prescribe Motrin and Elavil does not rise to the level of deliberate indifference. *See Hamm*, 774 F.2d at 1575.

Given that the Plaintiff cannot sufficiently establish a case of deliberate indifference against Dr. HERNANDEZ (or any of the other medical providers at SFRC) regarding the alleged discontinuance of his pain management medication, the Plaintiff cannot possibly correlate a WEXFORD HEALTH SOURCES, INC. policy, practice or custom with any alleged incidents of deliberate indifference. Thus, WEXFORD HEALTH SOURCES, INC. is entitled to summary judgment as a matter of law.

## Hip Reimplantation

At the time WEXFORD HEALTH SOURCES, INC. commenced its contract with the Florida Department of Corrections on March 15, 2013, the Plaintiff had already begun consulting with Dr. Arturo Corces, an orthopedic surgeon, for his right hip infection and resulting drainage. *See* attached Composite Exhibit "F". Specifically, the Plaintiff first consulted with Dr. Corces on February 22, 2013, while the medical care and treatment at SFRC was still under the management and supervision of the FDOC. *See id.* On that date, Dr. Corces recommended removal of the Plaintiff's previous total hip replacement and placement of antibiotic beads, as

well as a Hickman catheter for intra-articular antibiotic delivery. *See id*; [D.E.146]. At the time, Dr. Corces was very clear with the Plaintiff, given his past medical history, of the possibility of "amputation or hip disarticulation." *See id*.; [D.E.146 at pages 60 and 64-65]. The surgery was thereafter performed on February 27, 2013 by Dr. Corces, and Dr. Corces requested that the Plaintiff return in approximately two weeks for removal of the antibiotic beads and placement of a cement spacer. *See id*. Per Dr. Corces' recommendation, the Plaintiff returned on March 13, 2013, at which time Dr. Corces placed the cement spacer and noted the likelihood of recurrent infection and dislocation. *See id*. On March 20, 2013 Dr. Rodriguez-Garcia, a Senior Physician at SFRC, noted that he spoke with Dr. Barros about the treatment plan for the Plaintiff. *See* attached Composite Exhibit "H". Specifically, the Plaintiff was to receive continued intra-articular antibiotic delivery, as well as a follow-up with Dr. Corces. *Id*.

On April 17, 2013, Dr. Rodriguez-Garcia again consulted with the Plaintiff at SFRC and noted that the Plaintiff's Hickman catheter had "come out." *See* attached Exhibit "I". Dr. Rodriguez-Garcia and Dr. SEYED HOSSEINI, the Medical Director at the time, collaboratively decided that Plaintiff needed to be sent to the hospital for placement of a new one. *See* attached Exhibit "I". On April 19, 2013, Dr. Rodriguez-Garcia submitted a Consultation Request so that the Plaintiff could be seen by an orthopedist, specifically Dr. Corces. *See* attached Exhibit "J". On April 22, 2013, Dr. Hosseini likewise submitted a Consultation Request so that the Plaintiff could undergo a Hickman catheter reinsertion. *See* attached Exhibit "K". On that same day, Dr. Hosseini additionally placed a Consultation Request so that the Plaintiff could undergo a CT scan of the hip without contrast. *See* attached Exhibit "K". The next day, April 23, 2013, the Plaintiff underwent both the CT scan and placement of the Hickman catheter at Kendall Regional

Medical Center (in order to complete his intra-articular antibiotic treatment). *See* attached Composite Exhibit "K".

On May 7, 2013, in response to the April 19, 2013 Consultation Request, Dr. Corces again saw the Plaintiff and noted continued infection. *See* attached Composite Exhibit "F"; [D.E.146] On May 13, 2013, the Plaintiff presented again to Dr. Corces at Kendall Regional Medical Center for removal of the cement spacer and Girdlestone arthroplasty. *See id*. Dr. Corces documented the inherent complications associated with the surgery, namely continued pain, recurrent infection, loosening, vascular complication, wound complications, probable leg length discrepancy, external rotation, and damage to the sciatic nerve and also suggested *six months to a year without considering any kind of reimplantation*. *See id*.; [D.E.146 at pages 60 and 64-65]. Most significantly, contrary to the Plaintiff's repeated contentions, Dr. Corces never definitively told the Plaintiff that he would perform a hip reimplantation, and he stressed the possibility that the Plaintiff's infection might continue with the potential for amputation and/or hip disarticulation. *See id*.; [D.E.146 at pages 60 and 64-65]. The Plaintiff was discharged from Kendall Regional Medical Center on May 17, 2013.

The Plaintiff presented again to Dr. Corces for routine follow-ups on May 28, 2013, and June 25, 2013. *See* attached Composite Exhibit "F"; [D.E.146]. At the June 25, 2013 consultation, Dr. Corces suggested *one year without a prosthesis* in order to allow for the body to resolve the Plaintiff's severe infection. *See id*.; [D.E.146 at pages 60 and 64-65]. On July 23, 2013, the Plaintiff returned per Dr. Corces' recommendation, at which time he voiced his desire to attempt reimplantation. Again, Dr. Corces discussed the extensive associated dangers and stressed that it was "much too early." *See id*.; [D.E.146 at pages 60 and 64-65].

On November 27, 2013, Dr. Dora Gaxiola submitted a Consultation Request to Utilization Management so that the Plaintiff could be referred to an orthopedic surgeon. *See* attached Composite Exhibit "E". It is worth noting that on October 25, 2013, WEXFORD HEALTH SERVICES, INC. switched its contract for the provision of inpatient and outpatient hospital services from Kendall Regional Medical Center to Larkin Community Hospital. *See* attached Exhibit "L". As such, instead of the Plaintiff consulting with Dr. Corces (affiliated at the time with Kendall Regional Medical Center), the Plaintiff consulted with Dr. Jose Ponce de Leon (affiliated with Larkin Community Hospital) on December 13, 2013.[2] *See* attached Composite Exhibit "L"; [D.E.148 at pages 49-50]. At that time, Dr. Ponce de Leon assessed the Plaintiff and indicated that "no surgery was advised at the present time." *See* attached Composite Exhibit "E"; [D.E.150 at pages 34, 36, and 49]. The Plaintiff returned to SFRC and, as referenced above, transferred to Columbia Correctional Institution on January 16, 2014. At that point, WEXFORD HEALTH SOURCES, INC.'s management of the Plaintiff's medical care ceased.

In the interest of thoroughness, however, the Plaintiff consulted with Dr. Richard Vlasak, the orthopedic surgeon who performed his hip reimplantation procedures in early-mid 2013, at Shands Medical Center on both December 4, 2014 and December 10, 2015. *See* attached Composite Exhibit "C"; [D.E.147 at pages 18-19]. On December 4, 2014, Dr. Vlasak performed a physical assessment of the Plaintiff and "strongly recommended" that the Plaintiff not attempt any further hip reimplantations. *See id*. Dr. Vlasak added that the Plaintiff's recurrent infections "were probably not curable short of a hemipelvectomy." *See id*. Likewise, on December 10,

---

[2] The Plaintiff had actually consulted with Dr. Ponce de Leon dating back to January 31, 2012 for the mass in his right thigh. Interestingly, Dr. Ponce de Leon recommended surgical removal of the mass at that time. Thus, any contention that WEXFORD HEALTH SOURCES, INC., by and through its providers, colluded with Dr. Ponce de Leon to deny the Plaintiff a further hip reimplantation defies logic and is flatly refuted by the records.

2015, Dr. Vlasak consulted with the Plaintiff and ratified everything that had been contained in his prior 2014 report. *See id.*; [D.E.147 at pages 22-23]. Dr. Vlasak added that the right hip abductor brace the Plaintiff was wearing at the time was "not helping and should be stopped." *See id.*

Similarly to the Plaintiff's unfounded contention that he was denied pain management medication, the above-chronicled timeline of provision of care and treatment flatly refutes the Plaintiff's allegation that WEXFORD HEALTH SOURCES, INC.'s Utilization Management denied him a hip reimplantation. First, the Plaintiff was never – at any point in time between March 15, 2013 and January 16, 2014 – indicated for a hip reimplantation; nor was he ever told by *any* medical provider that he would *definitively* undergo a hip reimplantation. WEXFORD HEALTH SOURCES, INC. could not have possibly *denied* a hip reimplantation that was not clinically indicated or advised in the first place. At their depositions, Dr. Corces, Dr. Ponce de Leon, and Dr. Vlasak all testified alike that they never told the Plaintiff he was a candidate for a hip reimplantation. *See generally* [D.E.146, 147, and 150] Additionally, WEXFORD HEALTH SOURCES, INC.'s retained orthopedic surgery expert, Dr. Stephen Jacobs, opined that the Plaintiff's was not – and is not – a candidate for a hip reimplantation due to his immunocompromised condition and extensive history of previous surgeries, Hepatitis C, and drug abuse. *See* Affidavit of Stephen Jacobs, MD, attached hereto as Exhibit "R". Second, WEXFORD HEALTH SOURCES, INC., by and through its providers, appropriately deferred to the recommendations of the Plaintiff's orthopedic consultants, namely Dr. Corces and Dr. Ponce de Leon. *See* attached Exhibit "P". The Plaintiff was scheduled for timely follow-ups with Dr. Corces in accordance with his recommendations; the Plaintiff underwent the appropriate treatment and debridement with Dr. Corces; the Plaintiff received consistent, extensive – and

*expensive* – treatment while at SFRC; and upon the contractual change to Larkin Community Hospital, the Plaintiff was referred to Dr. Ponce de Leon who found that the Plaintiff was not indicated for surgery at the time.

There is not a single mention, reference, or indication anywhere in the voluminous record evidence that the Plaintiff was *definitively* going to undergo another hip reimplantation. While the Plaintiff may have *desired* a hip reimplantation, the multiple medical professionals were all in agreement that such a procedure was not clinically indicated. *See Hamm*, 774 F.2d at 1575. Thus, WEXFORD HEALTH SOURCES, INC. is entitled to summary judgment as a matter of law.

### Hip Abductor Brace

The Plaintiff has likewise alleged that by and through its medical providers, WEXFORD HEALTH SOURCES, INC. ordered the Plaintiff's "requested hip abductor brace be re-evaluated for the sole purpose of controlling costs." [D.E.77]. Concededly, during his May 28, 2013 consultation with the Plaintiff, Dr. Corces recommended the provision of a hip abduction brace. Accepting the Plaintiff's contention that he never received the hip abduction brace during the time he was incarcerated at SFRC as true, the Plaintiff has failed to establish that the hip abduction brace was not provided to him by and through WEXFORD HEALTH SOURCES, INC. because of a policy, practice, or custom of deliberate indifference. On te contrary, the Affidavit of Neil Fisher, MD establishes that the recommended brace *could not* have been denied by WEXFORD HEALTH SOURCES, INC. *because of cost*. *See* attached Exhibit "Q" at paragraph 12 ("As the Corporate Director of Utilization Management during the time of George Horn;s incarceration at SFRC from March 15, 2013 to January 16, 2016, Utilization Management did not deny George Horn a hip reimplantation, an abductor brace, or pain

management medication. Even more, Utilization Management most certainly did not deny George Horn a hip reimplantation, an abductor brace, or pain management medication for cost containment purposes."). Additionally, the Plaintiff cannot demonstrate the Dr. REDDICK used the Utilization Management Collegial Review Process to deny the Plaintiff a hip abductor brace because Dr. REDDICK, in his capacity as the Regional Medical Director, never even participated in the Collegial Review process for any medical issues related to the Plaintiff. *See* attached Exhibit "P".

Aside from the inability to correlate the Plaintiff's never receiving an abductor brace with a WEXFORD HEALTH SOURCES, INC. policy, practice or custom of deliberate indifference, the Plaintiff is unable to point to any concrete evidence suggesting that WEXFORD HEALTH SOURCES, INC. – or its medical providers – actually *denied* the abductor brace at all. There is a clear distinguishing line between *denying* a particular mode of treatment for cost containment purposes and potentially neglecting to provide an abductor brace because of clerical neglect, or the like.

Even more, the Affidavit of Dr. Stephen Jacobs establishes that the provision of an abductor brace is merely a matter of medical judgment that depends on the interests of each respective inmate-patient. *See* attached Exhibit "R". Additionally, as recently as December 10, 2015, there is evidence that the Plaintiff's abductor brace was not helping and "should be stopped." *See* attached Composite Exhibit "C"; [D.E.147 at page 23]. The Plaintiff cannot now allege, after the record unequivocally establishes the ineffectiveness of the abductor brace, that WEXFORD HEALTH SOURCES, INC. – by and through its medical providers – deliberately disregarded his serious medical needs.

II.     **The Plaintiff's Reliance On An August 2004 OPPAGA Report To Attempt To Create An Inference Of A WEXFORD HEALTH SOURCES, INC. Policy, Practice, Or Custom Of Deliberate Indifference Is Too Speculative, Remote, And Irrelevant To Be Considered In The Instant Case.**

In addition to the feigned allegations addressed above, the Plaintiff has cited within the Complaint an August 2004 Report by the Florida Legislature's Office of Program Policy Analysis and Government Accountability ("OPPAGA") in an effort to create an inference of a *current* WEXFORD HEALTH SOURCES, INC. policy, practice, or custom of deliberate indifference. [D.E.77]. The Report specifically reads as follows:

> A primary way Wexford contains costs is through tight utilization management. However, the quality of Wexford's health care has been problematic. The department's health care contract monitoring team and the Correctional Medical Authority review the appropriateness of the services provided to inmates. According to their reports, several of the facilities Wexford serves show repeated noncompliance. Inspections at Everglades, Dade, Broward, and Homestead correctional facilities and the South Florida Reception Center, often have shown repeated deficiencies and a deteriorated level of service to the extent that the clinical quality of care required immediate corrective action by the contractor. Issues of concern include inadequate medical records keeping, insufficient staffing, and postponement of specialty clinic visits.

The Plaintiff proceeds to allege that WEXFORD HEALTH SOURCES, INC. has a policy of directing and/or incentivizing its healthcare employees to deny non-emergency surgical care whenever feasible for cost containment, regardless of medical necessity.

It is first worth noting that any alleged incidents of deliberate indifference have been flatly rebutted above by sworn testimony and record evidence. Thus, the only iota of substantive evidence the Plaintiff uses to *attempt* to validate his claim of deliberate indifference is the above-quoted provision from the 2004 OPPAGA Report.

In *Moore v. District of Columbia*, 79 F.Supp.3d 121 (D.C.C. 2015), the Court considered whether the Plaintiff's reliance on a 2003 Report from the District of Columbia's Citizens Complaint Review Board and a study of arrest data from 2005 were sufficient for a reasonable jury to conclude that the District had a policy, practice, or custom of ignoring a pattern of unjustified disorderly conduct arrests between 2006 and 2011. In granting summary judgment on behalf of the District, the Court held that the record was "bare" of evidence that demonstrated such a policy, practice, or custom "continued over the next five years, let alone existed around the time of the Plaintiff's arrest." Most notably, the Court found that the Plaintiff "apparently plan[ned] to invite the jury to infer that because of warnings made in 2003 by the CCRB about disorderly arrests in the District . . . that the same problem continued unabated for the next five years. This invited inference crosses the line into speculation." *See id.* at 140 (emphasis added). *See also Hunter v. District of Columbia*, 824 F. Supp. 2d 125 (D.C.C. 2011) (quoting *Carter v. District of Columbia*, 795 F.2d 116 (D.C.C. 1986) (holding that one cited study, conducted *seven years* prior to the Plaintiff's arrest, does not show a "persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers, one that caused the deprivation of constitutional rights plaintiffs experienced.")).

The rationales in *Moore* and its progeny are dispositive in the instant case. The 2004 Report is far too remote in time, irrelevant, and speculative to be considered in the instant case.[3] In fact, the 2004 Report the Plaintiff seeks to use in the instant case is more distant in time than the Reports and studies the plaintiffs sought to use in *Moore*, *Hunter*, and *Carter*. Most significantly, Thomas Reimers, who has served as the Director of Health Services Administration and Programs for the Florida Department of Corrections since 2012, has testified

---

[3] Not to mention, WEXFORD HEALTH SOURCES, INC. did not even begin its management of the provision of medical care at SFRC until March 15, 2013.

that, during his tenure, WEXFORD HEALTH SOURCES, INC. "has performed satisfactorily in the provision of medical healthcare services" and "there were no pervasive or egregious non-compliances that would warrant [contract] termination." Additionally, Mr. Reimers stated that the FDOC's rigorous monitoring and auditing procedures have not revealed any indication of WEXFORD HEALTH SOURCES, INC. "systematically denying necessary medical healthcare services to save money or increase profits." Perhaps most telling, the Plaintiff has been unable to provide *any* record evidence aside from the 2004 Report to attempt to infer the existence of a WEXFORD HEALTH SOURCES, INC. policy, practice, or custom of deliberate indifference.

Considering the foregoing, the Court should not give credence to the Plaintiff's reference to the 2004 OPPAGA Report in assessing whether a WEXFORD HEALTH SOURCES, INC. policy, practice or custom of deliberate indifference exists. Given that the Plaintiff has provided no other evidence to create such an inference, WEXFORD HEALTH SOURCES, INC. is entitled to summary judgment as a matter of law.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed with the Clerk of Court through the CM/ECF system on August 16, 2016 Karen Marcell, Esq.**,** Attorney for Plaintiff, Katzman Garfinkel, P.A., 300 North Maitland Avenue, Maitland, FL 32751 at kmarcell@likeyourlawyer.com and Shane Weaver, Esquire, counsel for Florida Department of Corrections, Office of the Attorney General, 110 S. E. 6th Street, 10th Floor, Fort Lauderdale, FL 33301 at Shane.Weaver@myfloridalegal.com.

CHIMPOULIS, HUNTER & LYNN, P.A.
Attorneys for Defendants Wexford Health
Sources, Inc., Marlene Hernandez, M.D.
and David Reddick, M.D.
150 South Pine Island Road, Suite 510
Plantation, FL  33324
Phone: (954) 463-0033

BY: */s/ M. Katherine Hunter*
      M. KATHERINE HUNTER, ESQUIRE
      Florida Bar No.  981877
      Email:  khunter@chl-law.com
      ERIC D. FREEDMAN, ESQUIRE
      Florida Bar No. 111490
      Email: efreedman@chl-law.com

\\chl-sbs1\files-28-65\49-4007\pleadings\msj wexford.docx