## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

GEORGE HORN,

     Plaintiff,

vs.

                                         Civil Action No.: 14-20341-DPG
                                         Magistrate Judge William C. Turnoff

MICHAEL D. CREWS, Secretary
of the Florida Department of
Corrections, in his official capacity,
WEXFORD HEALTH SOURCES,
INC., a Florida corporation,
MARLENE  HERNANDEZ, M.D.,
SEYED HOSSEINI, M.D. and
DAVID REDDICK, M.D.,

     Defendants.

_____/

## DEFENDANT, DAVID REDDICK, M.D.'S
## MOTION FOR SUMMARY JUDGMENT

The Defendant, DAVID REDDICK, M.D., by and through his undersigned counsel, and pursuant to Fed. R. Civ. P. 56, hereby files his Motion for Summary Judgment and in support thereof states as follows:

## INTRODUCTION

The Plaintiff, GEORGE HORN, brought this action under the Civil Rights Act, 42 U.S.C. §1983 against multiple Defendants including DAVID REDDICK, M.D., alleging that, while incarcerated at South Florida Reception Center ("SFRC"), Dr. REDDICK was deliberately indifferent to his serious medical needs of a hip reimplantation and pain management medication. Because the evidence taken in light most favorable to the Plaintiff does not support a claim of deliberate indifference, Dr. REDDICK is entitled to summary judgment as a matter of law.

## <u>UNDISPUTED FACTS</u>[1]

1. The Plaintiff, GEORGE HORN, was an inmate at SFRC from September 15, 2011 until his transfer to Columbia Correctional Institution on January 24, 2014. *See* FDOC Transfer/Arrival Summary, attached hereto as Exhibit "A".

2. On March 15, 2013, WEXFORD HEALTH SOURCES, INC. commenced its contract with the Florida Department of Corrections for the provision of staffing and the operation of medical care and treatment to various institutions throughout the State of Florida, including SFRC. *See* Contract between Florida Department of Corrections and WEXFORD HEALTH SOURCES, INC., attached to Affidavit of Thomas Reimers, attached hereto as Exhibit "B".

3. From March 15, 2013 through January 24, 2014, Dr. REDDICK was employed by WEXFORD HEALTH SOURCES, INC. as the Regional Medical Director of Florida's Region IV institutions, which include SFRC. As the Regional Medical Director, Dr. REDDICK's roles and responsibilities were limited to administrative duties and oversight, and he was not tasked with rendering individualized care and treatment to inmates, including the Plaintiff.[2]

4. By way of background, the Plaintiff underwent a first-stage reimplantation at Shands Medical Center on January 21, 2003 after presenting with a chronically infected, well-fixed Intermedics total hip replacement and numerous sinus tracts. Dr. Richard Vlasak performed the surgery and placed a PROSTALAC prosthesis. The Plaintiff's active infection alleviated with IV antibiotic treatment, and Dr. Vlasak performed the second-

---

[1] The Plaintiff's Second Amended Complaint contains markedly different facts and allegations from this Motion that are merely a product of the Plaintiff's memory and are devoid of any evidentiary basis.
[2] Aside from ordering the Plaintiff a three-day prescription of Morphine sulfate on December 18, 2013, the records are devoid of any other direct, personal involvement by Dr. REDDICK in the Plaintiff's care and treatment.

stage reimplantation on June 3, 2003. However, the Plaintiff developed recurrent infections and dislocations and ultimately underwent a revision right hip replacement by Dr. Vlasak on August 25, 2003. *See* Medical Records from Richard Vlasak, MD, attached hereto as Composite Exhibit "C"; [D.E.147 at pages 8-13].

5.  On September 15, 2011, the Plaintiff presented to Kendall Regional Medical Center with chest pain. Incidental to the cardiology evaluation, Dr. Jose Barros discovered a large mass at the Plaintiff's right thigh. The Plaintiff underwent a procedure to drain synovial fluid that reduced the size of the mass considerably. Dr. Barros noted that "there is a high chance of recurrence of this cyst" and possible surgical excision would be considered. *See* Medical Records from Kendall Regional Medical Center, attached hereto as Composite Exhibit "D".

6.  On January 31, 2012, the Plaintiff consulted for the first time with Dr. Jose Ponce de Leon, an orthopedic surgeon, who assessed the mass at the medial aspect of the Plaintiff's right thigh. Dr. Ponce de Leon advised surgical removal of the mas after the performance of an MRI with contrast. *See* Medical Records from Jose Ponce de Leon, MD, attached hereto as Composite Exhibit "E"; [D.E. 150 at page 18].

7.  On June 14, 2012, the Plaintiff was admitted to Kendall Regional Medical Center and underwent incision and draining of "abundant infected type" fluid from the mass at the right thigh. *See* attached Composite Exhibit "D".

8.  On June 23, 2012, Dr. Pedro Kiliddjian, a general surgeon, consulted with Mr. Horn at Kendall Regional Medical Center and explained that his recurrent infection and fluid drainage was possibly the product of his initial hip prosthesis surgery from 1999. Dr.

Kiliddjian proposed incision and further drainage of the fluid with a Jackson-Pratt Drain. *See* attached Composite Exhibit "D".

9.  The Plaintiff underwent a surgical incision and drainage of the fluid collection at the right thigh on July 3, 2012 by Dr. Orlando Llorente. Dr. Llorente diagnosed an infected right hip implant. *See* attached Composite Exhibit "D".

10. Dr. Barros discharged the Plaintiff from Kendall Regional Medical Center on July 11, 2012. In his Discharge Summary, Dr. Barros noted that Mr. Horn was at an enhanced risk of infection and the chance of salvaging his hip was low. *See* attached Composite Exhibit "D".

11. On February 21, 2013, the Plaintiff presented again to Kendall Regional Medical Center with persistent drainage from the right hip and right thigh and was seen by Dr. Angel Perez-Tirse. Dr. Perez-Tirse consulted with orthopedic surgery and recommended intra-articular antibiotic therapy in the hopes of improving the drainage and maintaining the Plaintiff's chronic osteomyelitis. He added that the ideal treatment considering the Plaintiff's condition was removal of his prosthetic hip. *See* attached Composite Exhibit "D".

12. At the recommendation of Dr. Perez-Tirse, Dr. Arturo Corces, an orthopedic surgeon, consulted with the Plaintiff at Kendall Regional Medical Center on February 22, 2013. Dr. Corces noted that the Plaintiff had a long-standing infection and ongoing drainage for over one year. He recommended removal of the Plaintiff's total hip replacement and placement of antibiotic beads, as we all as a Hickman catheter for intra-articular antibiotic delivery. Dr. Corces obtained medical clearance and performed the procedure

on February 27, 2013. *See* Medical Records from Arturo Corces, MD, attached hereto as Composite Exhibit "F"; [D.E.146].

13. Per Dr. Corces's recommendation, the Plaintiff returned on March 13, 2013 for removal of the antibiotic beads and placement of a cement spacer for the proximal femur. Dr. Corces noted that the procedure was "fraught with complications, especially the possibility of dislocation." He also documented that the Plaintiff's cement spacer would likely fail secondary to recurrent infection. *See* attached Composite Exhibit "F"; [D.E.146].

14. From March 15, 2013 to March 18, 2013, the Plaintiff was administered 30mg of Morphine sulfate, four times a day. *See* Medication Administration Records and Physician Medication Orders, attached hereto as Composite Exhibit "G".

15. From March 18, 2013 to April 2, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

16. On March 20, 2013 Dr. Rodriguez-Garcia, a Senior Physician at SFRC, noted that he spoke with Dr. Barros about the treatment plan for the Plaintiff. Specifically, the Plaintiff was to receive continued intra-articular antibiotic delivery, as a well as a follow-up with Dr. Corces. *See* attached March 20, 2013 Chronological Record of Health Care, attached hereto as Exhibit "H".

17. During that period, from March 25, 2013 to March 31, 2013, the Plaintiff was also administered 200mg ibuprofen, three times a day. *See* attached Composite Exhibit "G".

18. On April 17, 2013, Dr. Rodriguez-Garcia again consulted with the Plaintiff at SFRC and noted that the Plaintiff's Hickman catheter had "come out." Dr. Rodriguez-Garcia and Dr. SEYED HOSSEINI, the Medical Director at the time, collaboratively decided that

Plaintiff needed to be sent to the hospital for placement of a new one. *See* attached April 17, 2013 Chronological Record of Health Care, attached hereto as Exhibit "I".

19. On April 19, 2013, Dr. Rodriguez-Garcia submitted a Consultation Request so that the Plaintiff could be seen by an orthopedist, specifically Dr. Corces. *See* Consultation Request dated April 19, 2013, attached hereto as Exhibit "J". On April 22, 2013, Dr. Hosseini likewise submitted a Consultation Request so that the Plaintiff could undergo a Hickman catheter reinsertion. On that same day, Dr. Hosseini additionally placed a Consultation Request so that the Plaintiff could undergo a CT scan of the hip without contrast. See Consultation Requests dated April 22, 2013, attached hereto as Composite Exhibit "K".

20. The next day, April 23, 2013, the Plaintiff underwent both the CT scan and placement of the Hickman catheter at Kendall Regional Medical Center (in order to complete his intra-articular antibiotic treatment). *See* attached Composite Exhibit "K".

21. From April 20, 2013 to May 9, 2013, the Plaintiff was administered 60mg of Morphine sulfate, twice a day. *See* attached Composite Exhibit "G".

22. On May 7, 2013, in response to the April 19, 2013 Consultation Request, Dr. Corces again saw the Plaintiff and noted continued infection. *See* attached Composite Exhibit "F"; [D.E.146].

23. From May 10, 2013 to May 12, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

24. On May 13, 2013, the Plaintiff returned to Dr. Corces at Kendall Regional Medical Center for removal of the cement spacer and Girdlestone arthroplasty. Dr. Corces noted the inherent complications associated with the surgery, namely continued pain, recurrent

infection, loosening, vascular complications, wound complications, probable leg length discrepancy, external rotation, and damage to the sciatic nerve. Dr. Corces suggested six months to a year without *considering* any kind of reimplantation. Most significantly, Dr. Corces never definitively told the Plaintiff that he would perform a hip reimplantation, and he stressed the possibility that the Plaintiff's infection might continue with the potential for amputation and/or hip disarticulation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 60 and 64-65]. The Plaintiff was discharged from Kendall Regional Medical Center on May 17, 2013. *See* attached Composite Exhibit "D".

25. From May 17, 2013 to May 20, 2013, the Plaintiff was administered 30mg of MS Contin (extended-release Morphine), three times a day. *See* attached Composite Exhibit "G".

26. From May 22, 2013 to June 21, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

27. Dr. Corces next saw the Plaintiff for a routine follow-up on May 28, 2013 and noted significant improvement. The Plaintiff returned to Dr. Corces as instructed on June 25, 2013, at which time Dr. Corces suggested that the Plaintiff spend one year without a prosthesis in order to allow for the body to resolve the infection. Again, Dr. Corces never definitively told the Plaintiff that he would performed a hip reimplantation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 64-65].

28. From June 19, 2013 to July 19, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

29. The Plaintiff last saw Dr. Corces on July 23, 2013. Dr. Corces noted that the Plaintiff wished to attempt reimplantation, but Dr. Corces again emphasized the procedure's

inherent complications and said it was much too early to consider reimplantation. *See* attached Composite Exhibit "F"; [D.E.146 at pages 64-65].

30. From July 19, 2013 to August 9, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

31. From September 10, 2013 to October 29, 2013, the Plaintiff was administered 60mg of Morphine sulfate, three times a day. *See* attached Composite Exhibit "G".

32. On October 25, 2013, WEXFORD HEALTH SOURCES, INC. commenced its contract with Larkin Community Hospital for the provision of inpatient and outpatient hospital services in the Miami area. *See* Contract between Florida Department of Corrections and Larkin Community Hospital, attached to Exhibit "L".

33. From November 13, 2013 to November 26, 2013, the Plaintiff was administered 30mg of Morphine sulfate, twice daily. *See* attached Composite Exhibit "G".

34. On November 27, 2013, the Plaintiff was prescribed Toradol and Clonidine. Both medications are used to relieve and manage chronic pain. *See* attached Composite Exhibit "G".

35. On December 13, 2013, the Plaintiff presented to another orthopedic surgeon, Dr. Jose Ponce de Leon, at the request of Dr. Dora Gaxiola, a senior physician at SFRC at the time. Dr. Ponce de Leon addressed the Plaintiff's desires for a further hip reimplantation and indicated that "no surgery was advised at the present time." *See* attached Composite Exhibit "E"; [D.E.150 at pages 34, 36, and 49].

36. From December 18, 2013 to December 21, 2013, the Plaintiff was administered 30mg of Morphine sulfate, twice a day, per the order of the Regional Medical Director, Dr. DAVID REDDICK. That prescription expired on December 21, 2013. *See* attached

Composite Exhibit "G"; Affidavit of Marlene Hernandez, attached hereto as Exhibit "M"; Affidavit of Carl Keldie, MD, attached hereto as Exhibit "N".

37. On that same day, ARNP William Bass ordered a prescription for 400mg of Motrin to be administered three times daily for six months, and a prescription for Elavil to be administered at bedtime for six months. ARNP Bass notated on his December 18, 2013 Physician Order Sheet that both Elavil and Motrin were prescribed to ameliorate the Plaintiff's neuropathic pain in his right hip. *See* attached Composite Exhibit "G"; Exhibits "M" and "N".

38. On December 23, 2013, Dr. HERNANDEZ began her tenure at SFRC as the Site Medical Director. In that capacity, Dr. HERNANDEZ's responsibilities were limited to overseeing the care and treatment rendered to the Plaintiff *only* from December 23, 2013 until the removal of his Medical Hold on January 16, 2014, and subsequent transfer to Columbia Correctional Institution. *See* attached Exhibit "M".

39. On December 30, 2013, based upon her chart review of the Plaintiff coupled with his history of Hepatitis C, Dr. HERNANDEZ lessened ARNP Bass' December 18, 2013 Motrin prescription to provide for the Motrin to be given twice daily for ten days, for a total of 800mg, PRN ("when necessary"). The PRN notation gave the Plaintiff the discretion to request Motrin when he experienced pain up to two times a day. *See* attached Composite Exhibit "G"; Exhibit "M".

40. On January 6, 2014, Dr. HERNANDEZ personally met with the Plaintiff for the first and only time regarding his continued insistence on a right hip reimplantation and explained to the Plaintiff the recommendation of Dr. Jose Ponce de Leon. There is no evidence that Dr. HERNANDEZ discontinued the Plaintiff's pain management medication at that time.

In fact, the records reflect the order by Dr. HERNANDEZ for PRN Motrin up to 800mg a day *expired* on January 10, 2014. Furthermore, the order for Elavil was also still in place and not discontinued. *See* attached Chronological Record of Health Care dated January 6, 2014, attached hereto as Exhibit "O"; Exhibit "M"; Affidavit of David Reddick, attached hereto as Exhibit "P"; [D.E.149 at page 11].

41. On January 24, 2014, following weeks of stability and no voiced complaints of discomfort by the Plaintiff, Dr. HERNANDEZ removed the Plaintiff from Medical Hold and he was thereafter transferred to Columbia Correctional Institution. At the time, Columbia Correctional Institution's medical department was under the management of Corizon Correctional Healthcare. *See* attached Exhibit "A".

42. On January 28, 2014, the Plaintiff brought this action under the Civil Rights Act, 42 U.S.C. §1983 against multiple defendants including Dr. HERNANDEZ, alleging he was denied adequate medical while incarcerated at SFRC. [D.E. 1]; *See also* [D.E.77].

43. On December 13, 2014, the Plaintiff presented to Dr. Richard Vlasak at Shands Medical Center regarding the prospect of a hip reimplantation. Dr. Vlasak noted that the Plaintiff had no active complaints of an infection. Nonetheless, Dr. Vlasak "strongly" recommended to the Plaintiff that he not attempt any further hip reimplantations and that the Plaintiff's recurrent infections were probably not curable short of a hemipelvectomy. *See* attached Composite Exhibit "C"; [D.E.147 at pages 18-19].

44. On December 10, 2015, the Plaintiff again presented to Dr. Richard Vlasak at Shands Medical Center, at which time Dr. Vlasak adopted his previous recommendations from December 13, 2014, namely that the Plaintiff not attempt any further hip reimplantations. *See* attached Composite Exhibit "C"; [D.E.147 at pages 22-23].

## MEMORANDUM OF LAW

### Standard of Review

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., Ltd.*, 475 U.S. 574, 587 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Cetolex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a *genuine* issue of material fact." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the record, taken in its entirety, could lead a rational trier of fact to find for the non-moving party. *See id.*; *Matsushita*, 475 U.S. at 586. Ultimately, "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be

enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

<div align="center">

**Legal Argument**

</div>

Detention facility officials violate a detainee's rights under §1983 if they withhold appropriate medical care "with deliberate indifference to the inmate's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim of deliberate indifference to a serious medical need, the plaintiff must show (1) an objectively serious medical need; (2) defendant's deliberate indifference to the need; and (3) causation between that indifference and the plaintiff's injury. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). Negligence is not enough, and a mere difference of opinion between an inmate and the institutional medical staff concerning his diagnosis and treatment does not rise to the level of a constitutional deprivation. *Enriquez v. Kearney*, 694 F. Supp. 2d 1282, 1296 (S.D. Fla. 2010). *See Estelle*, 429 U.S. at 107 (holding that "matters of medical judgment" do not give rise to a §1983 claim); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (relying on the premise that federal courts are reluctant to second guess the medical judgments of those providing care). Consequently, "[d]eliberate indifference is not established where an inmate received care but desired different modes of treatment." *Hamm*, 774 F.2d at 1575 (emphasis added). Most significantly, as long as an inmate receives medical care, courts are hesitant to find that defendants have been deliberately indifferent to the inmate's medical needs. *See generally Estelle*, 429 U.S. at 107; *Hamm*, 774 F.2d at 1575; *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (although nurse's actions may have violated professional standards, the objective standard was not met – the nurse ordered *some* medical care to be provided to the inmate and thus her actions were not sufficiently worse than negligence).

**I.      Supervisory Personnel Like Dr. REDDICK Cannot Be Held Liable Under §1983 Unless The Plaintiff Can Demonstrate That Dr. REDDICK Personally Participated In The Acts Comprising The Alleged Constitutional Violation.**

To attempt to sufficiently state a §1983 cause of action against Dr. REDDICK in his supervisory capacity as the Regional Medical Director, the Plaintiff alleges that Dr. REDDICK was aware of the Plaintiff's serious medical needs and instead used the Utilization Management Collegial Review Process to deny the Plaintiff a hip reimplantation, a hip abductor brace, and pain management medication to satisfy those needs. However, the Plaintiff has failed to demonstrate that Dr. REDDICK *personally participated* in the acts comprising those alleged constitutional violations, a necessary prerequisite to establishing a §1983 cause of action against supervisory personnel like Dr. REDDICK. *See Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995); *see also Williams v. Limestone County*, 198 F. App'x 893, 897-98 (11th Cir. 2006) (indicating that supervisory prison officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care).

In *Scott v. Campbell*, No. 4:08CV205-RH/WCS, 2009 WL 3028306 (N.D. Fla. 2009), the plaintiff brought a deliberate indifference claim against a jail administrator after the plaintiff was not given narcotic prescription medication for a serious back injury. This "detoxification" program was implemented at the instruction of the jail's medical director and further approved by the jail's physician. *Id*. at *1. While the jail administrator knew that the plaintiff was not being treated, summary judgment was granted in his favor because he reasonably relied on the judgment of medical professionals responsible for the plaintiff's care. *Id*. at *3.

In the instant case, the Plaintiff has not – and cannot – provide any articulable evidence the Dr. REDDICK *personally* and directly (or even indirectly) denied him constitutionally adequate treatment. The evidence demonstrates that Dr. REDDICK, as the Regional Medical

Page -13-

Director, merely oversaw the provision of medical care and treatment to inmate-patients at Region IV institutions, including SFRC. Dr. REDDICK did not make any medical decisions pertaining to the care and treatment to be provided to any inmate-patients at any Region IV institutions, including SFRC. Most importantly, as the Regional Medical Director, Dr. REDDICK was not a committee-member of Utilization Management's Collegial Review process. Thus, the allegation that Dr. REDDICK used the Collegial Review process to deny the Plaintiff a hip reimplantation, a hip abductor brace, and pain management medication is nothing more than self-serving statement devoid of any evidentiary basis. While Dr. REDDICK, through periodic, randomized chart reviews, was *aware* of the care and treatment that the Plaintiff was receiving at SFRC, Dr. REDDICK reasonably relied on the judgments and recommendations of the medical professionals who were in fact directly responsible for the Plaintiff's care. *See Williams v. Limestone County*, 198 F. App'x 893, 897-98 (11th Cir. 2006) (indicating that supervisory prison officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care).

Lastly, the Plaintiff contends that Dr. REDDICK used the Utilization Management Collegial Review process to have the Plaintiff "re-evaluated [for a hip reimplantation] for the sole purpose of controlling costs." Presumably, the Plaintiff is referencing the decision to send him to Dr. Ponce de Leon in December 2013 as opposed to Dr. Corces, with whom the Plaintiff had concededly been consulting for his hip issues for an approximate 6-month period in early-mid 2013. Aside from Dr. REDDICK not having participated in the Collegial Review Process, there is a very simple explanation for the decision: On October 25, 2013, WEXFORD HEALTH SOURCES, INC. switched its contract for the provision of inpatient and outpatient services from Kendall Regional Medical Center to Larkin Community Hospital. As such, instead of the

Plaintiff consulting with Dr. Corces (affiliated at the time with Kendall Regional Medical Center), the Plaintiff consulted with Dr. Jose Ponce de Leon (affiliated with Larkin Community Hospital) on December 13, 2013.[3]

Considering the foregoing, the Plaintiff cannot demonstrate §1983 supervisory liability against Dr. REDDICK, and thus Dr. REDDICK is entitled to summary judgment as a matter of law.

## II. Assuming Arguendo That Dr. REDDICK Was Personally Involved In Providing Care And Treatment To The Plaintiff, The Plaintiff At All Times From March 15, 2013 Through January 16, 2014 Received A Constitutionally Adequate Level Of Care.

Aside from the sworn testimony and record evidence refuting the Plaintiff's contention that Dr. REDDICK somehow used the Utilization Management Collegial Review process to deny the Plaintiff medical care and treatment, the uncontroverted record evidence in fact establishes that the Plaintiff in this case received a constitutionally adequate level of care consistent with both community and correctional healthcare parameters from the time WEXFORD HEALTH SOURCES, INC. commenced its contract with the FDOC on March 15, 2013 through the time of the Plaintiff's transfer to Columbia Correctional Institution on January 16, 2014.

### Pain Management Medication

From the time WEXFORD HEALTH SOURCES, INC. commenced its contract with the Florida Department of Corrections on March 15, 2013, until the time the Plaintiff was transferred from SFRC to Columbia Correctional Institution on January 16, 2014, the Plaintiff was at all times prescribed pain management medication to alleviate his alleged serious medical needs.

---

[3] The Plaintiff had actually consulted with Dr. Ponce de Leon dating back to January 31, 2012 for the mass in his right thigh. Interestingly, Dr. Ponce de Leon recommended surgical removal of the mass at that time. Thus, any contention that WEXFORD HEALTH SOURCES, INC., by and through its providers, colluded with Dr. Ponce de Leon to deny the Plaintiff a further hip reimplantation defies logic and is flatly refuted by the records.

Specifically, from March 15, 2013 through October 29, 2013, the Plaintiff was administered 60mg of Morphine Sulfate between two and four times daily. On November 12, 2013, Dr. Paula Medina prescribed 30mg of Morphine sulfate to be administered twice daily, for 14 days. After the expiration of Dr. Medina's ordered Morphine sulfate prescription, Dr. Dora Gaxiola prescribed *alternative* pain management medication to be administered to the Plaintiff, namely Toradol and Clonidine. According to Dr. HERNANDEZ, Morphine sulfate is an addicting drug, and the ultimate goal of Morphine treatment is to "taper down and discontinue," which goal was achieved through Dr. Medina lessening the Plaintiff's dosage, and thereafter Dr. Gaxiola prescribing alternative medications.

On December 18, 2013, Dr. REDDICK ordered a prescription for 30mg of Morphine sulfate to be administered to the Plaintiff twice daily for three days. That prescription *expired* on December 21, 2013. Additionally on December 18, 2013, ARNP Williams Bass ordered a prescription for 400mg of Motrin to be administered to the Plaintiff three times daily for six months, for a total of 1200mg daily, and a prescription for 50mg of Elavil to be administered at bedtime for six months. ARNP Bass notated on his December 18, 2013 Physician Order Sheet that both Elavil and Motrin were prescribed to ameliorate the Plaintiff's neuropathic pain in his right hip.

On December 30, 2013, Dr. HERNANDEZ conducted an initial chart review of the Plaintiff. She noted the Plaintiff's Hepatitis C and modified ARNP Bass' December 18, 2013 Motrin prescription to only be administered twice daily for ten days, for a total of 800mg, PRN ("when necessary"). The PRN notation gave the Plaintiff the sole discretion to request Motrin when he experienced pain up to two times a day. Dr. HERNANDEZ utilized sound medical experience and judgment in lessening the Plaintiff's prior Motrin prescription. Patients with

chronic Hepatitis C, like the Plaintiff, typically have mild elevations of liver enzymes in their blood, and high dosage or long-term administration of over-the-counter non-steroidal drugs, such as Motrin, can cause sharp elevations in those enzymes, suggesting significant liver injury. Most importantly, it is worth noting that as of Dr. HERNANDEZ's first day at SFRC on December 23, 2013, *and* as of the day of her chart review of the Plaintiff on December 30, 2013, the Plaintiff was no longer prescribed Morphine sulfate.

While the Plaintiff's above-discussed medication prescription records reveal the falsehood of his allegations, even assuming arguendo that Dr. HERNANDEZ somehow discontinued the Plaintiff's Morphine sulfate prescription that had expired more than two weeks prior to her January 6, 2014 meeting with the Plaintiff, the record evidence shows that Dr. HERNANDEZ, as well as the other SFRC medical providers, were diligent and attentive in ensuring that the Plaintiff was *always* prescribed alternative pain management medication. While the Plaintiff contends that "Dr. HERNANDEZ discontinued [the Plaintiff's] morphine prescription *and all other pain management treatments*," the records are clear that, even after the January 6, 2014 meeting between Dr. HERNANDEZ, Dr. REDDICK, and the Plaintiff, the Plaintiff was still prescribed both Motrin and Elavil. While the Plaintiff may have *desired* Morphine sulfate as a continued mode of treatment, the decision to prescribe Motrin and Elavil does not rise to the level of deliberate indifference. *See Hamm*, 774 F.2d at 1575.

Given the extensive record of pain management medication referenced above – *and* Dr. REDDICK's own decision to prescribe the Plaintiff Morphine sulfate on December 18, 2013 – the Plaintiff cannot demonstrate that he was flatly denied pain management medication. In fact, the Plaintiff cannot even establish that he was denied *adequate* pain management medication

(that still would fall short of sufficiently demonstrating a claim of deliberate indifference). Thus, Dr. REDDICK is entitled to summary judgment as a matter of law.

### Hip Reimplantation

At the time WEXFORD HEALTH SOURCES, INC. commenced its contract with the Florida Department of Corrections on March 15, 2013, the Plaintiff had already begun consulting with Dr. Arturo Corces, an orthopedic surgeon, for his right hip infection and resulting drainage. Specifically, the Plaintiff first consulted with Dr. Corces on February 22, 2013, while the medical care and treatment at SFRC was still under the management and supervision of the FDOC. On that date, Dr. Corces recommended removal of the Plaintiff's previous total hip replacement and placement of antibiotic beads, as well as a Hickman catheter for intra-articular antibiotic delivery. At the time, Dr. Corces was very clear with the Plaintiff, given his past medical history, of the possibility of "amputation or hip disarticulation." The surgery was thereafter performed on February 27, 2013 by Dr. Corces, and Dr. Corces requested that the Plaintiff return in approximately two weeks for removal of the antibiotic beads and placement of a cement spacer. Per Dr. Corces, recommendation, the Plaintiff returned on March 13, 2013, at which time Dr. Corces placed the cement spacer and noted the likelihood of recurrent infection and dislocation. On March 20, 2013 Dr. Rodriguez-Garcia, a Senior Physician at SFRC, noted that he spoke with Dr. Barros about the treatment plan for the Plaintiff. Specifically, the Plaintiff was to receive continued intra-articular antibiotic delivery, as a well as a follow-up with Dr. Corces.

On April 17, 2013, Dr. Rodriguez-Garcia again consulted with the Plaintiff at SFRC and noted that the Plaintiff's Hickman catheter had "come out." Dr. Rodriguez-Garcia and Dr. SEYED HOSSEINI, the Medical Director at the time, collaboratively decided that Plaintiff

needed to be sent to the hospital for placement of a new one. On April 19, 2013, Dr. Rodriguez-Garcia submitted a Consultation Request so that the Plaintiff could be seen by an orthopedist, specifically Dr. Corces. On April 22, 2013, Dr. Hosseini likewise submitted a Consultation Request so that the Plaintiff could undergo a Hickman catheter reinsertion. On that same day, Dr. Hosseini additionally placed a Consultation Request so that the Plaintiff could undergo a CT scan of the hip without contrast. The next day, April 23, 2013, the Plaintiff underwent both the CT scan and placement of the Hickman catheter at Kendall Regional Medical Center (in order to complete his intra-articular antibiotic treatment).

On May 7, 2013, in response to the April 19, 2013 Consultation Request, Dr. Corces again saw the Plaintiff and noted continued infection. On May 13, 2013, the Plaintiff presented again to Kendall Regional Medical Center for removal of the cement spacer and Girdlestone arthroplasty. Dr. Corces documented the inherent complications associated with the surgery, namely continued pain, recurrent infection, loosening, vascular complication, wound complications, probable leg length discrepancy, external rotation, and damage to the sciatic nerve and also suggested *six months to a year without considering any kind of reimplantation*. Most significantly, contrary to the Plaintiff's repeated contentions, Dr. Corces never definitively told the Plaintiff that he would perform a hip reimplantation, and he stressed the possibility that the Plaintiff's infection might continue with the potential for amputation and/or hip disarticulation. The Plaintiff was discharged from Kendall Regional Medical Center on May 17, 2013.

The Plaintiff presented again to Dr. Corces for routine follow-ups on May 28, 2013, and June 25, 2013. At the June 25, 2013 consultation, Dr. Corces suggested *one year without a prosthesis* in order to allow for the body to resolve the Plaintiff's severe infection. On July 23,

2013, the Plaintiff returned per Dr. Corces' recommendation, at which time he voiced his desire to attempt reimplantation. Again, Dr. Corces discussed the extensive associated dangers and stressed that it was "much too early."

On November 27, 2013, Dr. Dora Gaxiola submitted a Consultation Request to Utilization Management so that the Plaintiff could be referred to an orthopedic surgeon. It is worth noting that on October 25, 2013, WEXFORD HEALTH SERVICES, INC. switched its contract for the provision of inpatient and outpatient hospital services from Kendall Regional Medical Center to Larkin Community Hospital. As such, instead of the Plaintiff consulting with Dr. Corces (affiliated at the time with Kendall Regional Medical Center), the Plaintiff consulted with Dr. Jose Ponce de Leon (affiliated with Larkin Community Hospital) on December 13, 2013.[4] At that time, Dr. Ponce de Leon assessed the Plaintiff and indicated that "no surgery was advised at the present time." The Plaintiff returned to SFRC and, as referenced above, transferred to Columbia Correctional Institution on January 16, 2014. At that point, WEXFORD HEALTH SOURCES, INC.'s management of the Plaintiff's medical care ceased.

In the interest of thoroughness, however, the Plaintiff consulted with Dr. Richard Vlasak, the orthopedic surgeon who performed his hip reimplantation procedures in early-mid 2013, at Shands Medical Center on both December 4, 2014 and December 10, 2015. On December 4, 2014, Dr. Vlasak performed a physical assessment of the Plaintiff and "strongly recommended" that the Plaintiff not attempt any further hip reimplantations. Dr. Vlasak added that the Plaintiff's recurrent infections "were probably not curable short of a hemipelvectomy." Likewise, on December 10, 2015, Dr. Vlasak consulted with the Plaintiff and ratified everything that had been

---

[4] The Plaintiff had actually consulted with Dr. Ponce de Leon dating back to January 31, 2012 for the mass in his right thigh. Interestingly, Dr. Ponce de Leon recommended surgical removal of the mass at that time. Thus, any contention that WEXFORD HEALTH SOURCES, INC., by and through its providers, colluded with Dr. Ponce de Leon to deny the Plaintiff a further hip reimplantation defies logic and is flatly refuted by the records.

contained in his prior 2014 report. Dr. Vlasak added that the right hip abductor brace the Plaintiff was wearing at the time was "not helping and should be stopped."

Similarly to the Plaintiff's unfounded contention that he was denied pain management medication, the above-chronicled timeline of provision of care and treatment flatly refutes the Plaintiff's allegation that WEXFORD HEALTH SOURCES, INC.'s Utilization Management denied him a hip reimplantation. First, the Plaintiff was never – at any point in time between March 15, 2013 and January 16, 2014 – indicated for a hip reimplantation; nor was he ever told by *any* medical provider that he would *definitively* undergo a hip reimplantation. WEXFORD HEALTH SOURCES, INC. could not have possibly *denied* a hip reimplantation that was not clinically indicated or advised in the first place. At their depositions, Dr. Corces, Dr. Ponce de Leon, and Dr. Vlasak all testified alike that they never told the Plaintiff he was a candidate for a hip reimplantation. Additionally, WEXFORD HEALTH SOURCES, INC.'s retained orthopedic surgery expert, Dr. Stephen Jacobs, opined that, given the Plaintiff's extensive medical history, he was not – and is not – a candidate for a hip reimplantation due to his immunocompromised condition and extensive history of previous surgeries, Hepatitis C, and drug abuse. Second, WEXFORD HEALTH SOURCES, INC., by and through its providers, appropriately deferred to the recommendations of the Plaintiff's orthopedic consultants, namely Dr. Corces and Dr. Ponce de Leon. The Plaintiff was scheduled for timely follow-ups with Dr. Corces in accordance with his recommendations; the Plaintiff underwent the appropriate treatment and debridement with Dr. Corces; the Plaintiff received consistent, extensive – and *expensive* – treatment while at SFRC;  and upon the contractual change to Larkin Community Hospital, the Plaintiff was referred to Dr. Ponce de Leon who found that the Plaintiff was not indicated for surgery at the time.

There is not a single mention, reference, or indication anywhere in the voluminous record evidence that the Plaintiff was *definitively* going to undergo another hip reimplantation. While the Plaintiff may have *desired* a hip reimplantation, the multiple medical professionals were all in agreement that such a procedure was not clinically indicated. *See Hamm*, 774 F.2d at 1575. Thus, DAVID REDDICK, M.D. is entitled to summary judgment as a matter of law.

### Hip Abductor Brace

The Plaintiff has likewise alleged that by and through its medical providers, WEXFORD HEALTH SOURCES, INC. ordered the Plaintiff's "requested hip abductor brace be re-evaluated for the sole purpose of controlling costs." [D.E.77]. Concededly, during his May 28, 2013 consultation with the Plaintiff, Dr. Corces recommended the provision of a hip abduction brace. Accepting the Plaintiff's contention that he never received the hip abduction brace during the time he was incarcerated at SFRC as true, the Plaintiff has failed to establish that the hip abduction brace was not provided to him by and through WEXFORD HEALTH SOURCES, INC. because of a policy, practice, or custom of deliberate indifference. On te contrary, the Affidavit of Neil Fisher, MD establishes that the recommended brace *could not* have been denied by WEXFORD HEALTH SOURCES, INC. *because of cost*. *See* attached Exhibit "Q" at paragraph 12 ("As the Corporate Director of Utilization Management during the time of George Horn;s incarceration at SFRC from March 15, 2013 to January 16, 2016, Utilization Management did not deny George Horn a hip reimplantation, an abductor brace, or pain management medication. Even more, Utilization Management most certainly did not deny George Horn a hip reimplantation, an abductor brace, or pain management medication for cost containment purposes."). Additionally, the Plaintiff cannot demonstrate the Dr. REDDICK used the Utilization Management Collegial Review Process to deny the Plaintiff a hip abductor brace

because Dr. REDDICK, in his capacity as the Regional Medical Director, never even participated in the Collegial Review process for any medical issues related to the Plaintiff. *See* attached Exhibit "P".

Aside from the inability to correlate the Plaintiff's never receiving an abductor brace with a WEXFORD HEALTH SOURCES, INC. policy, practice or custom of deliberate indifference, the Plaintiff is unable to point to any concrete evidence suggesting that WEXFORD HEALTH SOURCES, INC. – or its medical providers – actually *denied* the abductor brace at all. There is a clear distinguishing line between *denying* a particular mode of treatment for cost containment purposes and potentially neglecting to provide an abductor brace because of clerical neglect, or the like.

Even more, the Affidavit of Dr. Stephen Jacobs establishes that the provision of an abductor brace is merely a matter of medical judgment that depends on the interests of each respective inmate-patient. *See* attached Exhibit "R". Additionally, as recently as December 10, 2015, there is evidence that the Plaintiff's abductor brace was not helping and "should be stopped." *See* attached Composite Exhibit "C"; [D.E.147 at page 23]. The Plaintiff cannot now allege, after the record unequivocally establishes the ineffectiveness of the abductor brace, that WEXFORD HEALTH SOURCES, INC. – by and through its medical providers – deliberately disregarded his serious medical needs.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was e-filed with the Clerk of Court through the CM/ECF system on August 17, 2016 Michael O. Colgan, Esq.**,** Attorney for Plaintiff, Katzman Garfinkel, P.A., 300 North Maitland Avenue, Maitland, FL 32751 at mcolgan@likeyourlawyer.com and Shane Weaver, Esquire, counsel for Florida

Department of Corrections, Office of the Attorney General, 110 S. E. 6th Street, 10th Floor, Fort

Lauderdale, FL 33301 at Shane.Weaver@myfloridalegal.com.

<div style="margin-left:40%">

CHIMPOULIS, HUNTER & LYNN, P.A.
Attorneys for Defendants Wexford Health
Sources, Inc., Marlene Hernandez, M.D.
and David Reddick, M.D.
150 South Pine Island Road, Suite 510
Plantation, FL  33324
Phone: (954) 463-0033


BY: */s/ M. Katherine Hunter*
    M. KATHERINE HUNTER, ESQUIRE
    Florida Bar No.  981877
    Email:  khunter@chl-law.com
    ERIC D. FREEDMAN, ESQUIRE
    Florida Bar No. 111490
    Email: efreedman@chl-law.com

</div>

\\chl-sbs1\files-28-65\49-4007\pleadings\msj reddick.docx